UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

EDWARD ACKERMAN,
               Petitioner

          v.

JOHN McCULLOUGH,
               Respondent

:   CIVIL NO. 1:CV-01-1048
:
:   (Judge Caldwell)
:
:
:
:
:

**FILED**
HARRISBURG, PA

APR 0 5 2002

MARY E. D'ANDREA, CLERK
Per _____
           Deputy Clerk

<u>NEW MATTER/COMMONWEALTH'S MOTION TO DISMISS</u>

    1.    The Commonwealth requests the Habeas Corpus Petition be dismissed for it fails to state/prove Defendant is in custody in violation of the Constitution or the laws or treaties of the United States. 28 USC §2254(a).

                         Respectfully submitted,

                         *Karen Byrnes-Noon*

                         KAREN BYRNES-NOON
                         ASSISTANT DISTRICT ATTORNEY
                         I.D. NO. 44261
                         SCHUYLKILL COUNTY COURTHOUSE
                         401 NORTH SECOND STREET
                         POTTSVILLE, PA 17901
                         (570) 628-1350

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

EDWARD ACKERMAN,     : CIVIL NO. 1:CV-01-1048
     Petitioner   :
          : (Judge Caldwell)
   v.       :
          :
JOHN McCULLOUGH,     :
     Respondent  :

**FILED**
HARRISBURG, PA

APR 0 5 2002

MARY E. D'ANDREA, CLERK
Per_____
    Deputy Clerk

COMMONWEALTH'S MEMORANDUM

## PETITIONER IS NOT ENTITLED TO HABEAS CORPUS REVIEW:

Initially, the Commonwealth notes that the Petitioner has not shown that he is entitled to federal habeas corpus review. *Conception Diaz v. Morales Bergeat*, 409 F.Supp. 749 (1975). Although he is in custody, he has not shown an "infirmity of constitutional dimension in the state court proceeding. *United States ex rel Means v. Salem*, 440 F.Supp. 544 (1977), nor has he shown a fundamental unfairness in trial. *Huston v. Justice of Wareham District Court*, 552 F.Supp. 974 (1982).

When a state prisoner challenges evidentiary rulings, he has alleged no deprivation of federal rights which would entitle him to habeas corpus relief. *Gutierrez v. Griggs*, 695 F.2d 1195 (1983).

Furthermore, when there is no allegation of a federal rights violation, it is unnecessary for the court to determine the exhaustion requirement. *Gutierrez*, supra.

The Commonwealth requests that 12c, Ground Three, in the petition be dismissed for not alleging/proving a constitutional violation. Through attachments and Opinions, the Commonwealth has shown that Petitioner was informed that the Commonwealth intended to use a statement he made because it was in the arresting document (Exhibit A). The statement was testified to by Trooper (now Sheriff) McAndrew at both trials where he was subjected to intense cross-examination  (Exhibits B and C). Whether this statement was accepted by both juries was a credibility issue.  Furthermore, this statement

has been reviewed and discussed in various Court Opinions (Exhibits G, H, J, K, L and M).  Thus, this part of the petition must be dismissed.

The Commonwealth further argues that 12E and 13 in the petition should also be dismissed for failing to state a constitutional violation.  This averment deals with post-conviction DNA testing.  The Honorable D. Michael Stine addressed this allegation previously (Exhibit I).  Thus, this part of the Petition must be dismissed.

The Commonwealth also avers that  Ground Four which states, "the Commonwealth deliberately delayed sentencing on the lesser charge for more than three (3) years after the conviction," must be dismissed for failure to state a constitutional violation.  The Commonwealth had not control over the sentencing date, but this issue was thoroughly addressed in the State Courts (Exhibits G and H).

With the above allegations, there is no showing of an infringement of a specific constitutional protection, thus Petitioner is not entitled to federal habeas corpus relief.  *Shrader v. Riddle*, 405 F.Supp. 752 (1975).

DOUBLE JEOPARDY:

The Commonwealth avers that Defendant's Ground Four, "conviction obtained by a violation of double jeopardy," should also be dismissed.  "A federal court in a habeas corpus proceeding should defer to state courts' interpretation of a statute as to whether a number of acts constitute only one criminal offense or separate offenses for double jeopardy purposes."  *Brecheisen v. Mondragon*, 833 F.2d 238 (1987), cert. denied 485 US 1011, 108 S.Ct. 1479, 99 L.Ed. 2d 707 (1988); *Mansfield v. Champion*, 992

F.2d 1098 (1993). Petitioner initially raised this issue after his conviction on simple assault and indecent assault. This issue was thoroughly addressed by the State courts (Exhibits D, E and F).

CONCLUSION:

       After reviewing all the exhibits and the case law presented, Respondent respectfully requests this Petition be denied.

                    Respectfully submitted,

                    *Karen Byrnes-Noon*

KAREN BYRNES-NOON
ASSISTANT DISTRICT ATTORNEY
I.D. NO. 44261
SCHUYLKILL COUNTY COURTHOUSE
401 NORTH SECOND STREET
POTTSVILLE, PA 17901
(570) 628-1350

# EXHIBIT A

# POLICE CRIMINAL COMPLAINT AND AFFIDAVIT OF PROBABLE CAUSE

(POLICE)

DISTRICT JUSTICE
DISTRICT NO. 21-3-05
...re St.
...ty, Pa. 17948

| COMPLAINT NUMBER | YEAR | TYPE | NUMBER |
| --- | --- | --- | --- |
| | 91 | CC | |
| Complaint Numbers if Other Participants | | | |

| INCIDENT NUMBER | UCR NO. | OTN |
| --- | --- | --- |
| L3-391103 | 021 | C742303-2 |

### COMMONWEALTH OF PENNSYLVANIA
DEFENDANT    VS.

Tpr. F. V. MC ANDREW
**(Name of Affiant)**

Pa. State Police, Frackville, Pa.
**(Identify department or agency represented and political subdivision)**

NAME
AND
ADDRESS

**X** Edward Paul ACKERMAN
565-C Willow St.
Highspire, Pa. 17034

R.S.A.
A K A

DOB: 07/21/66   SS# 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

hereby state:

[x] I accuse the above named defendant, who lives at the address set forth above or,

[ ] I accuse an individual whose name is unknown to me but who is described as _____

[ ] his nickname or popular designation is unknown to me and, therefore, I have designated him herein as John Doe;
with violating the penal laws of the Commonwealth of Pennsylvania at Brush St., Village of Nuremberg,
N. Union Twp.,
**(Place-Political Subdivision)**

in Schuylkill _____ County on or about 11/10/91, between 0300-0400 hrs.

Participants were (if there were participants, place their names here, repeating the name of above defendant)

The acts committed by the accused were: (A) Edward Paul ACKERMAN

**KIDNAPPING (F-1):** the above named defendant did, to facilitate commission of a felony, Rape
or flight thereafter, unlawfully remove Patricia BROBST a substantial dis-

**UNLAWFUL RESTRAINT (M-1)** tance in the circumstances from the place where she was found and/or did
unlawfully confine Patricia BROBST for a substantial period in a place of
isolation in that he did pull or drag her several hundred yards from the
street to a residence on Bush St.  And in doing so, exposed her to risk of
serious bodily injury.

**RAPE (F-1)** the above named defendant did intentionally, knowingly or recklessly, en-
gage in sexual intercourse with Patricia BROBST, NOT His spouse, by forc-
ible compulsion or by threat of forcible compulsion that would prevent re-
sistance by a person or reasonable resolution.

See attachment:
of which were against the peace and dignity of the Commonwealth of Pennsylvania and contrary to the Act of Assembly,
in violation of 2901(A2&3) 2902(1&2) 3121(1&2)3123(1&2) the Act of Pa. Crimes Code
**(Section)**                        **(Sub-section)**
3125, 3126(A1),2702(A1),2701(A1), 2705 & 2706
the _____ Ordinance of _____
**(Political Sub-division)**

3) I ask that a warrant of arrest or a summons be issued and that the accused be required to answer the charges
I have made.

4) I, verify that the facts set forth in this complaint are true and correct to the best of my knowledge or infor-
mation and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code
(18 Pa. C.S. §4904) relating to unsworn falsification to authorities.

November 11th _____, 19 91

_F. V. Mc Andrew_
**(Signature of Affiant)**

AND NOW, on this November 11th _____, 19 91 , I certify the complaint has been properly completed and
verified, and that there is probable cause for the issuance of process.

21-3-05
**(Magisterial District)**

_____  (SEAL)
**(Issuing Authority)**



DISTRICT JUSTICE
...AL DISTRICT NO 21-3-05
... Centre St.
...oy City, pa. 17948

| Complaint Numbers if Other Participants | | |
|---|---|---|
| INCIDENT NUMBER | UCR NO. | OTN |
| L3-391103 | 021 | C742303-2 |

...MMONWEALTH OF PENNSYLVANIA
...UNTY OF _Schuylkill_

COMMONWEALTH OF PENNSYLVANIA
VS.

DEFENDANT:

NAME
AND
ADDRESS

Edward Paul ACKERMAN
565-C Willow St.
Highspire, Pa. 17034

Tpr. F. V. MC ANDREW        Pa. State Police, Frackville, Pa.     (717) 874-0207

_(Name of Affiant)_        _(Police Department or Address of Private Affiant)_        _(Telephone Number)_

XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX (ee instruc. below)

(F-1)

INVOLUNTARY DEVIATE SEXUAL INTERCOURSE: The above named defendant did intentionally, knowingly or recklessly engage in diviate sexual intercourse with Patricia BROBST, by forcible compulsion or by threat of forcible compulsion that would prevent resistance by a person of reasonable resolution, in that he did so by compelling her to engage in anal, oral and vaginal intercourse.

AGGRAVATED INDECENT ASSAULT (F-2): The above named defendant did engage in penetration, however slight, of the genitals or anus of Patricia BROBST with the penis and fingers of the defendant for purposes other that good faith medical, hygienic or law enforcement procedures and without the consent of Patricia BROBST.

INDECENT ASSAULT (M-2): The above named defendant did intentionally, knowingly & recklessly have indecent contact with Patricia BROBST, not his spouse, or did cause Patricia BROBST to have indecent contact with him knowing the contact was offensive to Patricia BROBST, IN THAT HE DID bite, touch and feel her breast and vagina.

AGGRAVATED ASSAULT (F-1): The above named defendant did intentionally, knowingly or recklessly cause serious bodily injury to Patricia BROBST in that he did punch, bite & pull and physically restrain her, which acts are a manifestation of extreme indifference to the value of human life.

SIMPLE ASSAULT (M-2): The above named defendant id intentionally, knowingly or recklessly cause bodily injury to Patricia BROBST, in that he did punch, bite, pull and physically restrain her.

RECKLESSLY ENDANGERING ANOTHER PERSON (M-2): The above named defendant did intentionally, knowingly or recklessly engage in the following conduct, to wit, punching, biting, pulling & physically restraining Patricia BROBST, which conduct placed her in danger of death of serious bodily injury.

TERRORISTIC THREATS (M1): The above named defendant did threaten to commit a crime of violance against Patricia BROBST with the intent to terrorize her by threats of beating, pulling & biting her.

## PLEASE READ AND FOLLOW THESE INSTRUCTIONS CAREFULLY

1. If information was obtained from another person, e.g., an informant, a private citizen, or a fellow law officer, state specifically what information was received, and how and when such information was obtained. State also the factual basis for believing such other person to be reliable.

2. If surveillance was made, state what information was obtained by such surveillance, by whom it was obtained, and



DISTRICT JUSTICE
AL DISTRICT NO. 21-3-05
entre St.
City, Pa. 17948

| Complaint Numbers if Other Participants |  |  |
| --- | --- | --- |
| INCIDENT NUMBER L3-391103 | UCR NO. 021 | OTN C742303-2 |

ONWEALTH OF PENNSYLVANIA
Y OF SCHUYLKILL

COMMONWEALTH OF PENNSYLVANIA
VS.
DEFENDANT:

NAME
AND
ADDRESS

Edward Paul ACKERMAN
565-C Willow St.
Highspire, Pa. 17034

. F. V. MC ANDREW            Pa. State Police, Frackville, Pa.   (717) 874-0207
(Name of Affiant)         (Police Department or Address of Private Affiant)        (Telephone Number)

ing duly sworn (or affirmed) before me, according to law, deposes and says that there is probable cause to believe that:

PROBABLE CAUSE BELIEF IS BASED ON THE FOLLOWING FACTS AND CIRCUMSTANCES:  (see instruc. below)

11/10/91, at approx. 0300-0400hrs., Patricia A. BROBST, W/N-F-43, Box 110, Hazle St.,
emberg, Pa., was kidnapped from Mahanoy St., Nuremberg, Pa., a short distance east of
Valley View Hotel. She was drug and beaten through a vacant lot, several hundred yds.
the residence of Mary O. ACKERMAN (defendants mother), at Box 81, Brush St., Nuremberg,
Where she was drug upstairs and taken to a bedroom on the second floor. The victim
then raped vaginally, orally and anally and then released. During this attack, the
tim was able to scratch the defendant on the right side of his face with her wrist
ch.

11/10/91, at 1000 hrs., Patricia BROBST was interviewed by this officer and Tpr. Daniel
T, PSP Hazleton, at Hazleton Hospital. At this time she identified her attacker as Ed-
d ACKERMAN, W/N-M-20's, approx. 5'10", 160 lbs., blond hair, who was in the Valley View
el, Nuremberg, Pa., on theat evening.

11/10/91, this officer and Tpr. SIST interviewed Mary O. ACKERMAN, mother of the defendant.
e stated that her son was staying with her over the weekend and that he had just left a
ort time ago and is returning to Highspire, where he maintains an apartment. Mrs. ACKER-
N signed a Consent Search for her residence. While searching a bedroom on the second
oor, a string of white pearls and a large clump of head hair were found on the floor. The
arls were identified by the victim as being hers. Her shoes and glasses were found in a
cant lot, across the street from the ACKERMAN residence.

11/10/91, at approx. 1900 hrs., the defendant called this officer at PSP Frackville. When
was informed of the nature of this investigation, he responded that he had sex with the
ctim but that it was with her consent.

11/11/91, at approx. 1030 hrs., the defendant appeared at PSP Frackville and requested not
be interviewed without the services of an attorney. During his appearance, a large scratch,
easuring approx. 2", was evident on the defendants right cheek. There was also a smaller
cratch right of center, on the defendants forehead.

## PLEASE READ AND FOLLOW THESE INSTRUCTIONS CAREFULLY

1. If information was obtained from another person, e.g., an informant, a private citizen, or a fellow law officer, state specifically what information was received, and how and when such information was obtained. State also the factual basis for believing such other person to be reliable.

2. If surveillance was made, state what information was obtained by such surveillance, by whom it was obtained, and

# EXHIBIT B

# FIRST TRIAL TRANSCRIPT

# PP. 180 THROUGH 217

1        (October 30, 1992)

2        (9:34 a.m.)

3       THE COURT: Good morning, ladies

4     and gentlemen. Attorney Noon, ready to

5     proceed?

6       MS. NOON: Yes.

7

8 FRANCIS V. McANDREW, called as a witness on behalf of the

9 Commonwealth, was duly sworn, and testified as follows:

10

11 DIRECT EXAMINATION BY MS. NOON:

12

13   Q Do you want to give us your full name, please?

14   A Francis V. McAndrew.

15   Q And your current occupation?

16   A Schuylkill County Detective in the District

17 Attorney's Office.

18   Q And prior to that what was your occupation?

19   A I was a Pennsylvania State Policeman for

20 approximately 24 years.

21   Q And in November of 1991 were you assigned to the

22 criminal investigation unit at the State Police in

23 Frackville?

24   A Yes, Ma'am, I was.

25   Q And how long had you been a criminal investigator

1    during the 24 years that you were a a state policeman?

2        A   Approximately 17 years.

3        Q   Trooper Sist had testified that you were called to

4    the Hazleton Hospital on the morning of November 10 of 1991,

5    is that correct?

6        A   That's correct, Ma'am.

7        Q   And you met Patricia Brobst there at that time?

8        A   Yes, Ma'am.

9        Q   And you talked with her at that time?

10       A   Yes, I did.

11       Q   Now, there was some discussion from Patricia in

12   regards to her coat.  Did you see her coat at the hospital at

13   that time?

14       A   Yes, she had her coat with her at the time of my

15   initial investigation.  She had given me her coat and I had

16   thoroughly examined it for any soil or blood or any type of

17   evidence that would be prevalent and returned it, the

18   garment, to Ms. Brobst.

19       Q   Also Patricia had testified --

20       A   I might add that another one of the reasons we

21   returned the coat to her was because it was the only coat

22   that she had at that time.

23       Q   There was also testimony from different people

24   yesterday in regards to Rhodes' house.  Are you familiar with

25   this particular area of Nuremburg where this incident

1  occurred?

2      A  Fairly familiar, yes, Ma'am.

3      Q  I'd like to show you what has been previously marked

4  as Commonwealth's Exhibit No. 1.  If you can identify that

5  for me, please.

6      A  Yes, Ma'am.  This is a cinderblock garage adjacent to

7  the Ackerman residence, and this is a large garage next to

8  the Rhodes' residence.  This is a large empty lot, grassy

9  lot, leading down to the street in front of the Ackerman

10  home.

11     Q  You indicated the Rhodes' residence.  Where would you

12  the Rhodes' residence be on this particular photograph?

13     A  The Rhodes' residence would be over in this area

14  behind this garage on the street, on the main street, which

15  would be, I believe, Mahanoy Street.

16     Q  You also received evidence, as Trooper Sist testified

17  to yesterday, is that correct?

18     A  Yes, Ma'am.

19     Q  This has been previously marked as Commonwealth's

20  Exhibit No. 18.  Now, when you received it was it in a brown

21  bag as it is in today?

22     A  It was in a brown bag given to us by the hospital

23  staff.

24     Q  And in that I believe that Patricia identified her

25  dress and her bra, is that correct?

1     A  Yes, Ma'am.

2     Q  I believe 18 was her dress --

3     A  This is the purple dress that she was wearing at the

4  time of the assault, and this was the bra that she indicated

5  she was wearing also.

6     Q  Those items of clothing, did you do anything with

7  them at a later time?

8     A  Yes, Ma'am.  They were packaged and sent to the State

9  Police Bethlehem Lab at Bethlehem adjacent to the

10  Bethlehem-Easton-Allentown Airport.

11     Q  I'd like to show you what has been previously marked

12  as Commonwealth's Exhibit No. 21.  Are you familiar with

13  that?

14     A  Yes, Ma'am.

15     Q  And what is that?

16     A  This is the wrist watch that Patricia Brobst was

17  wearing on the evening of the kidnapping and rape.

18     Q  Was there a significant reason why you took her

19  watch?

20     A  Well, in her statement to us she had indicated that

21  she used her watch to scratch the individual that was

22  assaulting her.

23     Q  And did you do anything with that watch after you had

24  confiscated it as evidence?

25     A  Yes, Ma'am.  We also packaged the watch.  I

1                          CL)

2

3        Q   Commonwealth's Exhibit No. 27, are you familiar with

4    that?

5        A   Yes, Ma'am.   This is a pulled hair sample from the

6    victim, Patricia Brobst.

7        Q   And Commonwealth's Exhibit No. 28 --

8        A   When we say pulled hair sample, what we mean by that

9    is the hair itself was pulled from the head of the victim,

10   and this is a cut hair sample.   The reason for the pulled

11   sample would be to obtain the root of the hair which would be

12   more beneficial in the examination of the hair folicle, and

13   this is a cut hair sample, which would be as if you were at

14   the barber shop or something and they would just cut your

15   hair.

16       Q   And that's Commonwealth's Exhibit No. 28?

17       A   That's correct, Ma'am.

18       Q   You had begun to explain to the jury the reasons why

19   you took these.   Does it have anything to do with

20   Commonwealth's Exhibit No. 26?

21       A   Yes, Ma'am.   The samples taken from Patricia Brobst

22   at the time of our investigation were taken so they could be

23   compared with the clumps, large clumps of hair, found at the

24   crime scene, both in the yard and in the defendant's room

25   that he was staying at that time.

1    Q  And Commonwealth's Exhibit No. 26, what does that

2  show again?

3    A  This is a large clump of hair found in the bedroom

4  where the defendant was sleeping the evening prior to the

5  assault, the evening of the assault.

6

7                         (Plastic bag was marked for

8                         identification as follows:

9                         Commonwealth's Exhibit No. 29, 10-30-92,

10                        CL)

11

12                        (Plastic bag was marked for

13                        identification as follows:

14                        Commonwealth's Exhibit No. 30, 10-30-92,

15                        CL)

16

17   Q  You had alluded and there was testimony yesterday in

18  regards to the head hair found at the crime scene, and also I

19  believe you had just indicated to the jury that there was

20  some found in the vacant lot.  Could you examine

21  Commonwealth's Exhibit No. 29 and identify that for me?

22   A  This sample -- not sample, but clump of hair was a

23  clump of hair that was found in the vacant lot in that area

24  that I described to the jury earlier.

25   Q  That was on Commonwealth's Exhibit No. 1?

A   That's correct, Ma'am.

Q   Commonwealth's Exhibit No. 30, would you identify that for me, please?

A   This is another large clump of hair that was found in the bedroom where the defendant was sleeping.

Q   And this is the clump of hair that is noted, I believe, on Commonwealth's Exhibit No. 26, the picture?

A   On the photograph, Ma'am?

Q   Yes.

A   Yes, that's correct.

Q   Yes, Commonwealth's Exhibit No. 26.  Now, as you indicated, did you send these items to the lab also, all four of them, Commonwealth's Exhibit No. 27, 28, 29 and 30?

A   Yes, Ma'am, they were all taken to the State Police Bethlehem Lab in Bethlehem.

Q   What was the reason for that?

A   For comparison purposes to see if the sample taken from Patricia Brobst, both a pulled hair and a cut hair, would match with the clumps of hair that were found in the vacant lot and also in the bedroom.

Q   There is also several pieces of evidence that you also received from Trooper Sist and just for the record I'm going to have you identify them.  I believe they already have been identified.  Commonwealth's Exhibit No. 22, what is that?

1      Q  After you had talked to the variety of individuals in

2  this case did you have any conversations with the defendant,

3  Mr. Ackerman?

4      A  Yes, Ma'am, I did.

5      Q  And when was that?

6      A  That was on the evening of November 10, 1991.

7      Q  How did that conversation take place?

8      A  I believe I called the defendant's residence down in

9  Highspire, Pennsylvania, in the Harrisburg area, and was

10  unable to contact him, and I had a phone call with his mother

11  and his mother said that she would --

12                 MR. WATKINS:  I object to the

13                   phone call.

14                 MS. NOON:  I'll withdraw that.

15      A  I'm sorry.  Subsequently the defendant called me on

16  the evening of November 10, 1991, and I requested him to come

17  to the state police barracks the following morning.

18      Q  Did you at that time talk to him about this

19  particular incident at all?

20      A  Yes, Ma'am, I did.

21      Q  What specifically did you ask him?

22      A  Well, I told him what the nature of my investigation

23  was, that there had been a kidnaping and rape that took place

24  and that I was investigating it, and the defendant stated to

25  me that that was purely consensual.

1      Q  Did he indicate to you that he was with Patricia

2  Brobst on the evening of November 10th?

3      A  Yes, Ma'am, he did.  And that it was consensual.

4      Q  You had earlier testified about Patricia giving a

5  statement to you about using her watch on the defendant, is

6  that correct?

7      A  That's correct, Ma'am.

8      Q  Commonwealth's Exhibit No. 17, are you familiar with

9  that?

10      A  Yes, Ma'am.  This is a photograph of the defendant,

11  Edward Ackerman, which was taken the following morning,

12  November 11, at the Pennsylvania State Police barracks in

13  Frackville by myself, and the reason for the photograph was

14  to depict the marks on the defendant's face.  He had a

15  somewhat large scratch mark on his right cheek in this area

16  here, and he had a somewhat fainter scratch just right of

17  center on his forehead in this area.

18      Q  Does Commonwealth's Exhibit No. 17 -- is that a fair

19  and accurate representation of the way Mr. Ackerman looked --

20  I believe you said this was taken on November 11 of 1991?

21      A  Yes, Ma'am.  Yes, it is.

22      Q  I believe you indicated you were the one that took

23  this picture?

24      A  That's correct.

25                      MS. NOON:  I have nothing else.

1                    Cross examine.

2

3    CROSS EXAMINATION BY MR. WATKINS:

4

5        Q   Trooper McAndrew, when you did this investigation you

6    prepared a report, correct?

7        A   Yes, Sir.

8        Q   Did you put this statement that you took from Mr.

9    Ackerman in the report?

10       A   There was no statement given.

11       Q   The one that you just --

12       A   In person.

13       Q   The one you just relayed to us, did you put that in

14   your report?

15       A   No, I don't believe it's in there.

16       Q   This is the official police report, right?

17       A   It's the report that was made up by myself.

18       Q   And there is no mention that any statement was given,

19   is that correct?

20       A   No, Sir, there is not.

21       Q   And this was made back in November of '91?

22       A   November 10th, the evening of November 10th.

23       Q   And the official information we have been using,

24   this is what is submitted to the state police?

25       A   I believe the report made up my myself doesn't

1    contain that official statement; however, the probable cause

2    of the affidavit does.

3        Q  Well, this that was prepared at that time does not

4    contain the statement, is that correct?

5        A  No, it does not.  The report itself does not, but the

6    probable cause portion of the affidavit does.  And that was

7    prepared by myself also.

8        Q  But isn't it important to put statements in your

9    police reports?

10       A  Well, sometimes in haste and in trying to remember

11   everything it's difficult.

12       Q  It's difficult to remember something as important as

13   that?  Do you remember --

14       A  I remembered it the following day, Sir.

15       Q  You remember precisely what he said without writing

16   it down?

17       A  What he said was that was consensual.

18       Q  Are you sure he didn't say something like I didn't

19   rape her?

20       A  No, he said that was consensual.

21       Q  You're positive of that?  But you didn't write it

22   down or put it in the report?

23       A  I put it in the probable cause portion that day.

24       Q  And you didn't say anything to him about his

25   constitutional rights or anything?

1    A   It was a spontaneous statement made by himself over

2    the telephone.

3    Q   So he just called you up, said this without any

4    forewarning to you, and you didn't put it in your report?

5    A   I didn't put it in the initial portion of the report;

6    however, I did put it in the probable cause portion.

7    Q   Okay.  Well, I'm just saying this is part of the

8    official record, is it not?

9    A   Yes, sure.

10   Q   Now, beside that particular issue you said that you

11   went back to the hospital, I believe you said, or I don't

12   know where it was done, but you said you pulled hair samples

13   from Patricia Brobst?

14   A   We did not pull hair from Patricia Brobst, the

15   hospital staff pulled hair from Patricia Brobst.

16   Q   Were you present when it was done?

17   A   No.

18   Q   You weren't present?

19   A   We cut hair from Patricia Brobst.  I was present when

20   that was done.

21   Q   So the pulling was done at some other time?

22   A   At the hospital, Sir.

23   Q   Now, this coat that you said, there was a purple

24   coat.  Was it a long coat or a short coat?

25   A   It was a short coat.  I believe it was shorter than

1    the dress itself.

2        Q  And is it a heavy coat or light coat?

3        A  It was a winter coat.  I would describe it as a

4    winter coat.

5        Q  And you looked at this coat and examined it and found

6    nothing on it?

7        A  No, Sir, nothing of evidential value.

8        Q  You had determined that with -- by checking the

9    interior, exterior, all of that, you're typical police

10   investigation that you have used over all the years?

11       A  Yes, Sir.  What I was interested in was finding it

12   soiled or blood stained.

13       Q  Let me ask you, in your years of police activity when

14   you get a statement do you usually put it in your police

15   report?

16                   MS. NOON:  Your Honor, I believe

17                   we have been over this before, and I'm

18                   going to object at this time.

19                   THE COURT:  The objection is

20                   overruled.

21       A  Do I normally put --

22       Q  The statement from somebody accused --

23       A  I normally put everything that comes to my mind at

24   that time in my report, yes, Sir.

25       Q  Right.  You have in your report, which I have in

1    front of me, you have statements from Cindy Planutis who

2    testified here and other people, is that correct?

3        A  Yes, Sir.

4        Q  So you figure it's important enough to put their

5    statements in?

6        A  Well, you must understand, Sir, that this report was

7    made up on November 12th of 1991 at the state police barracks

8    after I had already made up my probable cause portion of my

9    report which contained the statement from the defendant on

10   November 11th.  So I would assume that I felt no need at that

11   time to duplicate the same thing.

12       Q  Okay.  When you saw Patricia Brobst at the hospital

13   did you interview her also?

14       A  Patricia Brobst?

15       Q  Patricia Brobst.  Or did you get your information

16   from the other troopers that testified?

17       A  I had heard Patricia Brobst's version of what took

18   place at the hospital, yes.

19       Q  Did she tell it to you again or were you there when

20   Trooper Sist or Balliett got --

21       A  She went through the entire scenario again when I was

22   present, yes, Sir.  That was probably the third time, I would

23   think, that she was interviewed.

24       Q  Did you put that into your report?

25       A  Pardon?

1    Q  Did you put your version of what she said in your

2    report?

3    A  I felt no need to duplicate a statement that had

4    already been taken twice.

5    Q  So -- well, there had been some differences as we had

6    discussed between Trooper Balliet's statement and Trooper

7    Sist's statement from her.

8                          MS. NOON:  I'm going to object

9                          to that, Your Honor.  That's a

10                         characterization of testimony.  It's not

11                         a question.

12                         THE COURT:  I don't think he's

13                         completed the question.

14                         MR. WATKINS:  I hadn't. I just

15                         stopped.

16                         THE COURT:  Do you want to

17                         complete the question?  I overrule the

18                         objection.

19   Q  And did you note that difference in those versions?

20                         THE COURT:  The objection is

21                         overruled, although I'm going to caution

22                         the jury.  Mr. Watkins is asking a

23                         question about which other people

24                         testified.  It's your recollection that

25                         controls.  You may answer the question.

1      A  And your question, Sir, is?

2      Q  Did you notice discrepancies in these versions?

3      A  There were minor discrepancies in the two statements,

4  nothing that I would consider major in the fact that we were

5  dealing with a woman that had just been kidnapped and raped.

6  I wouldn't think that it was significant.

7      Q  You have a picture that you took at the time of Mr.

8  Ackerman, is that correct?

9      A  That's correct.

10     Q  And he had a mustache, did he not?

11     A  Yes, Sir.

12     Q  And from your view of -- from your relationship of

13  the incident from Ms. Brobst there were -- alot of it took

14  place in areas that were well lit, is that correct?

15     A  I wouldn't classify it as well lit, Sir, no.

16     Q  What about the bedroom?

17     A  The bedroom was a dark -- I believe there was only

18  one window in the bedroom.  And there was no light on that I

19  know of.

20     Q  No light on.

21     A  That I know of.  There may have been but I don't

22  recall her saying that there was.

23     Q  So she could see these various things and tell you

24  about these various things in the bedroom if there was no

25  light on?

1      A  I think she based her opinion on the whole process

2   being taken from the street, off of the street where there

3   are streetlights and drug through an empty vacant lot and

4   into the defendant's residence.

5      Q  Okay, well, that's what I'm saying.  If you take that

6   at face value, your saying that your assumption is that there

7   were no areas where it was lit, including the bedroom?

8      A  The street was lit.

9      Q  No, I'm saying -- okay the street was lit.  What

10  about the bedroom?

11     A  The bedroom, to my knowledge, was not.  I don't

12  recall her saying whether it was or not, but --

13     Q  Okay.  Now, when you went to the scene, in your years

14  you have been in Nuremburg before?

15     A  Yes, Sir, numerous occasions.

16     Q  May I ask you, Trooper, to come over to the --  I

17  want to clarify this.  There are some elements of certain

18  offenses that involve distance and such.

19                          (The trooper went to the easel.)

20                          THE COURT:  Can everyone see

21                 that?

22     Q  Would you take that marker.  It's on the edge there.

23  It's been marked by Trooper Sist, who was here.  There is a

24  square marked PV and a street that runs in front of that.

25  Do you know the name of that street?

1      A  Which street?

2      Q  The street that --

3      A  This one here?

4      Q  Yes.

5      A  The main street.

6      Q  Is that the main street in Nuremburg?

7      A  Yes.  I would consider it the main street, but it's

8  called Mahanoy Street, I believe.  Do you want me to --

9      Q  Yeah, just mark that.  Now, do you know where the

10  county line is?

11      A  Generally speaking, yes.

12      Q  About where?

13      A  I assume they have a couple problems with the sketch

14  as it is.  I mean it's a very good general sketch; however, I

15  don't believe it's totally accurate.  There is a street that

16  runs --

17      Q  Well, mark that street if you're aware of a street.

18  Do you know the name of that street?

19      A  I'm not sure of the name of that street.  But there

20  is the highway leading to Weston.

21      Q  Okay.  Now, in relationship to what you have drawn

22  where do you visualize the county line to be?

23      A  Generally speaking?

24      Q  Generally speaking?

25      A  Generally speaking, the county line runs --

1      Q  Show it as a dotted line, please.  Okay.  So

2  depending on where anything took place that would be which

3  police department was involved, would that be correct?

4      A  That's correct.

5      Q  Now, the Valley View Hotel, you went there on the

6  10th?

7      A  Yes, Sir.

8      Q  Who did you talk to there?

9      A  I talked to Cindy Planutis.

10     Q  You spoke to Cindy Planutis.

11     A  Yes.

12     Q  Anyone else?

13     A  Not that I recall, no.  It was early morning and the

14  bar was just being cleaned up after a night of business.

15     Q  This was a Sunday morning?

16     A  It was a Sunday morning, yes, Sir.

17     Q  And that was the only person in there?

18     A  There may have been more people there but --

19     Q  The only one you talked to?

20     A  The only one I spoke to was Cindy, and she was the

21  most logical.  She was the waitress that evening.

22     Q  Who pointed her out to you as the waitress?

23     A  I think I went in and asked.  I had identified

24  myself and she came forward.

25     Q  Now, from Valley View Hotel to that block that's been

1  marked with an "R", which was designated as the --

2      A  Rhodes' residence?

3      Q  Yes.  How far is it from the Valley View Hotel to the

4  Rhodes' residence, approximately?

5      A  I would estimate that a tenth of a mile.

6      Q  A tenth of a mile, okay.  Now, did you go around the

7  Rhoades' residence, investigate around that building?

8      A  Yes.

9      Q  Was there anything between the street and the --

10  okay, you've been describing a garage.  Is that the one you

11  called the big garage?

12      A  Yes.

13      Q  Okay, that's the big garage.  And where is the cinder

14  block garage?

15      A  Between here.  Cinder block garage.  Now, is there a

16  wall or anything between the street and the Rhodes' -- and

17  that yard by the Rhodes'?

18      A  What side of the building?

19      Q  On the street, the Mahanoy Street side?

20      A  In this area here?

21      Q  Yes.

22      A  No.

23      Q  Is there anything --

24      A  There is a bank here.

25      Q  A bank.  A bank, not being a bank of dirt?

1        A   A bank of money.   A building.

2        Q   Now, in this yard or grassy area I'd like a couple

3   other questions.   The Ackerman home, are there any homes in

4   that vicinity?

5        A   There may be a home in this area.

6        Q   And about how far away is that?

7        A   Several hundred feet.   200 feet, 100 feet, something

8   like that.   There is a street here also.

9        Q   Anything on the other side?   Any other buildings?

10       A   In what direction, Sir?

11       Q   Heading toward my desk, toward Weston and toward the

12   Weston direction you've marked on there?

13       A   There are properties down in this area but --

14       Q   Further away?

15       A   Yeah, they weren't viewed by me at that particular

16   time because they were insufficient.

17       Q   You deemed them to be insignificant?

18       A   Yes.

19       Q   Now, are there any other buildings between, let's

20   say, the Rhodes' property, what is marked the Rhodes'

21   property, and the bank?

22       A   No, Sir.   This is a vacant lot, a grassy, vacant lot.

23       Q   And does the road to Weston run next to the Rhodes'

24   residence?   Is that right on the corner of that or is there

25   another building there?

1    A  That's correct, this is right on the corner there.

2    This is a single home, Rhodes' residence, and this is the

3    corner.

4    Q  Are there any behind it, any residences by the

5    garages there?

6    A  By the large garage?

7    Q  Or the small garage?

8    A  There is no properties in here whatsoever.

9    Q  Okay.  Well, how about behind the big garage?

10   A  When you say behind it, you mean in this area?

11   Q  Well, I would say that's -- I'm saying below on the

12   Weston side?

13   A  Over this side?

14   Q  Yes.

15   A  There are some properties over here.

16   Q  Residences?

17   A  I believe so, yes.

18   Q  And about how far would you say they are from the

19   garage?

20   A  I would guess your average distance of a lot, maybe

21   50 to 100.

22   Q  50 to 100 feet?

23   A  In this direction.

24   Q  Now, there has been talk and there has been testimony

25   about the lighting.  Did you notice if there were

1    streetlights anywhere in the vicinity?

2        A  There are streetlights all along Mahanoy Street.

3        Q  Are there any streetlights by the cinder block

4    garage?

5        A  By their garage here?

6        Q  No.  You have classified the small one as cinder

7    block, I believe, yes.

8        A  There is lighting in this area here, but exactly what

9    location I couldn't tell you.

10       Q  There is a streetlight somewhere within the vicinity

11   of that, too?

12       A  Yes.

13       Q  And the shoes were on that side of the building?

14       A  Shoes were right in this area.

15       Q  On the Weston side, whatever direction that is.

16       A  Again, this is not true north.  North, if I was

17   judging north, I would say it would be in this direction.  I

18   would say --

19       Q  So what is your estimation from the edge of the

20   Rhodes' property there where Mahanoy Street is on the lower

21   edge of the Rhodes' property to the Ackerman residence, how

22   far is that?

23       A  You're referring to --

24       Q  That point right here.

25       A  This point right here, the Ackerman residence?

1    Q  Yes.

2    A  I would estimate that travelling in a straight

3    line --

4    Q  Straight line.

5    A  -- and this is a little off here because you would

6    have to travel in this direction here.

7    Q  Okay.

8    A  I would estimate this to be in the neighborhood of 70

9    yards approximately, 200, 210 feet.

10   Q  That's from the very corner of the street end of the

11   Rhodes' property?

12   A  From the street corner of Rhodes to the garage here.

13   Corner of garage where the shoes may have been, possibly

14   another 40 feet from where the shoes are located to the

15   Ackerman residence.

16   Q  So where the shoes were lined up with the glasses in

17   them, that's about 40 feet?

18   A  From the shoes to the Ackerman residence, yes, Sir,

19   approximately.

20   Q  Now, you say you also found a clump of hair in that

21   yard, grassy area?

22   A  That's correct.

23   Q  Where was that?

24   A  Generally in this area.

25   Q  Which is somewhere right in the midpoint of that

1    straight line?

2    A  I would estimate it to be in that area.

3    Q  And how far would that be from where the shoes were

4    found?

5    A  If I may refer to the photograph, I may be able to --

6    it's difficult to view the hair on the grass, but I would

7    estimate it was in this area, general area.

8    Q  And were you ever able to make a determination as to

9    where the purse had been?

10    A  No.

11    Q  Or was to alleged to have been?

12    A  It was in this vacant lot, and she had retrieved it,

13    but she wasn't exactly sure.

14    Q  I believe her testimony was that she had left it in a

15    lit area.  Is that a lit area, that yard?

16                    MS. NOON:  Your Honor, excuse

17                    me, her testimony was that she dropped

18                    it.

19                    THE COURT:  Again, members of

20                    the jury, it's your recollection of what

21                    she said that counts, and I have told

22                    the jury a number of times if counsel

23                    makes a representation as to what was

24                    testified or even if I make a

25                    representation as to what was testified

1              to, our representations give way to your

2              recollection of what occurred, what she

3              said.  With that cautionary instruction,

4              Mr. Watkins, go ahead.

5      A   There is -- again, there is lighting along Mahanoy

6   Street, which is the main street here.  You must understand

7   that this is a bank and the bank is, I would consider, fairly

8   well lit, even after hours.  So even though it's a vacant lot

9   of large size there is some lighting that does infiltrate the

10  vacant area.

11     Q   Okay, well, from this bank which you say is well hit,

12  about how far is that hair, approximately?

13     A   I would guess this would be maybe 100 feet into this

14  area.

15     Q   And how far from the street?  Coming straight across

16  from the street, about how far?

17     A   In a straight line possibly 70 feet, something like

18  that.

19     Q   And you have been there at night and saw it's been

20  well lit?

21     A   I've been in Nuremburg on numerous occasions during

22  the evening.

23     Q   You also went to the Ackerman residence, correct?

24     A   Correct.

25     Q   Now, did you go around the residence?  Just -- let me

1   ask you this.

2       A  Walk around the residence?

3       Q  Walk around the residence, yes.

4       A  Yes.

5       Q  And can you estimate the dimensions of this house?

6       A  It's a fairly large home.  I would say possibly 30

7   feet square.  I'm not sure of that.

8       Q  30 by 30?

9       A  Approximately.

10      Q  Now, you also were inside, is that correct?

11      A  That's correct.

12      Q  And the door you entered, is that on the street side?

13  Was that facing whatever street runs in there?

14      A  There are three doors to the Ackerman residence.

15  There is a door in this area, a door in this area, and a door

16  in this area.  I believe he entered this door right here.

17      Q  And when you enter that door, where do you enter

18  into, what upon -- what do you see?

19      A  It's a living room, combination living room/parlor.

20  I believe there is a stairway in that area.

21      Q  Did you investigate the downstairs area of the home?

22      A  When you say the downstairs, you mean the first

23  floor?

24      Q  The first floor as you come in the door?

25      A  I viewed it.

1       Q   Just from the door entrance or did you go around?

2       A   Well, Mrs. Ackerman took us into the living room area

3  here, and we sat on a couch in this area.

4       Q   But you didn't look at the rest of it?

5       A   I can see that Mrs. Ackerman had a bedroom on the

6  first floor.

7       Q   And where was that located?

8       A   Again, I'm not totally sure, but I would guess it was

9  in this area here.

10       Q   In that area there.  And about how far is that from

11  the front door?

12       A   Possibly 20 feet or so, 25 feet.

13       Q   Would it be approximately the same distance from the

14  stairs?

15       A   They are all little rooms on the first floor of the

16  Ackerman residence.  It's a fairly large home.  It's -- and

17  what I would refer to as nooks and crannies, areas that are

18  petitioned off.  So it's not one big open area, but I recall

19  her bedroom being in that general area.

20       Q   And about the same distance from the stairs as from

21  the front door?

22       A   Well, I think this would be kind of behind the

23  stairs.

24       Q   The stairs is over there?

25       A   The stairs is in this area where you come in this

1      door.

2          Q   Okay, but it's still about 20 feet from the stairs?

3          A   20 to 25 feet, I'm not sure.  Approximately.

4          Q   And you also went upstairs, correct?

5          A   That's correct.

6          Q   And is it a long flight of stairs, a short flight of

7      stairs?

8          A   It's a fairly steep flight of stairs, the way I

9      recall.

10         Q   Long?

11         A   Fairly long.

12         Q   You also went up to the bedroom, is that correct?

13         A   That's correct.

14         Q   You examined the bedroom?

15         A   Yes.

16         Q   And what you found -- among those things you found

17     hair there?

18         A   Yes.

19         Q   Where was that located?

20         A   Hair was located in this photograph.

21         Q   Well, I understand it's in the photograph, but I

22     meant where was it in the room; let's say you walk into the

23     room through a door, obviously.

24         A   It was out toward the center of the bed on the floor.

25         Q   So if I were walking toward the center of the bed, is

1    this what you're saying, it would be on the floor?

2        A   That's correct.  Directly beneath the bed, off the

3    edge of the bed towards the center.

4        Q   Besides Cindy Planutis and Mrs. Ackerman did you

5    interview -- and Patricia Brobst -- did you interview anyone

6    else?

7        A   Let me have a moment.

8        Q   Sure.

9        A   Other than the hospital staff, no, Sir, that I can

10   recall.  No one of any significance, anyway.

11       Q   And who on the hospital staff did you talk to?

12       A   Well, we spoke to the nurse on duty, and we spoke

13   briefly to the doctor that was --

14       Q   Who was the doctor?

15       A   A very long name. Patlanwantahan Sicakol.

16                       MS. NOON:  The other way.

17       A   I'm sorry, Sicakol Patlanawanathan.  We transcribed

18   his name -- actually it's longer than that.  His first name

19   has 26 letters in it.  P-A-T-L-A-W-A-N-A-T-H-A-N,

20   S-I-C-A-K-O-L.

21       Q   Did you go to Patricia Brobst's residence at all?

22       A   Yes, Sir, I did.

23       Q   When did you go there?

24       A   The afternoon of November 10th.

25       Q   Was she home by then?

1    A  Yes.

2    Q  It was after she was home that you went there?

3    A  Yes, we were -- you must understand this is an

4  intensive investigation in a number of areas.

5    Q  I'm not disputing that, Officer.  I'm just --

6    A  It was in the afternoon.

7    Q  You didn't go there before she had arrived back?

8  She had come home already before you got there?

9    A  That's correct.

10   Q  It wasn't that you went to the scene before she

11  returned?  That's all I'm asking.  You did the rest of the

12  area and by the time you got there she had already come back.

13  That's all.

14   A  That's correct.

15   Q  It's not that you had gone there while she was still

16  at the hospital?

17   A  No.  She was present when we were at her residence.

18  She lives in this general area.  There's a church, I believe,

19  in this area, St. Joseph's Church, and I believe it's two

20  residences.  And there is a double block, and Patricia Brobst

21  lives there.

22   Q  The shoes and the glasses that you found, this was

23  on -- what time of day did you find those?

24   A  Those were found shortly after we arrived in

25  Nuremburg, prior to -- prior to, I believe, interviewing Mrs.

1  Ackerman.

2      Q  Prior.

3      A  Mrs. Ackerman was at church when we arrived at the

4  Ackerman residence.

5      Q  The question is what time of day was that?

6      A  It was approximately eleven.

7      Q  Eleven a.m. you found the shoes?

8      A  (Witness nodded.)

9      Q  And would it be about the same time you found the

10  hair, is that correct?

11     A  That's correct.

12     Q  In the vicinity of eleven o'clock.  And you did not

13  find any pantyhose?

14     A  No, we did not.

15     Q  No panties?

16     A  No.

17                    MR. WATKINS:  I have nothing

18              else.

19                    MS. NOON:  I just have a few

20              questions.

21

22  REDIRECT EXAMINATION BY MS. NOON:

23

24     Q  If you just want to stay there since you're there.

25  You had previously identified Commonwealth's Exhibit No 1.

1 Is this the garage here and the Rhodes' house which is back

2 this way?

3     A  This large building here is this garage here.

4     Q  This garage here.

5     A  And this cinder block garage, this smaller garage, is

6 this one here.

7     Q  This area, this grassy area as you described here,

8 does this have any streetlights back here?

9     A  No.  This is a vacant lot.  The lighting would come

10 from the street in this area or from the bank, which is well

11 lit after hours.

12     Q  And Commonwealth's Exhibit No. 8, I believe it was

13 identified as the Ackerman residence?

14     A  Yes.

15     Q  And is that a fair and accurate representation of

16 what it looked like on November 10, 1991?

17     A  Yes, it is, Ma'am.

18     Q  This photograph, Commonwealth's Exhibit No. 7, which

19 was identified by Patricia, where is this road from -- I

20 believe the Ackerman residence?

21     A  That would be this street here.

22     Q  So Commonwealth's Exhibit No. 7 shows this street

23 here, is that what you're saying?

24     A  That's correct.

25                         MR. WATKINS:  May I see

1               Commonwealth's Exhibit No. 7.  That

2               shows the street down the side of the

3               Ackerman's?

4                    THE WITNESS:  Yes.

5      Q  You testified in regards to your probable cause

6  affidavit that the statement from the defendant was on here,

7  is that correct?

8      A  That's correct.

9

10               (Affidavit was marked for

11               identification as follows:

12               Commonwealth's Exhibit No. 31, 10-30-92,

13               CL)

14      Q  Commonwealth's Exhibit No. 31, can you identify that

15  for me, please?

16      A  Yes, Ma'am.  This is a copy of the probable cause

17  made up by myself on the 11th of November.

18      Q  And that is the day before the police report was

19  completed, is that correct?

20      A  That's correct.

21      Q  And the probable cause affidavit, that's also part of

22  the official record in this case?

23      A  Yes.

24      Q  That's a true and correct copy of the affidavit?

25      A  Yes.

1    Q  And is that statement that Mr. Ackerman gave you that

2  is present in there as you testified to?

3    A  Yes, it is.

4    Q  You also testified to that at the preliminary hearing

5  on February 11th of 1992?

6    A  Yes, I did, Ma'am.

7    Q  You also informed Mr. Watkins about the statement

8  prior to trial, did you not?

9    A  Yes, I did.

10    Q  Just for the jury's knowledge, when you wrote the

11  county line here is it my understanding that this is Luzerne

12  County and this is Schuylkill County down here?

13    A  Yes.

14    Q  Can you mark that on the map, please?

15                   (The witness marked the map.)

16                  MS. NOON:  I have nothing else.

17

18  RECROSS EXAMINATION BY MR. WATKINS:

19

20    Q  One question I want to ask you about this Exhibit No.

21  7.  Trooper, this pole that's right by the street by the

22  garage where you found the shoes, the shoes are in the

23  corner, is there a light on that pole?

24    A  I'm not sure if there is or not.  I'm not --

25                 MR. WATKINS:  That's the only

1       question I have.

2                       MS. NOON:  I have nothing else.

3                       THE COURT:  Thank you, Trooper.

4                       MR. WATKINS:  Your Honor, for

5       the purpose of identification I'd like

6       to have that map marked Defendant's

7       Exhibit No. 1.

8

9                       (Map was marked for

10      identification as follows: Defendant's

11      Exhibit No. 1, 10-30-92, CL)

12

13      BARBARA ROWLEY, called as a witness on behalf of the

14      Commonwealth, was duly sworn, and testified as follows:

15

16      DIRECT EXAMINATION BY MS. NOON:

17

18      Q   Can you give us your name, please?

19      A   Barbara Rowley, R-O-W-L-E-Y.

20      Q   And your occupation?

21      A   I'm a forensic scientist at the Pennsylvania State

22      Police Crime Laboratory in Bethlehem.

23      Q   And how long have you been employed by the

24      Pennsylvania State Police as a forensic scientist?

25      A   Since February of 1987.

# EXHIBIT C

# SECOND TRIAL TRANSCRIPT
## PP. 298 THROUGH 347

1    the next witness, at least initially,

2    has been indicated will be Trooper

3    McAndrew, and that's going to be a

4    lengthy witness.  With that, yesterday I

5    think we took an hour and fifteen

6    minutes for lunch.  Why don't we recess

7    until 1 o'clock, 5 after 1?  That will

8    give an hour and 15 minutes.  Try to be

9    back here if you can by 1 o'clock.

10   Again, don't discuss the case with

11   anyone, not even among yourselves.  With

12   that, we will break for lunch.

13          (Lunch recess was held at

14   11:45 a.m.)

15          (After recess)

16          THE COURT:  Attorney Noon?

17

18   FRANCIS McANDREW, called to testify in behalf of the

19   Commonwealth, was duly sworn and testified as follows:

20

21   DIRECT EXAMINATION BY MS. NOON:

22

23        Q   Do you want to give us your name, please?

24        A   My name is Francis McAndrew.

25        Q   And your current occupation?

1        A   Sheriff of Schuylkill County.

2        Q   And how long have you been Sheriff of Schuylkill

3   County?

4        A   A little over a year and a half.

5        Q   Previous to your sheriff position, were you a

6   detective in the District Attorney's Office?

7        A   Yes, I was, Ma'am.

8        Q   And how long were you a detective in the District

9   Attorney's Office?

10        A   I was detective in the Schuylkill County District

11   Attorney's Office for approximately two years.

12        Q   And prior to that, what was your occupation?

13        A   I was employed by the Pennsylvania State Police for

14   approximately 24 years.

15        Q   And in 1991, November of 1991, at that time what was

16   your assignment with the Pennsylvania State Police?

17        A   I was a criminal investigator assigned to the

18   Frackville barracks.

19        Q   And how long were you in the criminal investigation

20   unit in the Pennsylvania State Police?

21        A   I did criminal investigation for the Pennsylvania

22   State Police for approximately 17 years of the 24 years that

23   I was employed.

24        Q   The other years were you in the patrol unit then?

25        A   That's correct, in various other duties.

Q   Okay.   On November 10th, the morning of November 10th

of 1991, you were sent to the Hazleton General Hospital at

that time?

A   That's correct, Ma'am.

Q   What were the circumstances that you were called to

the hospital?

A   November the 10th at approximately 8:50 a.m., I was

off duty at my residence in Raven Run, and I received a phone

call that, detailing me to investigate a rape that occurred

in the Nuremberg area.  I immediately proceeded to Hazleton

General Hospital and met with the victim and various other

investigators at the time.

Q   Okay.   You, when you arrived at the hospital,

Corporal Sist and Trooper, well, now Corporal Williams were

present there already, is that correct?

A   I think it's Corporal Sist and Trooper Williams.

Q   Actually, it's Corporal Sist and Corporal Williams.

A   There you go.

Q   They have both been promoted.

A   Excuse me, that's correct.

Q   So they were both there.

A   That's correct.

Q   Okay.   And you indicated that you then spoke with the

victim, Patricia Brobst, at that time?

A   That's correct, Ma'am.

1    Q  And you were aware that she had talked to other

2  troopers before she talked to you, is that correct?

3    A  That's correct.

4    Q  Now, you did some initial investigation in regards to

5  her clothing, and I want to go over that with you.  Did you

6  do anything with her coat?  I know she had testified, and

7  there was some testimony from a nurse in regards to a coat,

8  did you do anything with that coat?

9    A  Yes.  I received her coat.  I believe it was at the

10  Hazleton General Hospital, and I personally viewed the

11  garment closely.  I could not determine that there were, that

12  it was of any evidential value and returned her coat to her

13  at that particular time.

14    Q  Did--when you indicated it was no evidential value,

15  what were you looking for when you viewed the coat?

16    A  I was looking for various blood stains on the garment

17  to see if ...

18    Q  Were you also looking--

19    A  To see if it had been soiled in any manner, any kind

20  of hair follicles and so forth.

21    Q  Did you--you indicate that you--did you give the coat

22  back to her?

23    A  Yes, I did, Ma'am.

24    Q  Did she have any other coat with her at that time?

25    A  No, she did not.  It was, the weather was, it was

1  quite cold at the time.  It was in November, and it was the

2  only garment that she had, the only winter coat that she

3  owned at that particular time.

4      Q  So you indicate that you gave her coat back to her?

5      A  That's correct.

6      Q  In the morning of November 10th?

7      A  That's correct, Ma'am.

8      Q  Okay.  After you spoke with Patricia, you went to the

9  Borough of Nuremberg?

10      A  That's correct, Ma'am.

11      Q  And who did you go with at that time?

12      A  I believe I proceeded to the Borough of Nuremberg

13  with then Trooper Sist, and we conducted an investigation.

14      Q  And Trooper Williams was also, then Trooper Williams

15  was also with you as well.

16      A  He was also with us.

17      Q  He had testified that he is with the record R & I

18  unit with the state police in Hazleton?

19      A  He was at that time, Ma'am, yes.

20      Q  What did you do when you arrived in Nuremberg?

21      A  We arrived in Nuremberg.  I proceeded to the Valley

22  View Hotel which is the, on the north end of Nuremberg, and

23  interviewed a girl by the name of Cindy Planutis, I believe

24  that's the correct pronunciation of her name.  She resides at

25  London Street in Weston, Pennsylvania, and she was the

1    waitress at the Valley View Hotel on the evening that the

2    rape and kidnapping occurred.

3    Q  Okay.  You indicate that she, she was a waitress,

4    Cindy Planutis?

5    A  That's correct, Ma'am.

6    Q  Okay.  After you talked with Cindy, did you go to the

7    Ackerman residence?

8    A  I went to the Ackerman residence and spoke to

9    Mrs. Ackerman and at that time obtained a consent search from

10    Mrs. Ackerman allowing us to search the residence.

11    Q  I'm going to show you what has been previously marked

12    as Commonwealth's Exhibit No. 26, are you familiar with that?

13    A  Yes, Ma'am.

14    Q  Okay.

15    A  This is the, it's the consent to, right to consent to

16    search form that was prepared by myself at the Ackerman

17    residence and signed by Mary Ackerman on the 10th of

18    November, 1991, at approximately--

19    Q  It has 12:01 and 12 o'clock on there.

20    A  I'm sorry, at approximately 12 noon.

21    Q  Okay.  Your signature is on here, Mary Ackerman and

22    also Trooper Sist signed this as well, is that correct?

23    A  That's correct, Ma'am.

24    Q  The top part of this, line two, I want you to

25    indicate to the jury what did you put on there in regards to

1    line, as items to be looked for?

2        A  Line two states items to be searched for and seized

3    if found, and I have printed in there with my own handwriting

4    pearl necklace, red panties, panty hose and hair.

5        Q  What was the reason that you wrote that on there?

6        A  Well, on the initial interview with the victim,

7    Patricia Brobst, she had told us that she had lost her pearl

8    necklace at the residence at the time of the attack, that she

9    does not recall what had happened to her panties or her panty

10   hose, but there were some hair that was pulled from her head

11   at the time of the attack, and there may be some hair in the

12   residence.

13       Q  You realize that she was at the hospital for quite a

14   long period of time, is that correct?

15       A  Yes, she was, Ma'am.

16       Q  And I believe that there has been some testimony what

17   time she arrived at the hospital, and you're indicating that

18   you didn't arrive at the defendant's residence until

19   approximately 12, 12:01 as listed on Commonwealth's Exhibit

20   No. 26, I believe is the--

21       A  That was the time that I had Mrs. Ackerman sign the

22   form.  I would imagine that we probably arrived there several

23   minutes prior to that, possibly around 11:45 a.m.

24       Q  Now, you basically found certain items that were in

25   the room, is that correct?

1    A  That's correct.

2    Q  And what items did you find in the bedroom, the

3  upstairs bedroom?

4    A  I can't recall if it was myself or Corporal, Trooper

5  Sist at the time, that retrieved the pearl necklace from

6  behind a cardboard box that was within the bedroom on the

7  second floor, and the head hair was visible to all of us, all

8  the investigators at the time that we entered the room.  It

9  was at the base of the bed about midway.  There was a large

10  clump of hair.

11    Q  Did you ever find the panties or panty hose in the

12  room?

13    A  No, we did not, Ma'am.

14    Q  And you never found them, is that correct?

15    A  That's correct.

16    Q  Also at the time you took some bedclothes, is that

17  correct?

18    A  That's correct.

19    Q  I show you what I'll mark with the entire bag.

20                    (A bag was marked for

21                     identification as follows:

22                     "Commonwealth's Exhibit

23                     No. 33, 9-12-95, M.L.P.")

24    Q  Commonwealth's Exhibit No. 33, did you want to take a

25  look at any of these, Kent?

1             MR. WATKINS:  Are you going to be

2        taking them out of the bag?

3             MS. NOON:  I'm going to take them

4        out, yes.  It's collectively marked as

5        Commonwealth's Exhibit No. 33.

6    Q  Can you identify what's in there?  Commonwealth's

7  Exhibit No. 33, the first item, can you identify this for me,

8  please?  It's in this bag.

9    A  This is the mattress cover or sheet that was taken

10  from the bed at the time by myself.  It's dated 11-10-91.

11    Q  I believe it indicates on your crime evidence, is

12  that the sheet?

13    A  Tan bed sheet, and it's initialed by myself, F-E-M.

14    Q  Do you want to put that back in there?

15    A  Yes.

16    Q  Also in Commonwealth's Exhibit No. 33, can you

17  identify this for me?

18    A  This is the mattress cover that was taken from the

19  same bed at the Ackerman residence on the 10th of November,

20  1991, and it has been initialed by myself, F-E-M.

21    Q  Okay.  And also as part of Commonwealth's Exhibit No.

22  33?

23    A  This is the pillow that was taken from the Ackerman

24  residence, the second floor, and it's dated 11-10-91.

25             MR. WATKINS:  Excuse me, excuse me,

1                Trooper, would you please so I can hear?

2                I can't hear.

3                    THE COURT:  I can't hear the Trooper

4                either.

5      A  I'm sorry.  Would it--

6                    MR. WATKINS:  No, he's shacking this

7                bag.  I can't--I would just ask him to

8                stop until either I can hear what's

9                going on.  Okay, thank you.

10              THE COURT:  Okay, go ahead.

11     A  This, this is a pillow that was taken from the

12 Ackerman residence on the second floor bedroom, and it's

13 dated 11-10-91 and initialed by myself, F-E-M.

14     Q  Can you indicate to the jury why you, why you took

15 these items initially from the Ackerman residence?

16     A  Well, the items were taken from the Ackerman

17 residence because the victim Patricia Brobst at that, in her

18 initial interview had stated that she was attacked, taken to

19 that bedroom area on the second floor and attacked, rape was

20 committed, an assault was committed, and I felt that it may

21 be of some evidential value at that time.

22     Q  At some later point in time after you took the items

23 from the Ackerman residence, did you have a chance to review

24 the items?

25     A  Yes, I did, Ma'am.

1   Q  And when, was that later, was that at the state

2   police barracks in Frackville?

3   A  That was at the state police barracks in Frackville

4   at a later time that particular day.

5   Q  And after you viewed the items, did you send them to

6   the laboratory for analysis in this case?

7   A  They were not sent to the lab for analysis.  The bed

8   sheet cover and pillow, because after viewing them closely by

9   myself, I had determined them not to be of any evidential

10  value.

11  Q  Did you note at any point in time that there were any

12  stains on the sheet, on the bed sheet?

13  A  There were several minute stains that would appear to

14  be of--

15            MR. WATKINS:  I would object to a

16            conclusion of what the stains were.

17            MS. NOON:  Basically what he viewed

18            in regards to the, what, basically what

19            type of stains or what he viewed on

20            the--

21            THE COURT:  As to what it was, I'm

22            going to sustain the objection.  He can

23            testify as to what he viewed and what

24            color, et cetera, it may have been.

25  Q  You indicated that you viewed certain stains.

1    A   I viewed the sheet, sheets, and they contained

2   several minute stains that did not appear of any evidential

3   value to me at that particular time.

4    Q   Now, you also in this case received a variety of

5   items of evidence from both Trooper Williams and Trooper

6   Sist, is that correct?

7    A   That's correct, Ma'am.

8    Q   Okay.  I need to go through those with you.

9   Commonwealth's Exhibit No. 17, can you identify that for me,

10   please?

11    A   These were the victim's shoes that were recovered by

12   us at a small cinder block building adjacent to the Ackerman

13   residence on the 10th of November, 1991.  They were dated 10,

14   11-10-91 and initialed by myself, FEM.

15    Q   And Commonwealth's Exhibit No. 18?

16    A   This was the victim's bra that was obtained from the

17   victim at the hospital, Hazleton General Hospital.

18    Q   And Commonwealth's Exhibit No. 19?

19    A   And this was the dress that was worn by the victim,

20   and this was also obtained at the Hazleton General Hospital

21   from the victim.

22    Q   Commonwealth's Exhibit No. 21?

23    A   This was the victim's wristwatch that was taken from

24   the victim at the time of the interview by myself and

25   packaged and dated 11-10-91.

1    Q   Okay.   Trooper Sist had testified that he, you are

2   familiar with this?

3    A   Yes.

4    Q   I mean he indicated that he received that from Selena

5   Angelo at the Hazleton Hospital, what did you do with it

6   then?

7    A   This is the Johnson rape evidence kit that's typical

8   to any hospital, that they would utilize in any hospital.

9   The contents of the rape kit were packaged by the hospital,

10   given to me and transported to the Bethlehem State Police Lab

11   by myself.

12    Q   Commonwealth's Exhibit No. 20, can you indicate what

13   that is?

14    A   This is a set of white pearls owned by the victim

15   that were found in the Ackerman residence in the bedroom of

16   the second floor.

17    Q   These are the pearls that you indicated that Patricia

18   had told you in the consent search.   That's why--these are

19   the pearls that you were looking for?

20    A   Those are the pearls that were found behind the small

21   cardboard box in the bedroom on the second floor of the

22   Ackerman residence.

23    Q   And you had testified earlier to the jury that the

24   reason you were looking for these is because Patricia said

25   that she thought she had lost them in the room.

1    A  She had told us that she was missing a set of white

2  pearls, and she thought that they would be in that bedroom.

3    Q  Okay.  You had also testified that you and Corporal

4  Sist and Corporal Williams looked in the particular area.

5  You did view the scene that she had described that occurred

6  to you outside of the house?

7    A  That's correct, Ma'am.

8    Q  And you found something there, is that correct?

9    A  That's correct.

10    Q  And what did you find, Commonwealth's Exhibit No. 29

11  it has been identified.  It hasn't been identified, it has

12  been marked.  I need you to identify it for me, please.

13    A  This is a large clump of head hair that was found in

14  the vacant lot adjacent to the Ackerman residence on the 10th

15  of November, 1991.  It was taken by myself at approximately

16  four p.m. and packaged.

17    Q  You indicate this vacant lot.  I know there has been

18  some discussion about that to the jury.  Was this anywhere

19  close to where the shoes and the glasses were found?

20    A  It was in a close proximity to where the shoes and

21  the glasses had been found.

22    Q  Okay.  And Commonwealth's Exhibit No. 30?

23    A  This is another large clump of head hair that was

24  found on the second floor bedroom of the Ackerman residence.

25  It was taken by myself on the 10th of November, 1991, at

1    approximately 12:20 p.m., packaged and later sent to the

2    Bethlehem lab.

3         Q   Some of the items that you've indicated, you

4    sent--the hair that was found in the vacant lot, you

5    indicated that was sent to the lab, is that correct?

6         A   That's correct, Ma'am.

7         Q   And the large clump of hair that was found in the

8    bedroom, that was also sent to the lab?

9         A   That's correct.

10        Q   And the sexual assault kit, that was sent to the lab.

11   I believe you indicated that to the jury.

12        A   That's correct, Ma'am.

13        Q   And the bra, purple dress and the watch, that was

14   also sent to the crime lab, is that correct?

15        A   Yes, Ma'am.

16        Q   What was the significance of sending the watch to the

17   crime lab?

18        A   The initial interview with Patricia Brobst, our

19   victim, she had told us that during the attack that she had

20   managed to get her wristwatch and rake it across the victim's

21   face, and she felt that she may have--

22        Q   Across the victim's face?

23        A   I'm sorry, across the defendant's face.

24        Q   Okay.

25        A   And she felt that she may have scratched him in the

1  process, and we felt that there may have been some evidential

2  value of possibly some blood or other, possibly skin or

3  something like that might be contained in the watchband

4  itself.

5      Q  You also, and I believe that Trooper Williams

6  testified to this also, Corporal Williams, but you went to

7  her house after you went to the Ackerman residence and got

8  pulled hair samples and cut hair samples, is that also

9  correct, from Patricia Brobst?

10      A  I think at that time we had gotten cut hair samples,

11  but pulled hair samples had come from the hospital.

12      Q  Okay.  I'm going to show you what has been marked, I

13  believe they have already been marked and identified as

14  Commonwealth's Exhibit No. 31.

15      A  Okay.  This is Trooper Williams.

16      Q  Okay.

17      A  Cut hair samples.

18      Q  Okay, the cut hair samples, and then he gave them to

19  you?

20      A  That's correct.

21      Q  Okay.  And then that's when you sent them to the lab.

22      A  That's correct.

23      Q  All right.  And Commonwealth's Exhibit No. 32, it

24  indicates that Trooper Williams, his marks are over here,

25  pulled hair samples--

1    A   Umm-hum.

2    Q   --you sent them to the lab.

3    A   That's correct, they are the, these are all pulled

4  hair samples that were taken from Patricia Brobst at her

5  residence by Trooper Williams and given to myself.

6    Q   Okay, thank you.  You also received a variety of

7  photographs, is that correct?

8    A   That's correct, Ma'am.

9    Q   I'm just going to, Commonwealth's Exhibit No. 5, can

10  you please indicate what that is to the jury, please?

11    A   This is a photograph of our victim, Patricia Brobst,

12  accurately depicting her, what she looked like physically on

13  that particular morning.

14    Q   And that's her facial area?

15    A   That's correct, it's facial.

16    Q   And Commonwealth's Exhibit No. 6, is that a side view

17  of her facial area?

18    A   This is a side view of Patricia Brobst accurately

19  depicting the condition of her nose on that particular

20  morning.

21    Q   Okay.  Commonwealth's Exhibit No. 7?

22    A   This is a photograph of the victim's right hand

23  accurately depicting a bruise along the side of her right

24  hand.

25    Q   Okay.  Commonwealth's Exhibit No. 8?

A   This is a photograph of the victim's neck which accurately depicts a bruise of some type on her neck in this area.

Q   Commonwealth's Exhibit No. 9?

A   A photograph of the victim's knees which accurately depicts bruises and scrape marks on both knees of the victim.

Q   And Commonwealth's Exhibit No. 10?

A   This is a photograph of the victim's right breast which accurately depicts a bruise of some type on the victim's breast.

Q   And 11?

A   This is a photograph of the victim's back which accurately depicts a large bruise on the left side of her back and a more faint bruise on the right side of her back.

Q   Twelve, is that a close-up of the--

A   It's a--

Q   A close-up of the left side of the back?

A   This is a photograph of a close-up of the left side of the victim's back.

Q   And 13, that would be a close-up of the right side of the victim's back, is that right?

A   This is the right side of the victim's back, correct.

Q   And 14?

A   Number 14 is a photograph which accurately depicts a bruise of some type on the point of the victim's right

1    shoulder.

2        Q  Now, you had testified earlier, and you identified

3    the hair sample, Trooper Williams also identified this.  Can

4    you just indicate what that picture depicts, please?

5        A  This photograph accurately depicts the floor just

6    below the defendant's bed on the second floor of the Ackerman

7    residence depicting a large clump of human hair that we

8    found.

9        Q  And that was what you identified as being the one

10   that you sent to the laboratory, is that correct?

11       A  Yes, that's correct.

12       Q  On 22, can you indicate what that is, please?

13       A  This photograph shows the victim's high heels and a

14   pair of sunglasses that were found or glasses that were found

15   along the base of a cinder block building just adjacent to

16   the Ackerman residence.

17       Q  When you conclude, when Trooper Williams or Corporal

18   Williams took this picture and when you viewed this, was this

19   the way it was found, this is the way the glasses and the

20   shoes were found?

21       A  That is exactly how they were found there, yes.

22       Q  Okay.  Now, No. 16, can you indicate what that is?

23       A  This is a photograph which accurately depicts the

24   condition of the bedroom at the time we entered it on the

25   morning of November the 10th, 1991.

1    Q  And you had at this point did not take the sheets,

2  and those are the things that are on here.

3    A  That's, that, this is a photograph accurately

4  depicting the condition of the room as we entered it--

5    Q  Okay.

6    A  --prior to taking any evidence.

7    Q  And Commonwealth's Exhibit No. 15, now, you

8  identified the pearls already, and what does that depict in

9  that photograph?

10    A  This photograph depicts a set of white pearls that

11  are behind a cardboard box along the baseboard of the bedroom

12  on the second floor.

13    Q  That's the cardboard box that you referred to in your

14  testimony earlier?

15    A  That's correct.

16    Q  And this is just the outside.  I believe it's another

17  viewpoint of showing the--

18    A  This gives you a larger view of the vacant lot that's

19  adjacent to the Ackerman residence depicting the location of

20  the victim's high heels and glasses at the base of the cinder

21  block.

22                    THE COURT:  What is that exhibit

23                    number, counsel?

24                    MS. NOON:  That's Exhibit No. 27.

25    Q  Now, how did you receive these photographs?

1    A   Those photographs were taken by Trooper Williams and

2    later given to me at the state police barracks in Frackville.

3    Q   Okay.  You had referred to the Ackerman residence,

4    Commonwealth's Exhibit No. 2, is that the Ackerman residence?

5    A   This is the Ackerman residence, yes.

6    Q   And does it depict a fairly large home?

7    A   What I would say is a fairly large home, possibly 30

8    feet square or thereabouts with a large porch around the

9    outer perimeter.

10   Q   And 3 is just a grassy area?

11   A   This photograph again is similar to the one that we

12   spoke about before depicting the shoes and two beer cans and

13   a vacant lot adjacent to the Ackerman residence.

14   Q   Okay.  That's Commonwealth's Exhibit No. 3.

15   Commonwealth's Exhibit No. 4, is that also a picture of the

16   vacant lot?

17   A   This is--

18   Q   That would be across the street from the Ackerman

19   residence, is that correct?

20   A   This is adjacent to the Ackerman residence, the

21   vacant lot and the cinder block building.

22   Q   Is this the vicinity that you found the hair, the

23   clump of hair as you identified earlier for the jury?

24   A   I can't recall exactly what the location was, but it

25   would be within this vacant lot.

1      Q   Okay.  And these photographs also you received from

2    Trooper Williams, is that correct?

3      A   That's correct, Ma'am.

4      Q   Okay.  When--after you went to the Ackerman residence

5    and had talked to Patricia Brobst, found the evidence that

6    you have identified for this jury, which I understand took a

7    little bit of time, did you at some point make a phone call

8    to the defendant's mother?

9      A   Yes, Ma'am, I did.

10     Q   And after that phone call did the defendant call you

11   in regards to the evening of November 10th of 1991?

12     A   Yes, Ma'am, he did.

13     Q   Can you indicate from the beginning when the time you

14   answered the phone what did you do at that time and how did

15   you answer the phone, how did you identify yourself and that

16   type of situation for the jury, please?

17     A   I was at the state police barracks, I believe it was

18   on the Monday morning, the 11th of November, and there was a

19   call switched back to me from the switchboard out front to my

20   desk.  The caller identified himself as Edward Ackerman.  At

21   that time I identified myself, told the defendant that I was

22   investigating a kidnaping and rape in the Nuremberg area and

23   told him that our victim was Patricia Brobst and that we were

24   intensifying our investigation and that the investigation

25   centered around him.  At that point the defendant

1    spontaneously said to me that was consensual.

2        Q   Now, you indicate that you did tell him that you were

3    investigating an incident specifically with Patricia Brobst,

4    you used her name.

5        A   That's correct, Ma'am.

6        Q   Now, when you received the phone call, did you advise

7    the defendant of his Miranda warnings over the phone?

8        A   No, I did not.

9        Q   Can you indicate to the jury the purpose of the

10   Miranda warnings?

11       A   The reasoning he wasn't advised of his Miranda

12   warnings or constitutional rights at that time was, first of

13   all, he was not in my custody, it was a phone call, and he

14   was in the Harrisburg area.  I was about to request the

15   defendant to voluntarily come to the state police barracks in

16   Frackville and be interviewed by myself, and those, under

17   those conditions the Miranda warning is not necessary when

18   there is no custody involved.

19       Q   You are indicating that he wasn't in your custody

20   because it was a phone conversation.

21       A   That's correct.

22       Q   Okay.  Do you remember if the call was the evening of

23   November 10th or was it the morning of the 11th?  And if you

24   need to, if you need to refresh your recollection, I'll let

25   you do that.  I just want to make sure that we have the exact

1    date of the phone call.

2        A  It would, the phone call was made on November the

3    10th in the evening of November the 10th approximately seven

4    p.m. to the state police barracks.  I was requesting the

5    defendant to appear at the state police barracks the

6    following morning which he did, I'm sorry.

7        Q  Okay.  I just wanted to clarify that.  You indicated

8    that during the phone call that you had with him that you

9    were going to request him to come into the state police

10   barracks the next day.

11       A  That's correct.

12       Q  And did you do that?

13       A  Yes, I did.

14       Q  When he came to the state police barracks on that

15   day, what did you do at that time?

16       A  I brought him back.  I greeted him at the entrance to

17   the barracks and escorted him back to the criminal office to

18   my desk, and we started to discuss the investigation.

19       Q  Okay.

20       A  At that time I--

21       Q  And did you indicate, let me just ask you a question,

22   at that time did you notice something about him that drew

23   your attention immediately?

24       A  Yes, yes, Ma'am.

25       Q  What was that?

1    A  At that time I viewed a large scratch on the

2  defendant's right cheek and a smaller more faint scratch on

3  the defendant's forehead right of center.

4    Q  Now, why did that trigger something when you saw him

5  on the morning of November 11th?

6    A  Well, with the initial interview of the victim,

7  Patricia Brobst, she had told us that, again, that she had

8  thought that she scratched the defendant's face with her, the

9  band of her wristwatch, and I felt that it, the scratches on

10  the defendant's face were consistent with that type of

11  action.

                    (A photograph was marked for

12                    identification as follows:

13                    "Commonwealth's Exhibit No. 34,

14                    9-12-95, M.L.P.")

15

16    Q  Commonwealth's Exhibit No. 34, can you identify that

17  for me, please?

18    A  Yes, this is a photograph taken by our mug shot

19  camera in the barracks.  It's a black-and-white photograph

20  taken by myself of the defendant at that time once I viewed

21  the scratches on his face.

22    Q  Now, you indicate that was taken on the morning of

23  November 11th of 1991?

24    A  This photograph was taken on November the 11th, 1991,

25  somewhere in the neighborhood of 10:30 a.m. when the

1    defendant appeared at the state police barracks in

2    Frackville.

3        Q  Now, you indicated in your testimony that you were

4    with the state police, I believe the criminal investigation

5    unit for about 24 years, 25 years?

6        A  I was with the state police approximately 24 years.

7        Q  And the criminal investigation unit about 17 years?

8        A  Approximately 17 years, yes, Ma'am.

9        Q  Now, as part of that, you write police reports, is

10   that correct?

11       A  That's correct.

12       Q  Do you also write affidavits of probable cause?

13       A  Yes, Ma'am.

14       Q  Could you explain to the jury what is an affidavit of

15   probable cause?

16       A  Affidavit of probable cause is an affidavit setting

17   down the reasons why you feel that there is, there should be

18   an arrest made in a certain situation detailing the facts one

19   after the other in, sort of in chronological order.

20       Q  Did you write an affidavit of probable cause for this

21   case?

22       A  Yes, Ma'am, I did.

23       Q  The affidavits of probable cause, are they the ones

24   that are filed at the district justice office?

25       A  That's correct, Ma'am.

1    Q  Are there police reports filed at the district

2  justice office?

3    A  No, Ma'am, they are not.

4    Q  Police reports are filed where?

5    A  Police reports are filed on station and a copy is

6  sent to state police headquarters in Reading and another copy

7  sent to regimental headquarters in Harrisburg.

8    Q  And that's, your affidavits of probable cause are

9  also sent there too, is that correct?

10    A  Affidavits--

11    Q  If you know.

12    A  --of probable cause are made part of the report, they

13  are copied and made part of the report and kept on station.

14    Q  Okay.  Are either one of those, the police report or

15  the affidavit of probable cause more important in police

16  work?

17    A  That's a very difficult question.  The police--

18    Q  What I'm asking is that it would be, are they both of

19  equal importance?

20    A  They are very very important both.  I would say that

21  the police report is obviously important because in

22  situations like this it helps you refresh your memory as to

23  the facts that took place a certain time ago.  However, the

24  affidavit of probable cause is also very important because it

25  lays out specifically to a district justice why you feel that

1    an arrest should be made in this situation, and it is made

2    part of the criminal record as the case goes on.

3        Q  Okay.

4                        (A criminal complaint was marked for

5                        identification as follows:

6                        "Commonwealth's Exhibit No. 35,

7                        9-12-95, M.L.P.")

8        Q  Commonwealth's Exhibit No. 35, can you identify that

9    for me, please?

10       A  Yes, Ma'am, this is a criminal complaint drawn up by

11   myself charging the defendant, Edward Paul Ackerman--

12       Q  Okay.  I don't want to get into the charges, but you

13   had also written an affidavit of probable cause, is that

14   correct, as part of Commonwealth's Exhibit No. 35?

15       A  The affidavit of probable cause is made part of the

16   criminal complaint, and it's the second portion of the

17   criminal complaint--

18       Q  Okay.

19       A  --attached to it.

20       Q  And that's the original, is that correct?  That was

21   one that was filed with the district justice office.  Here's

22   your original signature at the bottom of--

23       A  This is a copy of the original.

24       Q  Okay, I'm sorry.  Is it a true and correct copy of

25   the original?

1      A  Yes, it is.

2      Q  Okay.  Now, you had mentioned this telephone

3  conversation that you had with Edward Ackerman on November,

4  the evening of November 10th of 1991.  Did you put that in

5  your police report, this statement in regards to the

6  telephone conversation?

7      A  The conversation itself was not made part of the

8  police report.  However, it was made part of the probable

9  cause stating why I feel that an arrest should be made in

10  this situation.

11      Q  You are indicating that you wrote it in the affidavit

12  of probable cause which is Commonwealth's Exhibit No. 35.

13      A  That's correct, Ma'am.

14      Q  And you wrote which--

15      A  Excuse me, Ma'am.

16      Q  Okay.

17      A  This is a copy of the complaint but not a copy of the

18  probable cause.

19      Q  Okay.  I think I have that in here.  I'm sorry,

20  that's my mistake.  I think this is the original, and I

21  apologize for that.  I'll make it part of Commonwealth's

22  Exhibit No. 35, and I'll show it to defense counsel, and I

23  apologize for that, Trooper.  Commonwealth's Exhibit No. 35,

24  page three, that is your affidavit of probable cause.

25      A  This is a copy of the affidavit of probable cause

1    drawn up by myself on the, I forget the date on here, on the

2    11th of November, 1991.

3         Q   Okay.  You're indicating that this was drawn up

4    November 11th of 1991.

5         A   That's correct.

6         Q   Is that correct?  And your signature is at the bottom

7    here.

8         A   Yes.

9         Q   Okay.  And in this particular document you have noted

10   the conversation that you had with the defendant on

11   November 10th of 1991 indicating that it was a consensual

12   encounter with Patricia Brobst.

13        A   That's correct, Ma'am.

14        Q   And your police report?

15        A   I have a copy of that here.

16        Q   Okay.  What date was your police report written?

17        A   My criminal investigation report was prepared on

18   November the 12th, 1991, the day following the probable

19   cause.

20        Q   Okay.  So you are indicating that the affidavit of

21   probable cause was written first.

22        A   That's correct.

23        Q   When you were investigating this incident in November

24   of 1991, did you have any information available to you that

25   Charles Ackerman was in the Borough of Nuremberg in November

1      of 1991?

2          A   The only information that he was not.

3          Q   You had information he was not?

4          A   That's correct.

5                          MS. NOON:  If I could just have a

6              moment, your Honor.

7                          THE COURT:  Okay.

8                          MS. NOON:  I have nothing else at

9              this time I don't think.  Cross-examine.

10                         THE COURT:  Mr. Watkins, can you

11             hold off for one second?  I'm sorry,

12             Mr. Watkins, go ahead.

13

14     CROSS-EXAMINATION BY MR. WATKINS:

15

16         Q   Trooper McAndrew, one of the things you were talking

17     about just recently is the statement you had said that came

18     from Ed Ackerman.  You said he called you, is that right?

19         A   That's correct, sir.

20         Q   And did you take notes of your conversation with him?

21         A   I may have.

22         Q   Do you have any of those notes?

23         A   I don't believe so.

24         Q   Okay.  So the only thing, you are saying he called,

25     the only thing you remember is that he said it's consensual.

1    That's basically all he said that you recall.  I mean I don't

2    know--

3        A  I recall him saying several things, but that was the

4    thing that jumped out at me the most at that particular time.

5        Q  Okay.  But you didn't make notes--well, let me ask

6    you this.  In the normal process to make that report there,

7    you don't take a word processor typewriter with you, right,

8    you take a notepad or something?

9        A  That's correct.

10       Q  All right.  And when you interview someone like

11   the various people named, you would write down notes,

12   correct?

13       A  That's correct.

14       Q  Okay.  And then when you take these notes, you go

15   back to the office or wherever you go and type it into this

16   report on the forms.

17       A  That's correct.

18       Q  Is that right?

19       A  That's correct.

20       Q  That's how it works.  Now, in this case, you're

21   saying that those notes, you don't have the notes or don't

22   know about the notes, and you did not type it into the report

23   either.

24       A  The evening of the phone call from Mr. Ackerman,

25   Mr. Ackerman spoke to me, and spontaneously after I had told

1   him what we are interested in and the investigation that we

2   are conducting, he had said that that was consensual.

3       Q  Okay, I understand.

4       A  I remember, I recall writing that down.  It was

5   probably on a legal pad on my desk at the time.  We spoke

6   about other things during that conversation specifically

7   making an appointment for the following day for him to come

8   to the state police barracks.  I made my police report on the

9   12th of November.  The following morning when he arrived at

10  the state police barracks, which was somewhere in the

11  neighborhood of 10:30 a.m., I spoke to Mr. Ackerman there.

12  He was placed under arrest in or about that time.  The

13  probable cause was comprised by myself while Mr. Ackerman was

14  at the state police barracks the following morning so

15  everything was basically fresh in my mind at that particular

16  time.

17      Q  All right.  But, well, then it's, maybe I didn't make

18  that clear, but your standard procedure is what I had said

19  about taking notes, and you type them in the report.

20      A  That's correct.

21      Q  And you did not do that in this case.

22      A  I recall writing our, the facts concerning our

23  conversation down possibly on a legal pad which was standard

24  procedure for myself at my desk and incorporating that into

25  the probable cause the following day, the following morning I

1    should add.

2        Q  Now, when you say a legal pad, you mean something

3    like this--

4        A  Yes.

5        Q  --with yellow paper on it.

6        A  That's correct.

7        Q  That's what you are referring to.  Okay.  Now, this

8    particular time when you saw Mr. Ackerman a day or two after

9    these allegations, he did have a mustache, did he not?

10       A  It was the following day, sir.

11       Q  That's what I mean.

12       A  The following morning.

13       Q  Well, it was not an overnight growth, though.

14       A  No.

15       Q  It was a mustache, full grown mustache, correct?

16       A  That's correct.

17       Q  This particular area in Nuremberg, you were familiar

18   with Nuremberg from your assignments with the state police,

19   is that correct?

20       A  Yes, sir.

21       Q  I show you what has been marked as Defendant's

22   Exhibit No. 1, do you recognize that, do you recognize it to

23   be the back of the bank?

24       A  This looks like the back of the bank of the Nuremberg

25   bank.

1      Q   Okay.  And is that cinder block building, is that the

2   building that you were referring to by the shoes?

3      A   Yes, sir.

4      Q   And this, can you recognize that?

5                        THE COURT:  What is that, Mr.

6                   Watkins?

7                        MR. WATKINS:  Oh, it's Defense

8                   Exhibit No. 2.

9      A   This depicts the intersection at the corner of the

10   Ackerman residence.

11      Q   And is that also the cinder block?

12      A   And it shows a portion of the cinder block building.

13      Q   Okay.  Now, well, why don't we just put this up?

14   Maybe that you might be able to use it, but I will sit over,

15   come over here, I guess.  I should move it.  Now, you in your

16   investigation you interviewed people at the Valley View or

17   who had been at the Valley View Hotel, correct?

18      A   That's correct.

19      Q   And this street which is Mahanoy Street and sort of

20   the main thoroughfare in Nuremberg has houses along this

21   street?

22      A   That's correct, sir.

23      Q   Did you interview anyone in any of these houses?

24      A   No, sir.

25      Q   Okay.  This, now--

1          A   Well, excuse me, yes, we did, at the Rhodes'

2     residence.

3          Q   Okay.

4          A   Well, I was in this block, up in this block right by

5     the, between the hotel and the next corner.

6          Q   Now, the Rhodes' house has been determined to be

7     across sort of the Weston Road or Hazle Street?

8          A   I think the Rhodes' residence is at the corner of

9     Mahanoy and the street leading back to the Ackerman

10    residence, I'm not sure.

11         Q   I believe it was testified this is the road to

12    Weston--

13         A   That's Weston, okay, yes.

14         Q   --known as Hazle Street.

15         A   You're correct, that's right.

16         Q   I know you're not intimately familiar with it; it's

17    not marked, and you're not intimately familiar with Nuremberg

18    but that's what has been testified to, but in this section

19    north of the Rhodes' residence, did you interview anyone?

20         A   Outside of the people at the Valley View Hotel, no,

21    sir.

22         Q   Now, you said you interviewed people at the Rhodes'

23    residence or some of the troopers did?

24         A   A young girl, yes, sir.

25         Q   And were you able to determine was there anything

1   heard or seen?

2      A  She had, she was a young girl, I think about 15 years

3   of age at that time.  She had stated to us that she had not

4   heard anything unusual that evening.

5      Q  Okay.  Then there's, the bank is the building on the

6   main street, Mahanoy Street.  That's below the Rhodes'

7   residence, correct?

8      A  That's correct, sir.

9      Q  And then you come to the corner, well, you can see

10   where the cinder block building is in the picture.  You come

11   to that area where the corner is by the Ackerman residence.

12      A  That's correct, sir, Bush Street I would believe.

13      Q  Bush Street, and is there also a home on the corner

14   of Bush Street just which would be to the west of the

15   Ackerman residence?

16      A  It's hard for me to recall that, sir.

17      Q  All right.

18      A  I would say there probably is because--

19      Q  Did--okay.

20      A  Knowing the amount of, the makeup of the neighborhood

21   there, I would say there is.

22      Q  Did you interview anyone in that house?

23      A  No, sir.

24      Q  Okay.  Is there also a home to the north and east of

25   the Ackerman residence?

1     A  The north and to the east?

2     Q  Across Brush Street.

3     A  Quite a distance away I think, yes.

4     Q  Okay.  Did you interview--

5     A  No, sir.

6     Q  So the only people outside of the Valley View Hotel

7 that you interviewed was the Rhodes' girl at this home.

8     A  That's correct.

9     Q  Okay.  This, were you able to determine the route

10 that Miss Brobst said she walked home?

11    A  Patricia had told us the route that they had taken

12 and where she was abducted and--

13    Q  No, how she got home, what road she took to go home.

14    A  Oh--

15    Q  After she said this allegedly happened, which was--

16    A  I think she told us that she walked out the, out

17 Hazle Street--

18    Q  Okay.

19    A  --to her home.

20    Q  Okay, all right.  So Hazle Street is a highway that

21 has no sidewalk, is that right, if you recall?

22    A  It's a typical highway for that area.  It's a

23 blacktop highway with a gravel berm.

24    Q  Now, you also, you interviewed Mrs. Ackerman,

25 correct?

1    A   That's correct.

2    Q   And she had told you that she had been home?

3    A   Yes, sir.

4    Q   And she also advised you she didn't hear anything, is

5    that correct?

6    A   She said she had been awakened at somewhere in the

7    neighborhood of 3:45 a.m. and went to the bathroom at that

8    time.

9    Q   She got up to go to the bathroom?

10   A   That's correct.

11   Q   But did you ask her if she heard anything?

12   A   She said she had not heard anything.

13   Q   Okay.  Now, you went into this house, correct?

14   A   Yes, sir.

15   Q   And you determined where Mrs. Ackerman had been in

16   the house that night?

17   A   Her bedroom?

18   Q   Yes.

19   A   Yes, sir.

20   Q   And was that sort of around the corner to the left

21   under the stairs?

22   A   I think it was behind the stairs, yes, sir.

23   Q   Okay.

24   A   On the first floor.

25   Q   Okay.  Now, the stairs, are they narrow?

1    A  Quite narrow as I remember them, yes, sir.

2    Q  And steep?

3    A  Yes, sir.

4    Q  Okay.  And that's, that's on the first floor as you
5  come into the residence.  There are several entrances to the
6  residence, is that correct?

7    A  It's, it's broken up into small compartments, the
8  home, and there are, I think, three entrances on the first
9  floor.  Mrs. Ackerman's bedroom was behind the stairway and
10  to the left, I believe, of the residence.  In front of that
11  bedroom, there is a dining room or parlor, whichever you
12  want, living room or parlor, whichever you want to call it,
13  and that's where I interviewed Mrs. Ackerman--

14    Q  Okay.  And you went--

15    A  --ultimately.

16    Q  And you or the troopers or the corporals, whatever
17  the rank were at the time, I'm not, you and the other state
18  police members went through--

19    A  Yes, sir.

20    Q  --went through the house basically looking, looking
21  for items.

22    A  No, sir, no, that's not accurate.  We went through,
23  we received the consent search from Mrs. Ackerman, and we
24  proceeded to the bedroom on the second floor where her son,
25  the defendant, had stayed that evening, and we did a thorough

1   search of that bedroom.  I don't recall doing a thorough

2   search of the rest of the residence, maybe a cursory search,

3   just a walk-through or something like that, but nothing that

4   would be construed as being thorough.

5       Q  Okay.  Were there any lights in the bedroom that you

6   recall?

7       A  I can't recall any lighting.  I'm sure there was, but

8   I can't recall at this time.

9       Q  Now, the items which are marked Exhibit 33, the

10  sheets from the bed, the mattress cover and the pillow which

11  you took from that room, they were not, nothing was done with

12  them other than taken by you back to the barracks, is that

13  correct, and observed?

14      A  We are talking about the bed sheet, the pillow and

15  the mattress cover?

16      Q  Right, the items which were identified as exhibits.

17      A  That's correct, sir.

18      Q  You identified as Exhibit 33.

19      A  That's correct, sir.

20      Q  You did not send them to the state police lab for

21  analysis for, as items you had talked about before, hair,

22  flesh, blood or anything like that.

23      A  No, sir, I did not.

24      Q  These are--

25      A  I deemed them to be of no evidential value at that

1    time.  The stains that were on the particular items that you

2    are questioning seem to be very old and very minute.  When I

3    viewed the garment or the, I'm sorry, when I viewed the

4    sheets and pillow cases and so forth, it was early into the

5    investigation.  It had only been several hours afterwards.  I

6    would think that with my experience I could probably have

7    determined if it was a fresh stain or not.

8         Q  Okay.  Now, you also, there's an item that's, besides

9    the panty hose and panties, there's an item that's not here,

10   that's the coat which you gave back, and you explained why

11   you did.

12        A  Yes, sir.

13        Q  Now, this, this item, the coat the victim was wearing

14   she said that night.

15        A  That's correct, sir.

16        Q  Okay.  And you examined it and could not find any

17   rips, tears, stains, hair, anything on it.

18        A  No, sir.

19        Q  Now, the item such as the, you take the head hair,

20   the various, the kind of the person who is making the

21   charges, to send that to the state police lab where they do

22   scientific microscopic tests on it, correct?

23        A  Comparison tests, yes, sir.

24        Q  Okay.  And then there's other people who testified to

25   that in more detail, correct?  That's not, you're not, that's

1    not your job per se.

2        A  That's not my expertise, no, sir.

3        Q  No, okay.  I just want to make that clear.  I know

4    being in this field we understand each other, but oftentimes

5    the jury doesn't understand the functions.

6        A  Yes, sir.

7        Q  And you also take the item such as the dress and the

8    brassiere and the watch to take it to a lab for analysis the

9    same way, to look for signs--

10       A  That's correct, sir.

11       Q  --of evidence that you say.

12       A  That's correct.

13       Q  Such as the clothing might be taken, you find hair

14   from somebody else to show that somebody else was present.

15       A  That's correct, sir.

16       Q  And the same with the, you don't do that analysis,

17   and the same with the rape kit, you or somebody, you pick it

18   up from a doctor who takes the samples, you or some other

19   person in the state police, and takes it down where a

20   scientific person takes it and analyzes it using scientific

21   equipment.

22       A  Our chemist would do that, yes, sir.

23       Q  Right, and you are looking again then for hair and

24   semen, blood, such things.

25       A  That's correct.

1 Q Identifying. You also--now, there were no what they

2 call DNA tests ordered in this kind of, in this case to

3 determine, there were no such things taken, correct?

4 A Yes.

5 Q I know they are popular now but--

6 A I'm not sure that DNA was, testing was available to

7 us in November of '91.

8 Q Right, I'm saying that that type of thing wasn't

9 done.

10 A Yes, sir.

11 Q And from my understanding, there wasn't a search for

12 fingerprints of any type, is that correct?

13 A No, sir. There was, the crime scene centered around

14 the victim's, the defendant's residence.

15 Q Okay.

16 A Fingerprints would be of no evidential value I

17 wouldn't think.

18 Q This area, I gather, now you say the shoes were right

19 by the cinder block building which is directly across the

20 street by that streetlight, is that correct?

21 A That's correct.

22 Q And you say the hair was also, some of the hair was

23 found somewhere over there--

24 A In that vacant--

25 Q --by the shoes.

1    A  --in that vacant lot in a close proximity to the

2    shoes.  I would be unable to tell you accurately what the

3    distance would be at this time.

4    Q  Okay.  Were there any other people that were

5    interviewed that you know of that were not included in your

6    report or one of the other investigating officers' reports?

7    A  Cindy Planutis was interviewed at the Valley View

8    Hotel on the morning of the assault, Mrs. Ackerman was

9    interviewed, the defendant was interviewed, a young girl at

10   the Rhodes' residence was interviewed, and I believe Patricia

11   Brobst's girlfriend whose name escapes me at this time was

12   interviewed also.

13   Q  Charla Laudig, would that be the correct name?

14   A  Yes, sir, that's correct.

15   Q  And you interviewed her somewhere in Nuremberg, is

16   that correct?

17   A  Yes, sir.

18   Q  Okay.

19   A  And the doctor and the medical staff.

20   Q  The doctor and the nurse who have testified here

21   previously--

22   A  Yes, sir.

23   Q  --today?

24   A  Yes, sir.

25   Q  When you--did you examine the bedroom yourself?

1    A   Yes, sir.

2    Q   Was there a rug or anything in there?

3    A   I believe there was.

4    Q   Okay.  Was there any vomit material on the rug?

5    A   I don't recall seeing any gurgitation.

6    Q   It's, this room that we are in, is it a relatively

7    small room?

8    A   I would say so, sir, yes, as far as bedrooms go.

9    Q   Well, as a room, whether it's a bedroom or otherwise,

10   about what was the size, could you estimate that?

11   A   That would be difficult for me to estimate, but I

12   would say in the neighborhood of maybe 10 foot square.

13   Q   Ten feet square, ten by ten, something like that?

14   A   Possibly.

15   Q   And there was in it you say a bed with this bed

16   clothing on and any other furniture?

17   A   Very little.  I think I recall a small dresser or

18   something like that, but a cardboard box behind in which we

19   found the white pearls, a bed with no bedpost or foot post,

20   kind of a simple uncomplicated room.

21                    MR. WATKINS:  I have no further

22                    questions.

23                    MS. NOON: I just have a few

24                    questions.

25

REDIRECT EXAMINATION BY MS. NOON:


    Q  You indicated that your notes that, you normally said that you kept a legal pad at your desk.

    A  That's correct, Ma'am.

    Q  And those notes were then incorporated into your affidavit of probable cause.

    A  That's correct.

    Q  You indicated that either you or one of the troopers talked to a 15-year-old girl in the Rhodes' residence, and she indicated that she didn't hear anything unusual.  In November of 1991, this was a cold evening, and I believe it was a cold morning as well?

    A  I believe it was.

    Q  Did she indicate that the windows were closed in her house?

    A  Yes, she did.

    Q  You had also testified that the, Mrs. Ackerman told you that she woke up approximately 3:45, 3:50 in the morning, but her bedroom was on the first floor.

    A  That's correct, Ma'am.

    Q  And this particular crime scene, as you indicated, which is noted as the defendant's bedroom was on the second floor of this residence.

    A  It would have been on the second floor and the

1  opposite end of the building as I recall it.

2      Q  You indicated that Mrs. Ackerman, that her son, the

3  defendant, was staying with her that evening, the evening of

4  November 10th of 1991, did you receive that directly from

5  Mrs. Ackerman--

6      A  Yes, Ma'am.

7      Q  --that information?  Did she at that time indicate to

8  you that the, that Charles Ackerman was staying at her

9  residence?

10     A  No, she did not.

11     Q  Now, you indicated that you viewed, and I think you

12 testified to this, but when you viewed the bed sheet you

13 determined that they were not fresh stains on the bed sheet,

14 is that correct?

15     A  They were very old type soiled sheet with very minute

16 stains, not fresh, no, sir, no, Ma'am.

17     Q  And that was at least part of the reason why you did

18 not send them to the state police crime lab.

19     A  That's correct, Ma'am.

20     Q  Okay.  When you talked to Patricia, was she at, did

21 she ever tell you that there was, that she knew that there

22 was anything on the sheet even prior to her getting to the

23 residence on that day?  Basically what I'm asking you is did

24 she ever mention anything about what was already on the sheet

25 when you talked to her?

1      A   No, she did not.

2      Q   And did she indicate that she had bled profusely in

3   regards to the room?

4      A   No, Ma'am, she did not.

5      Q   Okay.  You had testified to the jury, you had

6   testified to the jury that fingerprints would have been no

7   evidential value, and I just want you to elaborate on that

8   for a minute.  You had mentioned that this particular area

9   was the defendant's residence.

10     A   That's correct.

11     Q   So what, why would you think that they are there,

12   fingerprints would be of no evidential value?  I think the

13   answer is obvious, but I just want you to answer that for the

14   jury, please.

15     A   Well, the defendant at some point lived in that

16   residence and frequented the residence, and you could assume

17   that his fingerprints would be present somewhere.

18     Q   This particular point of the investigation, was it to

19   put the victim, Patricia Brobst, in this room, is that what

20   you were looking for when you went there on November 10th in

21   regards to the consent search?

22     A   That's correct.

23     Q   And items that she had left there?

24     A   That's correct, Ma'am.

25     Q   Did you also remember at some point either talking to

1   or interviewing a Debbie Enama, do you remember?

2       A   That name escapes me at this time.

3                       MS. NOON:  Okay.  I have nothing

4                   else.

5                       MR. WATKINS:  Just one slight

6                   follow-up.

7

8   RECROSS EXAMINATION BY MR. WATKINS:

9

10      Q   When you were searching, did you search the trash

11  bins, the trash barrels, the garbage cans, that type of thing

12  looking for items that had been mentioned to you or someone

13  in your group?

14      A   No, I did not personally, sir, but I wouldn't exclude

15  Trooper Williams or Trooper Sist.  I really couldn't say if

16  they did, but I didn't, no.

17      Q   You searched thoroughly.  I mean you tried to search

18  thoroughly these items?

19      A   The bedroom, yes.

20                      MR. WATKINS:  Okay, thank you.  I

21                  have nothing further.

22                      MS. NOON:  Nothing else of this

23                  witness.

24                      THE COURT:  Okay, thank you.

25                      THE WITNESS:  Thank you, your Honor.

# EXHIBIT D

# OPINION & ORDER
# DATED 6/21/94

**COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY**
**CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA    :    No. 84-1992

                                :

                v.              :

                                :

EDWARD PAUL ACKERMAN,           :

                    Defendant   :

FILED

JUN 2 2 1994

Stephen M Lukach Jr.
Clerk of Courts
Per      VA

Karen Byrnes-Noon, Esq., Assistant District Attorney - for the Commonwealth
Kent D. Watkins, Esq. - for the Defendant

## ORDER AND OPINION PURSUANT TO PA.R.A.P. 1925

STINE, J.

AND NOW, this __21st__ day of June, 1994, at __4:00__ __P__.M., in accordance with the Opinion of the Court, the Clerk of Courts of Schuylkill County is directed to transmit the record papers to the Pennsylvania Superior Court.

BY THE COURT,

_____, J.

COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA  : No. 84-1992
                             :
              v.             :
                             :
EDWARD PAUL ACKERMAN,        :
                  Defendant  :

Karen Byrnes-Noon, Esq., Assistant District Attorney - for the Commonwealth
Kent D. Watkins, Esq. - for the Defendant

### OPINION PURSUANT TO PA.R.A.P. 1925

STINE, J.

The defendant, Edward Paul Ackerman, was tried before this court and a jury from October 29 through November 2, 1992, on charges of kidnapping, unlawful restraint, rape, involuntary deviate sexual intercourse, aggravated indecent assault, aggravated assault, simple assault, recklessly endangering another person, and terroristic threats. Following completion of the Commonwealth's case, the offenses of unlawful restraint pursuant to §2902(1) of the Crimes Code, aggravated assault and recklessly endangering another person were dismissed[1]. The defendant was convicted on the charges of indecent assault and simple assault, however the jury was unable to reach a verdict as to the offenses of kidnapping, unlawful restraint, rape, involuntary deviate sexual intercourse, aggravated indecent assault, and terroristic threats. Timely post-verdict motions were filed challenging the sufficiency of the evidence, moving for acquittal pursuant to Pa.R.Crim.P. 1124, challenging issues regarding jury instructions, and raising issues of double jeopardy.

---

[1] The court denied the demurrer with regard to the unlawful restraint charge under subsection 2 of 18 Pa.C.S.A. §2902, thereby allowing the offense under that subsection to go to the jury.

On February 18, 1994, the post-verdict motions were denied, and this appeal followed. Although the appeal filed preceded sentencing, the record from the lower court is being forwarded together with this Opinion because issues involving double jeopardy were raised and disposed of by the trial court in the post-verdict motions[2]. The trial court was aware that the Commonwealth intended to proceed with a subsequent prosecution on the offenses which were undecided by the jury, and in light of the rationale set forth in **Commonwealth v. Bolden**, infra, the trial court has recognized the timeliness of this appeal without objection by the Commonwealth. As reflected in the docket entries the defendant did file a motion to dismiss those charges upon which the jury was unable to return a verdict on February 28, 1994. The Commonwealth sought to quash that motion on March 7, 1994, because of the ruling of the trial court on the post-verdict motions.

## I. THE WEIGHT OF THE EVIDENCE

By way of paragraphs 1, 2, 3, 4, 5, 6, 7, 9, 13, 14 and 15 in the post-verdict motions, the defense raises issues challenging the sufficiency of the evidence with regard to those matters in which a determination of guilt was entered, as well as those offenses in which the jury could not reach a verdict (Pa.R.Crim.P. 1124). Although the post-verdict motions relate to various stages in the trial, because each challenges the sufficiency of the evidence[3], all are considered herein.

The standard of review for the trial court as it passes upon a motion challenging the sufficiency of the evidence is limited to a determination of the absence or presence

---

[2] Although generally a criminal defendant may appeal only from a judgment of sentence, the denial of a defendant's double jeopardy or Pa.R.Crim.P. §110 claims may be appealed prior to trial or judgment of sentence. *Commonwealth v. Bolden*, 472 Pa. 602, 373 A.2d 90 (1977); *Commonwealth v. Norman*, 248 Pa. Super. 341, 375 A.2d 128 (1977). Interlocutory appeals of colorable double jeopardy claims are permitted. *Commonwealth v. Rightley*, 421 Pa. Super. 270, 617 A.2d 1289 (1992).

[3] Those challenges include the denial of the demurrer by the court, the sufficiency of the evidence to support the findings of guilt, as well as the sufficiency of evidence as to those charges upon which the jury could not reach a verdict pursuant to Pa.R.Crim.P. 1124(a)(3).

of that quantum of evidence necessary to establish the elements of the crime. *Commonwealth v. Bigelow*, 416 Pa. Super. 449, 611 A.2d 301 (1992). In deciding a motion challenging sufficiency, the court must evaluate the evidence upon the entire trial record, and all the evidence must be read in the light most favorable to the Commonwealth, the Commonwealth being entitled to all reasonable inferences arising therefrom. *Commonwealth v. Tabb*, 417 Pa. 13, 207 A.2d 884 (1965); *Commonwealth v. Meadows*, 471 Pa. 201, 369 A.2d 1266 (1977). Where there has been a conviction, the evidence must be viewed in a light most favorable to the Commonwealth as the verdict winner, and must be assessed to determine whether the jury could have found that each and every element of the charged offense was proven beyond a reasonable doubt. *Commonwealth v. Battiato*, 422 Pa. Super. 285, 619 A.2d 359 (1993). The facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence, and questions of doubt should be resolved by the jury unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. *Commonwealth v. Battiato*, supra. The sufficiency standard and ruling at the conclusion of the Commonwealth's case is whether the evidence, if believed by the fact finder, and all reasonable inferences stemming from the evidence established the crime as charged. *Commonwealth v. Wimberly*, 488 Pa. 169, 411 A.2d 1193 (1979).

So viewed, the evidence established that the victim, a 44-year old female, had departed the Valley View Hotel, in the village of Nuremburg, during the early morning hours of November 10, 1991, after having been at the hotel for a period of several hours. While there the victim engaged in dancing, had consumed a number of sodas, and had observed the defendant at that location drinking beer. Although the victim was uncertain as to the actual time she departed the hotel, she did testify that it was after the hotel had closed and the entertainment ceased.

After departing the hotel the defendant proceeded toward her home in the village of Nuremburg and encountered the defendant while on her way home. The defendant crossed the street and approached the victim, placed his arm around her and began walking with her in the direction of her home. While en route, and after walking a short distance, the defendant grabbed the victim by her wrist and dragged her into a yard adjacent to a home known as the Rhodes home. After being dragged into the yard, the victim was forced to the ground by the defendant and dragged for some distance, however she ultimately was able to get away from the defendant. The defendant caught the victim as she was running, and again dragged her into the yard area where he removed her panty hose and pants and began biting the victim in the face. The defendant got on top of the victim, holding the victim on the ground by her wrists.

After the defendant knocked the victim to the ground a second time and bit the victim's face and hand at several locations, the victim again got free and was chased and dragged to the ground by the defendant another time. The victim was then dragged by her hair, face down across the field, across the street, to a point along the road where the defendant pounded the victim's head onto the roadway. The victim was then taken by the hair and her hand to the home of the defendant, where she was taken up the steps and into a bedroom at the defendant's home.

Once inside the bedroom location, the defendant closed the door, ordered the victim to undress, and by the testimony of the victim bit her, pinched her breasts, inserted his penis into her both vaginally and rectally, and ultimately forced his penis into her mouth. During the process the victim was removed approximately 250 feet from the point where she was originally attacked, and sustained various bruises and bite marks to the face, hand, back, and breast area. In addition, clumps of hair were pulled from the head of the victim, and at the conclusion of the incident inside the bedroom, a clump of the victim's hair was placed in a book and she was told to swear that she would not tell anyone what occurred.

4

After leaving the home of the defendant, the victim proceeded to her apartment where she called a friend, and informed her of the incident that occurred. Following the arrival of the victim's friend, the victim was transported to the Hazleton State Hospital where she was treated for the injuries sustained, had samples taken for processing with a rape kit, and ultimately was referred to the Pennsylvania State Police. During the course of the incident, the defendant's shoes and glasses were left behind in the yard adjacent to the defendant's home and the victim lost a pair of simulated pearls in the bedroom of the defendant. The victim testified that while she undressed herself at the home of the defendant, she did so in a state of fear, including fear for her own life.

Following the report to the Pennsylvania State Police, they proceeded to the defendant's home. Although the defendant was not present, they were admitted to the home by the defendant's mother and proceeded to the bedroom described by the victim. At that location the police secured several items of physical property, including hair samples and the pearls described and later identified as belonging to the victim. In addition, the victim's shoes and glasses were recovered next to a garage in the yard area described as the initial point of attack. The results of the scientific testing on the rape kit contents, done at the direction of the Pennsylvania State Police, proved negative. Trooper McAndrew of the Pennsylvania State Police testified that he ultimately contacted the defendant, gave him his constitutional rights commonly known as Miranda warnings, was advised by the defendant that he had an encounter with the victim, but that in every respect the relationship between the two was with the victim's consent.

In addition, expert testimony was produced by the Commonwealth by Barbara Rowley, a forensic scientist with the Pennsylvania State Police and Richard Bindie, M.D., a forensic pathologist. That testimony demonstrated that hair found in the room of the defendant matched the hair of the victim and that it had been forcibly pulled from the victim's head. Additionally, Dr. Bindie's testimony revealed that the injuries

5

sustained in the face and back area of the victim were consistent with bite marks, and the marks on the victim's body were the result of suction. The testimony of the forensic scientist revealed that the analysis performed on the Johnson rape kit was negative for the presence of spermatozoa or seminal fluid.

Viewing all the evidence admitted at trial, together with all reasonable inferences to be drawn therefrom in the light most favorable to the Commonwealth, all of the defendant's arguments with regard to the sufficiency of the evidence must fail. In viewing the elements of the offenses in which the jury returned a verdict of guilty, in light of the Commonwealth's testimony, it is clear that the evidence is more than adequate to establish a verdict of guilt beyond a reasonable doubt. Likewise, the evidence presented on those offenses to which the jury was unable to reach a verdict was of a sufficient quantum at law to deny the motion of acquittal of the defendant pursuant to Pa.R.Crim.P. 1124.

The defendant specifically argues that the court committed error in not granting the motion for acquittal with regard to the crime of kidnapping, arguing that there was insufficient evidence that the victim had been removed a **substantial** distance or confined for a **substantial** period in a place of isolation. The defendant's contention on this particular offense must likewise fail. The offense of kidnapping is defined as follows:

> §2901 Kidnapping
> (a) Offense defined. - A person is guilty of kidnapping *if he unlawfully removes another a substantial distance, under the circumstances, from the place where he is found, or* if he unlawfully confines another for a substantial period in a place of isolation, with any of the following intentions:
>                . . . . . . . . . . . . . . . . .
>
> (2) to facilitate the commission of any felony or flight thereafter.
> (3) to inflict bodily injury on or to terrorize the victims or another.
> 18 Pa.C.S. §2901 (emphasis added).
>                . . . . . . . . . . . . . . . . .

6

The evidence adduced in this proceeding is more than ample to permit the charge of kidnapping to be submitted to the jury. As noted in *Commonwealth v. Laird,* 526 Pa. 578, 587 A.2d 1367 (1991), kidnapping can be established by proof of either removal or a substantial period of isolated confinement; proof of both is not necessary. The substantial distance requirement is to be evaluated "under the circumstances", *Laird,* supra. 587 A.2d at 1382. The circumstances here, where the victim was dragged several hundred feet across a lot and a side street to the home of the defendant, and ultimately into the bedroom of the defendant, is clearly adequate to submit to the jury the question as to whether or not the victim had been removed a substantial distance. Although the jury was unable to reach a verdict on this count, it is clear that the Commonwealth had met its burden and that a judgment of acquittal must be denied.

## II. JURY INSTRUCTIONS

The defense next contends that the court committed error in failing to charge with regard to the defense points for charge numbered 5 and 6[4]. The defendant's proposed points for charge were made part of the record as Court Exhibit No. 1. The primary duty of a trial judge in charging a jury is to clarify the issues so that the jury may understand the questions to be resolved. *Commonwealth v. Litman,* 276 Pa. Super. 114, 419 A.2d 121 (1980). A trial court is not required to affirm all requested instructions, even though the statement of law contained therein may be correct. It is free to use its own form of expression so long as it adequately, accurately, and clearly

---

[4] To preserve an issue regarding the charge to the jury, a specific objection must be made pursuant to Pa.R.Crim.P. 1119(b) and Rule 302. See *Commonwealth v. Rounds,* 510 Pa. 524, 510 A.2d 348 (1986). Although defense counsel did not specifically object to the charge to the jury, he did question the court's ruling on the points for charge which were done in camera at the conclusion of the charge to the jury (Tr. p. 350). Although not formed as a specific objection, the trial court has recognized defense counsel's reference to the denied points for charge as an objection.

explains the principle of law for the jury. *Commonwealth v. Perkins,* 473 Pa. 116, 373 A.2d 1076 (1977).

Defense point for instruction number 5 was as follows: "Where it is established the general reputation of the witness for truth and veracity is bad, the trier may disregard her uncorroborated testimony. *Mathney v. Flory Milling Co.,* 283 Pa. 331, 129 A. 109 (1925)." While not utilizing the exact language requested by defense counsel, the court clearly charged the jury with regard to the assessment of testimony, as well as the right to disregard any and all testimony, in light of the allegations that the victim's reputation for truth and veracity had been questioned (Tr. p. 334). The language was clear and adequately covered the issue raised by defense counsel regarding the charge on point 5. The trial court has broad discretion in phrasing its points for charge, and is not bound to give instructions in the form requested, but may choose its own language so long as the area is adequately, accurately, and clearly presented to the jury for their consideration. *Commonwealth v. Ohle,* 503 Pa. 566, 470 A.2d 61 (1983).

Defense also alleges error in the court's failure to charge on point 6, which was a recitation from *Commonwealth v. Hook,* 355 Pa. Super. 10, 512 A.2d 718 (1986). In so ruling, the court determined that the principle enunciated in *Hook* was not applicable to the facts in this proceeding where the proof of the Commonwealth demonstrated that the victim had been removed a substantial distance. Likewise, the court further found that the language from *Hook* relied upon by the defendant was mere <u>dicta</u>, and not a statement of existing law. The court is not bound to give instructions requested where the form of the instruction does not reflect a correct interpretation of the law. *Commonwealth v. Holland,* 480 Pa. 202, 389 A.2d 1026 (1978). Furthermore, in light of the fact that the defendant was not convicted of the specific charge referenced by point 6, the failure to give such a charge would be harmless error. As a general rule, the refusal to give a proper instruction requested by

8

a party is ground for a new trial only, and since the defendant was not convicted, any error with regard to point 6 is harmless. See *Commonwealth v. Lamassa,* 367 Pa. Super. 54, 532 A.2d 450 (1987).

## III.  JURY INQUIRY AS PART OF THE RECORD

The defense next contends that the court erred in failing to read notes from jurors into the record in open court.  In his brief the defendant argues that the failure to make the inquiry from the jury part of the record, both by reading it into the record and providing a copy for review by defense counsel, constitutes prejudicial error, apparently warranting a new trial.  Defense counsel cites to the cases of *Commonwealth v. Rush,* 605 A.2d 782 (1992); *Commonwealth v. Dawson,* 301 Pa. Super. 82 (1982); *Commonwealth v. Hopson,* 484 Pa. 250, 398 A.2d 1364 (1979); and *Commonwealth v. Jones,* 248 Pa. Super. 214, 375 A.2d 63 (1977)[5] to support the proposition that counsel must be made aware of the contents of a jury's request and counsel must be made aware of the contents of the communication from the jury.  After review of those cases, the court found that none of the cases cited relate to the propositions raised as controlling law by defense counsel.  The only case having any applicability to this proceeding is *Commonwealth v. Jones,* supra, wherein the Superior Court held that where the trial court erred with regard to jury instructions, or supplemental jury instructions, and defense counsel did not object to the error, the allegations of error have been waived.  *Commonwealth v. Jones* at 375 A.2d 65-66.  Review of the record herein demonstrates that defense counsel did not properly object.

Nevertheless, a review of the record indicates that on only one occasion did the jury return with questions or a request for additional instructions by the court.  As reflected in the trial record, the jury returned at 2:07 p.m. on November 2, 1992, requesting additional instructions on several of the charges.  The written request was

---

[5]  Cites are as submitted by defense counsel.

made part of the record as a court exhibit and specifically read into the record prior to further instruction (Tr. p. 357). Thereafter, the only communications to the court occurred at 3:40 p.m. and again at 4:05 p.m. wherein the jury advised the court that they had reached a hopeless impasse as to some of the charges. Since no further instructions were requested nor were any questions directed to the court, the notifications that the jury had reached an impasse were appropriately noted on the trial record (Tr. pp. 364 & 368). Following the first notification of impasse, the court did further instruct the jury to attempt to continue deliberation and directed their return to the jury deliberation room, however further successful deliberations did not occur. At no time did defense counsel object to the statement from the jury that they had reached an impasse. No error was committed by the trial court.

## IV. BAR TO FURTHER PROSECUTION / DOUBLE JEOPARDY

The defendant finally contends by way of paragraphs 12, 16, 17, 18, and 20 of the post-verdict motion, that any subsequent prosecution on the charges upon which the jury could not render a verdict are barred by principles of double jeopardy. The argument by the defendant challenges the Commonwealth's right to proceed with a successive prosecution on two distinct double jeopardy grounds: (1) in paragraphs 12, 18, and 20 of the post-verdict motions, the defense argues that the declaration of a mistrial by the court was not manifestly necessary, and accordingly further prosecution is barred; and, (2) in paragraphs 16 and 17 of the post-verdict motions, the defense argues that the convictions on the counts of simple assault and indecent assault bar further prosecution for the offenses upon which the jury could not return a verdict.

The double jeopardy provisions found in both the Fifth Amendment to the United States Constitution and Article 1, Section 10 of the Pennsylvania Constitution prohibit not only the possibility of conviction or multiple punishment, but also protect an accused from the burden of having to stand trial a second time, when a jury is

10

discharged for failure to reach a verdict.  Retrial is barred unless the discharge of the jury was manifestly necessary.  *Commonwealth v. Bolden,* 472 Pa. 602, 373 A.2d 90 (1977); *United States v. Jorn,* 400 U.S. 470, 27 L.Ed.2d 543, 91 S.Ct. 547 (1971); *Commonwealth v. Sullivan,* 484 Pa. 130, 398 A.2d 978 (1979).  Manifest necessity for mistrial exists in a jury trial when there is no reasonable probability that the jury will agree upon a verdict.  *Commonwealth v. Kivlin,* 267 Pa. Super. 270, 406 A.2d 799 (1977).  The decision as to whether to declare a mistrial is within the sound discretion of the trial judge; however, before the jury can be properly dismissed, the trial judge must ascertain the position of the jury from his or her personal communications with the jury and must be satisfied that further deliberation to reach a verdict would be futile. *Commonwealth v. Reardon,* 374 Pa. Super. 212, 542 A.2d 572 (1988); *Commonwealth v. Bartolomucci,* 232 Pa. Super. 559, 335 A.2d 747; <u>affirmed</u> 468 Pa. 338 (1976).  The number of hours of deliberation by a jury is not the controlling factor in determining whether or not absolute necessity exists warranting declaration of a mistrial; however, the court must consider the defendant's timely objection, the jury's collective opinion that it could not agree, the length of jury deliberation, the length of trial, the complexity of issues presented to the jury, the communications between the judge and the jury, and any other factors the court finds relevant. *Commonwealth v. Fredericks,* 235 Pa. Super. 78, 340 A.2d 498 (1975); *United States v. Crosley,* 634 F.Supp. 28, E.D. Pa. (1985).  The voluntary statement of the jurors that they were at an impasse is entitled to great weight by the trial court in deciding whether deadlock exists that warrants declaration of a mistrial. *U.S. v. Crosley,* <u>supra</u>.

In this proceeding the testimony during the trial was rather short duration (eight hours of actual testimony) and the issues, as in most assault cases, not very complex. The critical issue to be determined by the jury was essentially the credibility of the victim.  The jury began deliberations at 12:05 p.m. on November 2, 1992, and returned for additional instructions on the offenses charged at 2:03 p.m. on the same date.  The

jury again deliberated until 3:40 p.m. at which time they returned to the courtroom and advised the trial judge that they had reached an impasse as to some of the offenses. At this point, the trial court advised the jury of the importance of the proceeding to all parties involved, asked that they return to the jury deliberation room to attempt further negotiations, and asked if anything further could be provided by the court to assist in that deliberation process. At 4:05 p.m. on the same day, the jury again returned to the courtroom and the foreperson advised the court that they remained at a hopeless impasse as to some of the charges. The court inquired of each juror as to whether or not he or she individually felt that an impasse that could not be resolved by further negotiation was at hand, to which each juror unequivocally and individually responded affirmatively. In assessing the individual questioning of each juror by the trial court, the trial court found the responses by the jurors to be without hesitation and completely sincere. Given the nature of the proceeding, the relatively short period of testimony, the lack of complex issues before the jury, and the sincerity of the jury in advising the court that they had reached an impasse as to some of the charges, the court determined that the jury was hopelessly deadlocked. This determination was further supported by the fact that the jury was able to reach a unanimous verdict on two offenses, clearly suggesting the sincere consideration given to the case by each individual juror. As such the court found that manifest necessity dictated the sua sponte declaration of a mistrial which would not bar further prosecution on the offenses which the jury could not reach a verdict. See *United States v. Corbitt,* 368 F.Supp. 881 (1973).

In conjunction with this argument the defense argues that the court committed error in failing to give a "*Spencer*" charge when the report of an impasse was announced to the trial court. See *Commonwealth v. Spencer*, 442 Pa. 328, 275 A.2d 299 (1971). The giving of a *Spencer* charge is a matter for the exercise of discretion by the trial court which will not be reversed absent an abuse of that discretion.

*Commonwealth v. Santiago*, 492 Pa. 297, 424 A.2d 870 (1981). Here the trial court properly advised the jury members of their responsibilities in attempting to reach a verdict and of the requirements of further deliberations (Tr. pp. 364-367). As such the trial court did not commit error in this proceeding.[6]

The defendant's final arguments, as contained in paragraphs 16 and 17 of the post-verdict motions, assert that the convictions of the offenses of simple assault and indecent assault bar further prosecution by the Commonwealth as to all offenses in which the jury was unable to return a verdict. The arguments so advanced by the defendant appear to be a compilation of arguments centered around Pa.R.Crim.P. 1120(d), Crimes Code Section 110 (18 Pa.C.S.A. §110), and the Fifth Amendment to the United States Constitution under *Grady v. Corbin,* 495 U.S. 508, 109 L.Ed.2d 548, 110 S.Ct. 2084 (1990). Although the same basic rights are arguably at issue, the analysis as to those separate issues is distinct.

The defendant's arguments with regard to the bar to future prosecutions as a result of Pa.R.Crim.P. 1120(d) and Section 110 of the Crimes Code, are controlled by the analysis of the Pennsylvania Superior Court as set forth in *Commonwealth v. Harris,* 400 Pa. Super. 12, 582 A.2d 1319; 1990 (alloc. denied in 597 A.2d 1151). In *Harris*, the Superior Court enunciated the following rule:

> "The rule which emerges from the decided cases, therefore, is that retrial of the charges on which a jury has been unable to agree is not barred unless the jury made findings on one or more other charges which must be interpreted as an acquittal of the offense for which the defendant is to be retried". 582 A.2d at 1322.

---

[6] It must be noted that defense counsel did not request a further instruction from the trial court after the instructions were given at pp. 364-367 of the transcript. Most *"Spencer"* type issues follow such an instruction and subsequent conviction.

In *Harris*, the jury found that the defendant was guilty of committing a simple assault, but was unable to reach a verdict on the charge of aggravated assault. After careful analysis of the purposes which emerge involving principles of collateral estoppel and codified double jeopardy protections in the applicable Pennsylvania Rule of Court, the Superior Court agreed that the Commonwealth was not prohibited from proceeding with further prosecution on the charge of aggravated assault[7]. As was noted by the Superior Court, the verdict in *Harris*, wherein the jury found the defendant had caused or attempted to cause bodily injury, did not necessarily prevent a finding by another jury that the appellant had also caused or attempted to cause serious bodily injury. Those considerations control in the case at hand. The convictions of the charges of simple assault and indecent assault do not prevent reprosecution by a subsequent jury of the more serious offenses to which the jury in this proceeding could not render a verdict.

*Harris* is likewise controlling with regard to an argument pursuant to 18 Pa.C.S.A. §110. As noted by the Superior Court, a defendant's retrial is not barred by the provisions of Section 110 of the Crimes Code in instances where all charges were brought in one prosecution. Section 110 of the Crimes Code "applies only to successive prosecutions, not to the distinct problem of retrial following a deadlocked jury." *Commonwealth v. Harris*, at 582 A.2d 1325. As noted by the Superior Court, Section 110 was designed to limit successive prosecutions where all charges arising out of the same criminal transaction could have been brought in a single prosecution. See *Commonwealth v. Holmes*, 480 Pa. 536, 391 A.2d 1015 (1978). In this proceeding the Commonwealth complied with Section 110 by bringing all charges against the defendant in a single proceeding. A retrial on the charges to which the jury had reached a deadlock is, therefore, not precluded. See also *Commonwealth v. McCane*, 517 Pa. 489, 539 A.2d 340 (1988).

---

[7] As recognized by the Superior Court, the reverse may not be true. If the jury had found the defendant not guilty of the included offense, the principles advanced would have prevented a retrial for the aggravated assault.

The defendant also appears to argue that further prosecution is barred by application of the Fifth Amendment to the United States Constitution as interpreted by *Grady v. Corbin,* supra. This argument is likewise without merit. Pennsylvania Courts have not given its citizens broader double jeopardy protection than that provided by the United States Supreme Court interpreting the Federal Constitution. See *Commonwealth v. Rosario*, 418 Pa. Super. 196, 613 A.2d 1244 (1992). A court , including an appellate court, must decide a case according to existing laws, because the court has the duty to apply the law as it exists at the time it renders its decision, including those decisions rendered in criminal cases. See *Commonwealth v. Rightley*, 421 Pa. Super. 270, 617 A.2d 1289 (1992); *Commonwealth v. Kohl*, 532 Pa. 152, 615 A.2d 308 (1992).

In this proceeding, the reliance by the defense on *Grady v. Corbin*, is misplaced, in that the *Grady* decision had been overruled by the United States Supreme Court at the time of the trial court's decision as to the double jeopardy challenge. See *United States v. Dixon,* 509 U.S. ____, 113 S.Ct. 2849, 125 L.Ed.2d. 556 (1993). In *Dixon*, the Supreme Court of the United States expressly overruled its prior decision in *Grady v. Corbin*, thereby eliminating the "same-conduct" rule, and reestablishing prior constitutional analysis to determine "whether two offenses resulted, each of which had an element not embraced in the other". In applying the prior double jeopardy case law as enunciated in *Blockberger v. United States*, 284 U.S. 299, 76 L.Ed. 306, 52 S.Ct. 180 (1932), the inquiry by this court was whether each offense contained an element not contained in the other. If not, they are the same offense and double jeopardy would bar additional punishment and successive prosecution. By carefully analyzing the statutory requisites for the charges upon which the defendant was convicted, with reference to those upon which the jury was unable to reach a verdict, it was clear to the trial court that the offenses upon which a verdict had not been rendered contain elements not found in the charges of simple assault and

15

indecent assault.  Accordingly, further prosecution is not prohibited.  The arguments raised by defense are thus not applicable to this proceeding.

For the reasons stated above, the post-verdict motions of the defendant were properly denied.

# EXHIBIT E

# JUDGMENT & MEMORANDUM OF SUPERIOR COURT DATED 11/7/94

J. S33019 (1994)

COMMONWEALTH OF PENNSYLVANIA,   )   IN THE SUPERIOR COURT OF
                        )         PENNSYLVANIA
        Appellee       )
                        )
    v.                )
                        )
EDWARD PAUL ACKERMAN,        )
                        )
        Appellant      )   No. 00984 Philadelphia 1994

Appeal from the Order of the Court of Common Pleas, Criminal Division, of Schuylkill County at No. 84-1992.

BEFORE:  BECK, HUDOCK and HESTER, JJ.

# J U D G M E N T

ON CONSIDERATION WHEREOF, it is now here ordered and adjudged by this Court that the judgment of the Court of Common Pleas of   SCHUYLKILL   County be, and the same is hereby   AFFIRMED.

BY THE COURT:

_David A. Szerzel_

PROTHONOTARY

Dated:   NOVEMBER 7, 1994

J. S33019 (1994)

COMMONWEALTH OF PENNSYLVANIA,   )    IN THE SUPERIOR COURT OF
                           )           PENNSYLVANIA
        Appellee        )
                           )
    v.                )
                           )
EDWARD PAUL ACKERMAN,        )
                           )
        Appellant      )    No. 00984 Philadelphia 1994

        Appeal from the Order of the Court of Common
        Pleas, Criminal Division, of Schuylkill County
        at No. 84-1992.

BEFORE:  BECK, HUDOCK and HESTER, JJ.

MEMORANDUM:        **FILED**  NOV 0 7 1994

    This is an appeal from the order of the Court of Common
Pleas of Schuylkill County which denied Appellant's post-trial
motions.  Appellant was charged with and tried before a jury on
two counts of kidnapping, two counts of unlawful restraint, two
counts of rape, two counts of involuntary deviate sexual inter-
course, one count of aggravated indecent assault, one count of
indecent assault, one count of aggravated assault, one count of
simple assault, one count of recklessly endangering another
person, and one count of terroristic threats.[1]  At the close of
the Commonwealth's evidence, Appellant's demurrer was granted and
one count of unlawful restraint, the count of aggravated assault,
and the count of recklessly endangering another person were
dismissed.  Following jury deliberations, Appellant was found
guilty of indecent assault and simple assault.  The jury, due to a

---

1

    18 Pa.C.S. §§ 2901(a)(2) and (a)(3); 2902(1) and (2);
3121(1) and (2); 3123(1) and (2); 3125; 3126(a)(1);
2702(a)(1); 2701(a)(1); 2705; and 2706, respectively.

J. S33019 (1994)

deadlock, was unable to reach a verdict as to the other charges, and a mistrial was declared by the trial court. In his post-trial motions, Appellant argued that any subsequent prosecution by the Commonwealth of the charges on which the jury deadlocked is barred by the principle of double jeopardy. The trial court denied Appellant's petition, and this direct appeal followed. We affirm.

Before addressing the merits of Appellant's claim, we must address the issue of whether this appeal is properly before us. In Commonwealth v. Bolden, 472 Pa. 602, 373 A.2d 90 (1977) (plurality), our Supreme Court, recognizing that normally an appeal may be had only after a judgment of sentence has been entered, held that an immediate appeal may be taken from an order denying a pre-trial motion to dismiss a criminal information on the ground of double jeopardy. This principle was limited in Commonwealth v. Brady, 510 Pa. 336, 508 A.2d 286 (1986), wherein our Supreme Court stated that a defendant may file an immediate appeal from a trial court's order denying a pre-trial motion to dismiss an information on double jeopardy grounds only if the trial court has not made a finding that such an appeal to this Court would be frivolous.

In the present case, the trial court reviewed the merits of Appellant's double jeopardy claim, which he made in his post-trial motions.[2] As noted, the trial court denied the post-trial

_____

[2]  The official docket entries reveal that, following the trial court's order denying Appellant's post-trial motions, Appellant filed a motion to dismiss the criminal information.

J. S33019 (1994)

motions, determining that the declaration of mistrial was clearly supported by manifest necessity.  We cannot find that this determination alone is equivalent to stating that Appellant's claim is frivolous.  See Commonwealth v. Gains, 383 Pa.Super. 208, 556 A.2d 870 (1989).  Thus, we shall address Appellant's appeal. See also Commonwealth v. Smith, 426 Pa.Super. 31, 626 A.2d 178 (1993)(appeal from order denying Appellants' post-trial motion to dismiss a retrial on the grounds of double jeopardy and collateral estoppel).

On appeal, the sole issue presented for our review is whether a subsequent prosecution for the charges on which the jury was deadlocked is barred by the principles of double jeopardy.  In this regard, Appellant claims that the trial court abused its discretion when it made a sua sponte declaration of a mistrial because no manifest necessity was shown.  Specifically, Appellant avers that the trial court, in its instructions to the jury, did not urge the jurors to reach a verdict before dismissing the jury.

It is well-settled that if a mistrial is declared without manifest necessity, double jeopardy attaches.  Commonwealth v. Mehmeti, 501 Pa. 589, 462 A.2d 657 (1983); Commonwealth v. Balog, 395 Pa.Super. 158, 576 A.2d 1092 (1990).  The inability of a jury to reach a verdict can constitute a manifest necessity that justifies a mistrial.  Commonwealth v. Murry, 498 Pa. 504, 447 A.2d 612 (1982).  Thus, in cases where a jury is properly determined to be deadlocked, the jury may be discharged without prejudice to the Commonwealth to retry the defendant again on the same charges.

J. S33019 (1994)

Commonwealth v. Williams, 373 Pa. Super. 270, 541 A.2d 7 (1988), alloc. den., ___ Pa. ___, 557 A.2d 724.

Our Supreme Court has instructed:

> In accordance with the scope of review, we
> must take into consideration all the circum-
> stances when passing upon the propriety of a
> declaration of mistrial by the trial court.
> The determination by the trial court to
> declare a mistrial after jeopardy has attached
> is not one to be lightly undertaken, since the
> defendant has a substantial interest in having
> his fate determined by the jury first
> impaneled. Commonwealth v. Stewart, 456 Pa.
> 447, 452, 317 A.2d 616, 619 (1974), citing
> United States v. Jorn, 400 U.S. 470, 91 S.Ct.
> 547, 27 L.Ed.2d 543 (1971). Additionally,
> failure to consider if there are less drastic
> alternatives to a mistrial created doubt about
> the propriety of the exercise of the trial
> judge's discretion and is grounds for barring
> retrial because it indicates that the court
> failed to properly consider the defendant's
> significant interest in whether or not to take
> the case from the jury. Commonwealth, ex rel.
> Walton v. Aytch, 466 Pa. 172, 352 A.2d 4
> (1976). Finally, it is well-settled that any
> doubt relative to the existence of manifest
> necessity should be resolved in favor of the
> defendant. Bartolomucci, [468 Pa. 338, 347,
> 362 A.2d 234 (1976)].

Commonwealth v. Diehl, 532 Pa. 214, ___, 615 A.2d 690, 691 (1992).

The length of time that the jury should deliberate is left to the discretion of the trial judge. Commonwealth v. Ketner, 304 Pa. Super. 226, 450 A.2d 653 (1982). Further, this determination must be decided on a case-by-case basis because "the trial of criminal cases involves a host of variables which precludes the mechanical formulation of predetermined periods of time for the jury's deliberations." Commonwealth v. Hoover, 314 Pa. Super. 158, ___, 460 A.2d 814, 815 (1983). It must be kept in mind that

J. S33019 (1994)

"[e]ach case differs in the complexity of the issues presented, the seriousness of the charges, the number of charges to be considered, [and] the amount of testimony to be digested and reviewed . . . " Commonwealth v. Monte, 459 Pa. 495, ___, 329 A.2d 836, 840 (1975).  However, "the primary element in judging whether a jury is really deadlocked is the firmness of its communication to the trial court that it is deadlocked and the judge's belief that such is the case." Hoover, 460 A.2d at 816.

In the present case, "the testimony during the trial was rather short [in] duration (eight hours of actual testimony) and the issues, as in most assault cases, not very complex.  The critical issue to be determined by the jury was essentially the credibility of the victim." Trial Court Opinion, at p. 11. The record further reveals that after the court's charge, the jury left the courtroom at 12:05 p.m. to deliberate.  At 2:03 p.m., the jury returned to the courtroom and was, after its request, further instructed on the charges of indecent assault, aggravated assault, and involuntary deviate sexual intercourse.  The jury again left the courtroom at 2:16 p.m. to continue its deliberations.  At 3:40 p.m., the jury returned to the courtroom and the following discussion took place:

> THE COURT:   . . . Now, ladies and gentlemen of the Jury, it has been brought to my atten-tion--I know you have been deliberating for roughly 3 1/2 hours, a little bit more than 3 1/2 hours--that you are having difficulty in resolving the issues or some of the issues raised in the particular case.
>
> I understand and believe me I am aware that in part the difficulty is an indication of the sincerity that you have exercised as jurors and your objectivity with regard to

J. S33019 (1994)

your duties as jurors in this particular case.

On the other hand, you know, I have some concern given the amount of time as to whether or not the confusion in your minds might be the result of the instructions; and there were a lot of instructions that I had given you in this case or about the law. I am in a position where if you think that after discussing again among yourselves that any further instructions might be helpful in any way, shape, or form, I would like to hear about that.

Now, I think you all realize and I told you that your verdict must be unanimous as to each of the charges that are before the Court. You do have a duty to consult with one another and deliberate with a view toward reaching an agreement if that can be done without violence to your individual judgment.

As I indicated initially, each of you must decide the case for yourself but only after an impartial consideration of the evidence and with your fellow jurors.

The foreperson of the Jury, you have indicated--there has been an indication that there is some deadlock here. What I would like you to do with that in mind, we have put a good deal of time into this. A number of people have put a good bit of time into this. You know how important that is. I would ask that you take the Jury back to the deliberation room. I would like you to discuss with the Jury whether or not they feel there is anything the Court can do, add additional, go over the charges, whether or not that would make any progress in your minds or the minds of your other jurors as to whether or not there might be some movement. If you think that that can be done, if you think that you can make progress, I would ask that you move in that direction. If you think that that's not going to make any progress, then notify the Court Attendant; and I'll have you come back into Court, and we'll proceed from there. Okay. Thank you.

N.T., 11/2/92, at pp. 364-67. At 3:43 p.m., the jury left the courtroom to further deliberate. Finally, at 4:05 p.m., the jury

-6-

J. S33019 (1994)

returned and stated that it had reached a decision on two of the charges, but that it was hopelessly deadlocked on the remaining charges.  The jury was individually polled by the trial court in order to determine whether the jury was at such an impasse that reaching a verdict was impossible.  At this time, the trial judge declared a mistrial.

Given the circumstances of this case, including the trial court's communications with the jurors, we find that the trial court did not abuse its discretion in granting a mistrial.  Four hours may not be an overly long period of time for a jury to deliberate, but, given the nature of the case and the simplicity of the matters involved (the credibility of the witnesses), it is evident that the jury was hopelessly deadlocked.  See Hoover, supra.  We must also reject Appellant's assertion that the trial court erred in not rendering an Allen charge to the jury.  See Allen v. United States, 164 U.S. 492 (1896).  Specifically, he alleges that, "[t[he jury should have been informed that the minority ought to give more weight to the opinions of the majority."  Appellant's Brief, at p. 12.  Initially, we note that defense counsel did not request such charge before a mistrial was granted.  Further, such request would have been in error given our Supreme Court's decision in Commonwealth v. Spencer, 442 Pa. 328, 275 A.2d 299 (1971).  In Spencer, our Supreme Court held that an Allen charge should no longer be used by the trial judges in the Commonwealth because to urge a juror in the minority to yield to the opinions of the majority has potential for abuse and coercion. Since we find that the discharge of the jury was required by

J. S33019 (1994)

manifest necessity, a new trial by the Commonwealth is not barred.[3]

    Order affirmed.

---

[3]

    We further note that, in Appellant's post-trial motions, he also argued that his convictions for simple assault and indecent assault bar any further prosecution because they are lesser included offenses of the other crimes. This claim was properly rejected by the trial court.  In respect to this claim on appeal, Appellant merely states that, "[d]ouble jeopardy holds that conviction of a minor included offense will bar a subsequent prosecution for a higher crime bracing the minor offenses. Commonwealth v. Bolden, 472 Pa. 602, 373 A.2d 90 (1977)."  Appellant's Brief, at p. 12.  Because this claim has not been more fully developed on appeal, we will not address it.  Commonwealth v. Sanford, 299 Pa.Super. 64, 445 A.2d 149 (1982).

# EXHIBIT F

# ORDER OF THE SUPERIOR COURT
# DATED 4/11/95

IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

COMMONWEALTH OF PENNSYLVANIA   : NO. 575 M.D. ALLOCATUR
                               : DKT. 1994
                               :
              V.               :
                               :
EDWARD PAUL ACKERMAN,          : Petition   for   Allowance   of
              PETITIONER       : Appeal from the Superior Court

O R D E R

PER CURIAM:

AND NOW, this 11th day of April, 1995, the Petition for
Allowance of Appeal in the above matter is denied.

Mr. Justice Montemuro is sitting by designation.

TRUE & CORRECT COPY

ATTEST: APR 1 3 1995

JOAN L. STEHULAK, ESQUIRE
DEPUTY PROTHONOTARY

# EXHIBIT G

# MEMORANDUM OF THE SUPERIOR COURT DATED 10/7/96

J.A30042/96

COMMONWEALTH OF PENNSYLVANIA    :    IN THE SUPERIOR COURT OF
                             :          PENNSYLVANIA
             v.                  :
                             :
EDWARD PAUL ACKERMAN,          :
               Appellant    :    No. 4080 Philadelphia 1995

Appeal from the Judgment of Sentence October 31, 1995 in the Court of Common Pleas of Schuylkill County, Criminal, No. 84-1992

BEFORE: BECK, KELLY, and SCHILLER, JJ.

MEMORANDUM:                    FILED    OCT - 7 1996

Appellant, Edward Paul Ackerman, appeals his judgment of sentence entered October 31, 1995, following his conviction of rape,[1] involuntary deviate sexual intercourse,[2] aggravated indecent assault,[3] indecent assault,[4] simple assault,[5] and terroristic threats[6] in two separate jury trials. We affirm.

The relevant facts and procedural history of this case are as follows. During the early morning hours of November 10, 1991, the victim, after having spent several hours dancing, departed the Valley View Hotel in the Village of Nuremburg. The victim had begun to walk toward her home when appellant, whom the victim had seen at the hotel but with whom she had not spoken, approached her and began walking with her in the direction of her home. After walking a short distance, appellant grabbed the victim by the

---

[1]   18 Pa.C.S.A. §3121.

[2]   18 Pa.C.S.A. §3123.

[3]   18 Pa.C.S.A. §3125.

[4]   18 Pa.C.S.A. §3126.

[5]   18 Pa.C.S.A. §2701(a)(1).

[6]   18 Pa.C.S.A. §2706.

wrist and dragged her into a yard. Appellant then forced the victim to the ground and dragged her for some distance. The victim managed to escape from appellant, but shortly thereafter, appellant caught the victim while she was running and again dragged her into the yard area. Appellant then removed the victim's pantyhose and pants and began to bite the victim's face and hands. The victim managed to escape once again, but appellant chased the victim and forced her to the ground another time. Appellant then dragged the victim by the hair through a field, across a street and to a point along the road where appellant then pounded the victim's head on the street. Next, appellant dragged the victim by her hair and hand to his home.

Once inside his home, appellant took the victim to a bedroom and ordered her to undress. Appellant subsequently bit the victim and pinched her breasts. Appellant forced his penis into the victim's vagina and anus and then into her mouth. At the conclusion of the assault, appellant ordered the victim to swear that she would not tell anyone what had happened. After leaving appellant's home, the victim went to Hazleton State Hospital where she was treated for her injuries and samples were taken for processing with a rape kit that later tested negative for the presence of spermatozoa or seminal fluid. For his part, appellant admitted to having a sexual encounter with the victim but maintained it was with the victim's consent in every respect.

On November 2, 1992, a jury convicted appellant of indecent assault and simple assault. The jury was unable to reach a verdict with respect to the remaining counts. After polling the

J.A30042/96 - 3

jury as to whether or not they believed a hopeless deadlock existed, the trial court entered a mistrial as to those charges.

On November 6, 1992, appellant filed post-trial motions. The trial court denied these motions on February 18, 1993.

On March 17, 1994, appellant filed a timely appeal. This Court affirmed the decision of the trial court and held that retrial was not barred by double jeopardy. Appellant petitioned the Pennsylvania Supreme Court for allowance of appeal. On April 11, 1995, the Pennsylvania Supreme Court denied appellant's petition, and on August 3, 1995, remanded the record to the trial court for a trial on the remaining charges.

Prior to appellant's second trial, the Commonwealth moved to <u>nol pros</u> the charges of kidnapping and unlawful restraint. The retrial began on September 11, 1995, and on September 13, 1995, a jury found appellant guilty of the remaining offenses of rape, involuntary deviate sexual intercourse, aggravated indecent assault, and terroristic threats. On October 31, 1995, the trial court sentenced appellant to a prison term of four to twelve years for rape, concurrent terms of four to twelve years for involuntary deviate sexual intercourse and one to twenty-four months for simple assault and a consecutive term of six to twelve months for terroristic threats. The remaining convictions merged for sentencing purposes. This timely appeal followed.

On appeal, appellant raises the following issues for our review:

    1.    IS THE VERDICT IS [SIC] AGAINST THE WEIGHT OF THE EVIDENCE BECAUSE THE SUFFICIENT EVIDENCE IS INCONSISTENT WITH THE DEFENDANT'S GUILT?

2. SHOULD A JUDGMENT OF ACQUITTAL HAVE BEEN ENTERED IN FAVOR OF THE DEFENDANT ON THE CHARGES ON WHICH THE JURY WAS UNABLE TO REACH A VERDICT?

3. DID THE COURT ERRED [SIC] IN ALLOWING THE JURY TO CONSIDER THE CHARGE OF KIDNAPPING AT THE FIRST TRIAL CAUSING CONFUSION TO THE JURY AND PREJUDICE TO THE DEFENDANT?

4. DID THE COURT ERRED [SIC] IN DENYING THE DEFENDANT'S POINT FOR CHARGE NUMBER FIVE (5) AND NUMBER SIX (6) AT THE FIRST TRIAL?

5. DID THE DEFENDANT'S CONVICTION AT THE FIRST TRIAL ON THE CHARGE OF INDECENT ASSAULT AND SIMPLE ASSAULT ACT AS AN ACQUITTAL OF ALL CHARGES WHICH REQUIRE INDECENT CONTRACT OR SIMPLE ASSAULT.

6. DID THE COURT ERR IN FAILING TO READ THE NOTES FROM THE JURORS INTO THE RECORD IN OPEN COURT.

7. DID THE COURT ERR IN FAILING TO SENTENCE THE DEFENDANT FOR THE CONVICTIONS OF THE FIRST TRIAL PRIOR TO THE COMMENCEMENT OF THE SECOND TRIAL.

8. THE COURT ERR AT THE SECOND TRIAL IN MANNER IN WHICH IT ALLOWED THE COMMONWEALTH'S WITNESSES TO TESTIFY AS TO THE ALLEGED VICTIM'S REPUTATION FOR TRUTH AND VERACITY.

9. DID THE COURT ERR IN ALLOWING TROOPER MCANDREW TO TESTIFY AS TO WHAT THE DEFENDANT ALLEGEDLY SAID WITHOUT VERIFICATION OF THE TELEPHONE CALLER.

Appellant's Brief at 5.

Our standard for reviewing a weight of the evidence claim is well settled.

> The decision to grant or deny a motion for a new trial on the ground that the verdict is against the weight of the evidence is committed to the trial court's sound discretion. Commonwealth v. Pronkoskie, 498 Pa. 245, 251, 445 A.2d 1203, 1206 (1982); Commonwealth v. Taylor, 324 Pa.Super. 420, 425, 471 A.2d 1228, 1230 (1984). The test is not whether this Court would have made the same decision but whether the verdict is so contrary to the evidence that justice compels a new trial. Id. For a

> new trial to be awarded on this challenge, the evidence must be "so tenuous, vague and uncertain that the verdict shocks the conscience of the court." Commonwealth v. Edwards, 399 Pa.Super. 545, 554, 582 A.2d 1078, 1083 (1990), appeal denied, 529 Pa. 640, 600 A.2d 1258 (1991). Where the credibility of a witness is at issue, the trial court's judgment will remain undisturbed on appeal. Commonwealth v. Rochon, 398 Pa.Super. 494, 504, 581 A.2d 239, 244 (1990). If the source of the evidence is, however, so unreliable or contradictory that it renders a verdict thereon pure conjecture, this Court will overturn the conviction. Commonwealth v. Whack, 482 Pa. 137, 140, 393 A.2d 417, 419 (1978); Commonwealth v. Trudell, 371 Pa.Super. 353, 538 A.2d 53 (1988), appeal denied, 519 Pa. 665, 548 A.2d 255 (1988).

Commonwealth v. La, 433 Pa.Super. 432, 460-61, 640 A.2d 1336, at 1351 (1994), allocatur denied, 540 Pa. 597, 655 A.2d 986 (1994). "[W]here the evidence is legally sufficient, it generally meets the test for weightiness." Commonwealth v. Edwards, 399 Pa.Super. 545, 554, 582 A.2d 1078, 1083 (1990), allocatur denied, 529 Pa. 640, 600 A.2d 1258 (1991)(citing Commonwealth v. Robinson, 351 Pa.Super. 309, 505 A.2d 997 (1986)). We also note that evidentiary rulings are committed to the trial court's sound discretion and will not be reversed absent a clear abuse of that discretion. Commonwealth v. Wood, 432 Pa.Super. 183, 211, 637 A.2d 1335, 1349 (1994)(citing Commonwealth v. Foy, 531 Pa. 322, 612 A.2d 1349 (1992); Commonwealth v. Halloway, 524 Pa. 342, 572 A.2d 687 (1990)).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable D. Michael Stine, it is our determination that there is no merit to appellant's issues raised on appeal. Judge Stine's opinion comprehensively discusses and properly disposes of each

J.A30042/96 - 6

issue presented.[7] Accordingly, we affirm on the basis of that opinion.

     Judgment of sentence affirmed.

---

   [7] For the trial court's discussion of appellant's first and second issues, <u>see</u> Trial Court Opinion, 2/2/96, at 3-4; issues three, four, five, and six at 4-5; issue seven at 5-6; issue eight at 7-8; and issue nine at 8-9.

# EXHIBIT H

# OPINION OF THE
# HONORABLE D. MICHAEL STINE

**COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY
CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA   :   No. 84-1992
                   v.               :

EDWARD PAUL ACKERMAN,         :
               Defendant  :

Karen Byrnes-Noon, Assistant District Attorney - for the Commonwealth
Kent D. Watkins, Esquire - for the Defendant

### OPINION PURSUANT TO PA.R.A.P. 1925

STINE, J.

The defendant, Edward Paul Ackerman, has filed a direct appeal to the Superior Court pursuant to Pa.R.Crim.P. 1410(A)(3) following his sentencing on October 31, 1995, on charges of rape, involuntary deviate sexual intercourse, aggravated indecent assault, indecent assault, simple assault, and terroristic threats. The convictions herein stem from two separate jury trials, the first occurring from October 29 through November 2, 1992 (convictions of indecent assault and simple assault) and the second occurring from September 11 through September 13, 1995, resulting in convictions of rape, involuntary deviate sexual intercourse, aggravated indecent assault, and terroristic threats. Following the November 2, 1992 conviction, where the defendant was convicted of two counts and the jury was unable to reach a verdict with regard to the remaining counts, the defendant filed post-trial motions which were disposed of by this court[1], and thereafter filed an appeal to the Pennsylvania Superior Court docketed

---

[1] At the time of the initial determination of guilt, post-verdict practice was governed by Pa.R.Crim.P. 1123. As such, the defendant was required to seek relief in the lower court by way of post-verdict motions, and thereafter appealed the denial of the post-verdict motions raising issues relative to double jeopardy. Although the defendant was convicted of two offenses during the first trial, sentencing was deferred until final disposition of the case to insure both legality and propriety of sentencing and to avoid the possibility of sentencing on offenses that might merge.

at No. 984PHI1994.  The judgment of the Court of Common Pleas of Schuylkill County was affirmed by the Superior Court on November 7, 1994, the defendant's petition for allowance of appeal was denied by the Pennsylvania Supreme Court on April 11, 1995, and the record was remanded to the trial court for trial on the remaining issues on August 3, 1995.

Prior to commencement of the retrial on the offenses to which the original jury could not render a verdict, the Commonwealth moved to nol pros the charges of kidnapping and unlawful restraint (18 Pa.C.S.A. §2902[2]), the motion being granted by the trial court on that date.  The retrial occurred from September 11, 1995 through September 13, 1995, with the defendant being convicted by a jury of the remaining offenses of rape, involuntary deviate sexual intercourse, aggravated indecent assault, and terroristic threats on September 13, 1995.  Following sentencing on October 31, 1995, this direct appeal followed, the trial court ordered a statement of matters complained of on appeal, which this opinion attempts to address.[2]

---

[2] This case demonstrates the difficulties encountered by the trial courts as a result of the amendment of the post-trial process in criminal proceedings by Pa.R.Crim.P. 1410 and that rules inconsistency with Pa.R.A.P. 1925.  The amendments regarding post-sentence motions were designed to expedite sentencing, address the realities of a trial judge reversing a previous decision, and directing research and writing on legal issues to a forum better staffed and suited for disposition of those issues.  Nevertheless, Pa.R.A.P. 1925 continues to mandate opinions by the trial court, even where direct appeals are taken to the Superior Court, which appears to defeat much of the purpose of Pa.R.Crim.P. 1410.  Following appeal the record is to be transmitted to the appellate court within 40 days.  During that time the trial court must determine the issues that are being raised on appeal (directing filing of a statement of matters complained of on appeal), assess the nature of those issues set forth in the statement, and transmit the record together with an opinion within that time frame (40 days).  The task presented is virtually impossible.  To begin, receipt of the statement of matters complained of on appeal usually takes half of the allotted time.  The trial court must make reason of the issues raised on appeal without the benefit of elaboration or briefing, must attempt to assume what arguments are being made by the advocates involved, and must render an opinion without the benefit of legal research by either party.  If in part the purpose of the change to the criminal rules was to divert the research and writing functions to forums more appropriate, the inverse has occurred.  The trial court is asked to do what the appellate courts will not, that is address legal issues raised by the parties without the benefit of legal briefing.  As demonstrated with regard to Paragraph VII herein, the trial court must attempt to frame the issue and become the advocate for presentation of those legal issues.  Hopefully some accommodation can be made by adjustment of the respective rules that will benefit the litigants as well as the trial and appellate court.

Because the testimony at the trial and retrial was substantially the same, and many of the issues raised were addressed in the Opinion of this court dated June 21, 1994, we reference that Opinion where dispositive, and attempt to address issues not covered by the prior Opinion.

## I.  THE WEIGHT OF THE EVIDENCE

By way of paragraphs 1, 2, 3, 6 and 7 of the defendant's concise statement of matters complained of on appeal, the defense raises issues challenging the sufficiency of the evidence which we address collectively.  To that extent, the court incorporates the factual discussion and legal analysis set forth at Roman Numeral I of the Opinion dated June 21, 1994.  Although the defendant generally argues that the verdict is against the weight of the evidence, it is clear from a review of the factual matters set forth that the defendant's arguments lack merit.  The testimony of the victim alone is adequate to support conviction for all of the offenses set forth herein.  Furthermore, in paragraph 2 of the statement, the defendant argues that the trial court should have entered a judgment of acquittal as to the offenses of which the defendant was not convicted on November 2, 1992, due to jury deadlock.  The mere fact that the jury was unable to reach a verdict on a number of counts is not tantamount to a conclusion that there is insufficient evidence to warrant a conviction by another jury.  Rather, to arrest judgment on the basis of insufficient evidence, it must be determined by the trial court after accepting all of the evidence and reasonable inferences therefrom which the verdict could properly be based, that such evidence and such inferences would, nonetheless, be insufficient as a matter of law to find the defendant guilty of the crimes charged beyond a reasonable doubt. *Commonwealth v. Bagley,* 296 Pa. Super. 43, 442 A.2d 287 (1982).  The motion must be evaluated upon the entire trial record, all

evidence must be read in a light most favorable to the Commonwealth, with an effect that such motion admits all facts which the Commonwealth's evidence tends to prove. *Commonwealth v. Harrison,* 290 Pa. Super. 389, 434 A.2d 808 (1981). In so doing it is clear from the factual scenario set forth in the testimony of the witnesses summarized in the Opinion of June 21, 1994, that a judgment of acquittal should not have been entered in favor of the defendant as to those charges where the jury was unable to reach a verdict. The discussion set forth in the attached Opinion under the heading "the weight of the evidence" likewise addresses the issues raised by defense counsel.

The defendant at paragraph 3 of the statement also suggests that confusion resulted from allowing the jury to consider the charge of kidnapping at the first trial. While the defendant states that the defendant was prejudiced by so doing, the court has difficulty in understanding how that prejudice relates to the charge of kidnapping where, as here, that offense was nol prossed without prejudice whatsoever to the defendant on that charge.

At point 6 the defendant argues that the scientific evidence is inconsistent with the defendant's guilt. Again, as recited in the prior Opinion, the evidence of guilt in this proceeding is overwhelming. The fact the some of the evidence, in this case scientific evidence, does not bolster the Commonwealth's case does not give ground for granting a directed verdict. At best the scientific evidence here could be viewed as conflicting with the testimonial evidence, nevertheless resolution of such conflicts is solely for the jury, and here the jury's finding is supported by the record. *Commonwealth v. Yohn,* 271 Pa. Super. 537, 414 A.2d 383 (1979); *Commonwealth v. Hinchcliffe,* 479 Pa. 551, 388 A.2d 1068 (1978).

## II.  JURY INSTRUCTIONS

The defendant raises issues of error with regard to jury instructions in points 4 and 5 of the statement of matters complained of on appeal.  These matters have been addressed by the lower court in the Opinion dated June 21, 1994, beginning at page 7.  Furthermore, the defendant's claim of error with regard to paragraph 4 involving the charge of kidnapping lacks merit in that that offense was nol prossed by the Commonwealth, and accordingly the defendant suffered no harm whatsoever even if an error were committed.

## III.  BAR TO FURTHER PROSECUTION

The defense next contends by way of paragraphs 8, 9, 11, 12, 13, 14 and 19 of the statement of matters complained of on appeal that any subsequent prosecutions on the charges upon which the jury could not render a verdict at the initial trial are barred by various principles, including principles of double jeopardy.  Those issues have been addressed beginning at page 10 of this court's Opinion of June 21, 1994, as well as the Opinion of the Superior Court disposing of the alleged jeopardy issues.

## IV.  JURY INQUIRY AS PART OF THE RECORD

The defense next contends that the court erred in failing to read notes from the jurors into the record in open court at the time of the first trial.  Again that issue is adequately addressed beginning at page 9 of the Opinion of June 21, 1994.

## V.  TIME OF SENTENCING

The defendant alleges error in paragraph 15 of the statement suggesting that the defendant was somehow prejudiced by the fact that the court did not sentence him

following his initial conviction, but rather sentenced as to all charges on October 31, 1995. Without the benefit of legal argument on this issue the trial court has difficulty in seeing any merit to this allegation. Pa.R.Crim.P. 1404(A)(1) provides that sentence in a court case shall ordinarily be imposed within sixty (60) days of conviction or the entry of a guilty plea. Prior to the adoption of changes to the Rules of Criminal Procedure effective as to cases in which the determination of guilt occurred on or after January 1, 1994, the rules provided no specific time limit within which sentence had to be pronounced. See *Commonwealth v. Glover,* 500 Pa. 524, 458 A.2d 935 (1983). As viewed by this court the conviction was not complete until a verdict was rendered on all counts before the court, being September 13, 1995, and thus sentencing prior thereto would be premature. While a sentencing date was initially set by the court following denial of the first appeal, it was realized by the court that to sentence at that time would be improvident. One, the case was not yet completed; and (2) the defendant could be subjected to multiple punishment for similar offenses. Frankly, to sentence following the initial conviction could only result in prejudice to the defendant, and the court cannot imagine any prejudice to the defendant by delaying sentencing until the case was completely resolved. Judicial economy and fairness dictate sentencing at one time.

## VI.  GRANT OF BAIL PENDING APPEAL

The defendant in paragraph 16 of his statement argues that the court erred in failing to grant bail pending an appeal. The court's reasoning set forth in the record at the time of sentencing, and further set forth in the Order of December 1, 1995, is dispositive of this allegation of error.

### VII.  PARAGRAPH 17

At paragraph 17 of the defendant's statement an error is alleged which, at first blush, is unintelligible.  Without the benefit of elaboration (reference footnote 2), at best the court can speculate as to the issue.  During the course of the trial the defense introduced a witness ( Reverend Judy Wadsworth) who testified as to the character of the victim, Patricia Brobst, for truthfulness.  (Tr. of trial of September 13, 1995, pp. 447 to 450.)  As shown in the transcript she testified that she knew the victim in the community, was aware of her reputation in the community as to truthfulness, and that the reputation in that regard was bad.  Nevertheless, under cross-examination, it appears that the testimony of the witness was questionable as to whether or not she heard statements about the victim by community members as to her truthfulness.

In rebuttal the Commonwealth offered several witnesses (Michael Bott, Stephen Fecko, Jr., Christine Dennison, and Brenda Rodriquez) to counter the character testimony of the defense.  (Tr. of trial of September 13, 1995, pp. 462-479.)  In so doing, the Commonwealth witnesses testified that they knew the victim for a long time, that they traveled in the same circles, would have heard adverse comments about the victim had there been any, and that there were not any such adverse comments about her truthfulness.  Defense counsel objected to the use of this testimony on the ground that it was an impermissible manner by which one can introduce character testimony.

In ***Commonwealth v. Gaines,*** 167 Pa. Super. 485, 75 A.2d 617 (1950) the Superior Court recognized that character evidence may be established by negative proof of good reputation.  As stated by the court:

> "... there is, however, a well established rule permitting
> negative proof of good reputation.  Within the confines of
> this rule, a witness who has never discussed nor heard
> discussed the reputation of a criminal defendant may

7

> nevertheless be competent to give proof of good reputation
> if it appears that he moved in the same circles as the
> defendant and would have heard adverse comments had
> there been any.  This rule has been stated in Wigmore
> Evidence, 3rd Edition, §1614 as follows: '.... the absence of
> utterances unfavorable to a person is a sufficient basis for
> predicating that the general opinion of him is favorable.' "
> 75 A.2d at 619.

This court sees no reason to distinguish the rationale herein from that of the present

case and finds that the decision in *Gaines* is controlling.


## VIII.  VOICE IDENTIFICATION OF THE DEFENDANT

In paragraph 18 of the statement the defendant argues that the court improperly

allowed Trooper McAndrew to testify as to what the defendant allegedly said without

verification that the voice on the telephone was actually that of the defendant.  That

allegation lacks merit.  Although the testimony of Trooper McAndrew could be viewed

as being somewhat inconsistent at the two trials[3], it is clear that the defendant never

objected to the testimony of the trooper as it related to the defendant's conversation.

Thus any error is waived.  *Commonwealth v. Farquharson,* 467 Pa. 50, 354 A.2d 545

(1976).  Furthermore, the context of the testimony demonstrates that identification of

the phone caller was from the mouth of the defendant at both trials.  At both

proceedings Trooper McAndrew testified that the defendant returned his call, identified

himself as Ackerman, and volunteered that his actions with the victim were consensual.

McAndrew requested that the caller respond to the state police station the next

morning, and the defendant appeared.  Clearly the issue of identity of the caller was

resolved by the defendant himself.   While it is generally recognized that it is not

---

[3] The testimony of Trooper McAndrew on this issue is found at pp. 189-190 of the transcript of October 29-30 of 1992 and pp. 310-321 of the transcript of September 11-13 of 1995.  The testimony at the first trial may be interpreted differently as to whether the defendant's statement was given over the phone on the evening of November 10, 1991 or in person on November 11, 1991.  The testimony at the second trial is clear in establishing that the statement was given over the phone.  In both instances the defendant clearly identified himself.

8

enough that during the course of a conversation a party stated that he or she was a certain person, the identity of the caller may be established by the circumstances. *Smithers v. Light,* 305 Pa. 141, 157 A. 489 (1931); *Limestone Products and Supply Co., v. Tom Brown, Inc.,* 198 Pa. Super. 375, 181 A.2d 696 (1962). Thus, authentication may be accomplished by circumstantial evidence showing facts that only one person would be likely to know. *Commonwealth v. Sullivan,* 372 Pa. Super. 88, 538 A.2d 1363 (1988). Trooper McAndrew placed the initial call, the person returning the call identified himself as the defendant, that person knew of the facts of the incident as only a participant would, and at the request of McAndrew that person (defendant) responded to the police station the next morning and again discussed the incident. The identity of the caller is well established.

# EXHIBIT I

# ORDER OF COURT OF THE HONORABLE D. MICHAEL STINE DATED 1/9/98

## COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY
### CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA   : No. 84-1992

            vs.

EDWARD ACKERMAN,

              Defendant

**F I L E D**

JAN 0 9 1998

Stephen M Lukach Jr.
Clerk of Courts

Pe: _____

Karen Byrnes-Noon, Assistant District Attorney - for the Commonwealth
Joseph P. Semasek, Public Defender - for the Defendant

### ORDER OF COURT

STINE, J.

AND NOW, this _____9th_____ day of January, 1998, at ___10:00___ A.M., in accord with our Order of September 19, 1997, and upon consideration of the Defendant's Post-Conviction Petition, as supplemented by post-conviction counsel on December 10, 1997, and the Commonwealth's response thereto, it is hereby ORDERED that the following claims designated in the supplemented motion filed December 10, 1997, are dismissed for the following reasons:

1.    Ineffectiveness for defense counsel's failure to obtain DNA testing.  The Defendant has failed to specify what exculpatory evidence was or may have been withheld, or to designate what may have been available for DNA testing.  As presented at trial there was no testimony to suggest physical evidence for purposes of testing, nor was there a suggestion of the existence of evidence that could have been tested.  The Defendant has failed to allege sufficient facts to support the claim.  **Commonwealth v. Cottman**, 327 Pa. Super. 453, 476 A.2d 40 (1984).

2.    Commonwealth's failure to comply with discovery.  The Defendant has failed to specify what exculpatory evidence was not made available.  Testimony from

both trials indicate full disclosure.  The Defendant has failed to allege sufficient facts to support this claim.

3.     Failure to produce notes.  The Defendant has failed to specify what notes the Commonwealth failed to produce.  References in the pro se petition to handwritten notes made by Trooper McAndrew were fully explained and not available for production.  All notes maintained by counsel appear to have been provided via discovery.  The Defendant has failed to allege sufficient facts to support the claim.

4.     Failure to examine all statements of victim/defendant.  The Defendant has failed to specify what exculpatory evidence or what statements made by the victim or defendant that were not provided for examination.  The Defendant has failed to allege sufficient facts to support the claim.

9.     Violation of Rule of Criminal Procedure 1405.  The provisions of the rule referenced by defense counsel were not in effect at the time of sentencing.  The effective date of the rule was July 1, 1996.  Furthermore, Defendant has failed to allege any prejudice as a result of the purported harm, and sentencing was completed within 60 days of the final verdict.  Furthermore, this issue has been fully litigated and addressed on appeal by the Superior Court of Pennsylvania, docketed at No. 4080PHL1993, dated October 7, 1996.

It is further ORDERED that a hearing on the issues raised in the Defendant's Petition in paragraphs 5 through 8 is scheduled for the **24th day of March, 1998, at 1:30 P.M.** in Courtroom No. 5, Schuylkill County Courthouse, Pottsville, Pennsylvania.

BY THE COURT,

_____, J.

2

# EXHIBIT J

## OPINION OF COURT OF THE HONORABLE D. MICHAEL STINE DATED 9/1/98
## AND
## ORDERS OF COURT OF THE HONORABLE D. MICHAEL STINE DATED 8/31/98 AND 1/9/98

DA

## COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY
## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA     :   No. 84 - 1992

vs.                  :

EDWARD ACKERMAN,             :
               Defendant     :

**F I L E D**

SEP 0 1 1998

Stephen M Lukach Jr
Clerk of Courts
Per

Karen Byrnes Noon, Assistant District Attorney - for the Commonwealth
Joseph P. Semasek, Public Defender - for the Defendant

### OPINION OF COURT

STINE, J.

       The matter before the court for consideration is the defendant's petition for relief under the Post-Conviction Relief Act, 42 Pa.C.S.A. §9541, *et seq.* An evidentiary hearing was conducted by the court, at which time the defendant was represented by counsel other than trial counsel. After careful consideration of the entire record and the applicable law, we are convinced that the defendant's petition must be denied.

       We make the following **FINDINGS OF FACT:**

       (1) The defendant was arrested on November 11, 1991, and charged with rape and related offenses.

       (2) Following a preliminary hearing the defendant was held for court on these charges.

       (3) The case was tried before this court and a jury from October 29 through November 2, 1992 resulting in a conviction on two of the counts in the criminal information, indecent assault and simple assault. The jury was unable to reach a verdict as to the remaining counts in the criminal information.

(4)  Thereafter the defendant filed post-trial motions, raising double jeopardy issues, which were denied by the trial court.

(5)  An appeal was filed by the defendant on March 17, 1994 and the judgment of the Court of Common Pleas was affirmed by the Superior Court on November 7, 1994.

(6)  On April 11, 1995 the Pennsylvania Supreme Court denied the defendant's petition for allowance of appeal and remanded the record to the trial court for trial on the remaining charges.

(7)  The retrial began on September 11, 1995, and on September 13, 1995, a jury found the defendant guilty of the offenses of rape, involuntary deviate sexual intercourse, aggravated indecent assault, and terroristic threats.[1]

(8)  On October 31, 1995, the defendant was sentenced to a prison term of 4-12 years for rape, concurrent terms for involuntary deviate sexual intercourse, and 1-24 months for simple assault, and a consecutive term of 6-12 months for terroristic threats.

(9)  An appeal from the judgment of sentence was filed to the Superior Court of Pennsylvania with the judgment of sentence being affirmed by the Superior Court on October 7, 1996.

(10)  Further findings of fact are separately discussed hereinafter emanating from the post-conviction proceeding and hearing thereon.

## DISCUSSION

The defendant initially filed his petition for post-conviction relief *pro se* raising various factors that he alleged emanate from ineffective assistance of trial counsel.  In the petition for post-conviction relief the defendant further requested the appointment of counsel, and thereafter the court appointed Attorney Joseph Semasek of the Public

---

[1] Prior to the defendant's second trial, the Commonwealth moved to nol pros the charges of kidnapping and unlawful restraint.

2

Defender's Office, directed that any amendments to the petition be made within a given time, and directed a response from the Commonwealth. Following an amended petition by PCRA counsel, and response of the Commonwealth, this court entered an order dismissing various allegations in the initial PCRA petition setting forth the reasons for those dismissals. That order entered January 9, 1998, is incorporated herein. Defense counsel then filed a subsequent amended petition on April 22, 1998, with the hearing before the court being limited to those issues not previously ruled upon by the court in our January 9, 1998 order.

The defendant alleges ineffectiveness of trial counsel in the following respects: in failing to file a suppression motion to exclude the defendant's admissions made to Trooper McAndrew both during a telephone interview and a personal interview the following day; that counsel failed to properly impeach the testimony of Trooper McAndrew regarding conflicting testimony involving notes taken during the interviews; by failing to secure exculpatory evidence in the nature of a coat worn by the victim at the time of the offense; by failing to secure expert testimony regarding the effects of drugs which the victim was using at the time of the incident; by failing to secure the handwritten notes of the investigating officer prior to trial; by failing to impeach the testimony of the prosecuting officers with regard to the identity of the defendant; and by failing to investigate the scene of the incident prior to trial. While there are other allegations set forth in the amended petition for post-conviction relief, no testimony was presented with regard to those additional issues.

To be eligible for post-conviction relief, an appellant must establish by a preponderance of the evidence that his conviction or sentence resulted from one or more

3

of the errors or defects listed at 42 Pa.C.S.A. §9543, and that the issues he raises have not been previously litigated or waived. 42 Pa.C.S.A. §9543(3). To establish an ineffective assistance of counsel claim, the defendant must demonstrate that the underlying claim is of arguable merit, that counsel's action or inaction was not grounded on any reasonable basis designed to effectuate the defendant's interest, and finally that the outcome of the proceedings would have been different but for the act or omission in question. **Commonwealth v. Travaglia**, 541 Pa. 108, 661 A.2d 352 (1995). The defendant bears the burden of proof of all three prongs of this standard. **Commonwealth v. Baker**, 531 Pa. 541, 562, 614 A.2d 663, 673 (1992). Counsel is presumed to have acted in his client's best interest and suggestions to the contrary are the defendant's burden to prove. **Commonwealth v. Miller**, 541 Pa. 531, 557, 664 A.2d 1310, 1323 (1995), (citations omitted). With these standards in mind, we turn to the allegation raised in defendant's petition.

Much of the argument presented by the defendant relates to the statements given to Trooper McAndrew and trial counsel's use of those statements. The defendant argues that trial counsel was ineffective for failing to have those purported statements suppressed, failing to properly impeach Trooper McAndrew for what defendant perceives as inconsistency in those statements, and for denying the defendant his right of confrontation because defense counsel did not secure the handwritten notes referenced by Trooper McAndrew. The record clearly demonstrates that the arguments with regard to those statements lack merit. Initially we note that in both trials defense counsel vigorously cross examined Trooper McAndrew with regard to making notes, especially notes from the initial telephone conversation with the defendant. By comparing the testimony of Trooper McAndrew in the first trial (N.T. pp. 189-192) and the second trial (N.T. pp. 319-330) it appears that there is little, if any, inconsistency at all. The defendant makes reference to

4

inconsistencies as to whether or not McAndrew made notes of the telephone conversation on the evening of November 10, and asserts that the testimony at the two proceedings is inconsistent. The testimony at the initial trial does not in any way state that the trooper did not take notes; rather Trooper McAndrew testified that he recalled specifically that the defendant said that the acts were consensual. During the second trial the trooper did say he may have taken notes, but that he did not maintain those specific notes after his police report was completed. Simply stated the disparity of that testimony here is minimal, if existent at all, and any further impeachment would not affect the outcome of the trial. This is especially so in light of the testimony of the victim. Counsel's examination for purposes of testing McAndrew's credibility as to the statement given over the phone was more than adequate by defense counsel.

The defendant's argument that the statement given to Trooper McAndrew should have been suppressed is likewise without merit. As noted in reviewing the standards for challenging the effectiveness of counsel, the defendant must demonstrate that the underlying claim is of arguable merit. It is clear from the record that the only inculpatory statement made by the defendant was made on the evening of November 10, 1992, where the defendant spontaneously stated to Trooper McAndrew that his encounter with the victim was consensual. The defendant failed to advance any legal basis for suppression of that statement. Initially we note that the phone conversation in which the statement was given was not under circumstances where the defendant was subject to custodial interrogation. **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The defendant did not present any evidence to suggest that trial counsel was ineffective for not having the statement suppressed, but argues that the trooper should not have been believed. That is not a suppression issue, but rather a credibility issue. Thus,

5

counsel could not have been ineffective for not filing a suppression motion, where, as here, no grounds for the suppression of the statement exist.[2]

The defendant also argues that counsel was somehow ineffective for not securing exculpatory evidence, in particular the coat worn by the victim. Defendant equates the fact that they did not have the coat with being denied exculpatory evidence. The record simply refutes this contention. The testimony of the prosecutors during trial clearly indicated that there were no markings or mud on the victim's coat, and thus the jury was well aware that some conflict existed between the testimony of the victim and the physical evidence of the coat. To try to argue that the defendant was denied that exculpatory evidence somehow suggests that preserving a coat which had no prosecutorial value is equivalent with preserving evidence which is exculpatory in its very nature. The testimony presented at trial as to the condition of the coat clearly favored the defendant, and maintaining the coat had no further value.

The defendant next argues that his trial counsel was somehow ineffective in failing to further impeach the victim and prosecutors as a result of his misidentification related to his first name. The crux of the argument is that because he was initially identified as Charles Ackerman, his attorney should have somehow challenged the affidavit of probable cause or further impeached witnesses because of the use of that name. That argument likewise lacks merit. What is clear from the transcript of both trials is that the victim clearly identified this defendant. The fact that the victim may have misidentified the first name of the individual involved is negated by actual sight identifications by the victim at the preliminary hearing and at both trials, as well as information provided that she

---

[2] In the defendant's supplemental brief, filed July 21, 1998, the defendant makes a rambling argument addressed to prior inconsistent statements of witness and their use at trial for impeachment purposes, but fails to address the issues at hand. In addition the defendant argues violations of mandatory discovery provisions which relate to notes that may have been made by Trooper McAndrew, but that simply did not exist following preparation of the police report. Counsel cannot be ineffective for failing to secure that which does not exist. The defendant was well aware of the content of the admission as it was contained in the affidavit of the probable cause attached to the criminal complaint.

scratched the face of the defendant, in an area which proved to be identical to the wounds found on Edward Paul Ackerman. To attempt to argue misidentification where there has been no misidentification, other than use of an improper first name, would not affect the outcome of the proceedings.

The defendant next asserts that trial counsel was somehow ineffective for failing to visit the immediate site of the incident prior to the first trial. Although some spurious comments were made by the defendant that in doing so his attorney could not effectively examine witnesses as to lighting and conditions on the field adjacent to the defendant's home, nothing was presented that demonstrated that trial counsel was not aware of those conditions. To the contrary, extensive testimony was elicited by trial counsel at both trials as to the surrounding conditions as well as the lighting available. Furthermore, nothing presented suggests that the defendant was incapable of making counsel fully aware of surrounding conditions. Clearly the defendant was fully acclimated with the surrounding area, he lived there. Nothing presented at this proceeding suggests that the trial counsel was ineffective by failing to go to the scene prior to the first trial, nor can the court envision that the area could not be adequately described to defense counsel by his client, in that nothing extraordinary existed with regard to those conditions.

Finally the defendant argues that his counsel was ineffective for not securing the services of a psychiatrist to testify as to the effects of the drugs that were being taken by the defendant at the time of the incident. The offer by the defendant was that such testimony would demonstrate that she could not have had the reactions to the drugs which she indicated, thus her credibility would be further questioned. Defense counsel had secured information with regard to the reactionary characteristics of the drugs which the victim was taking, and extensively examined medical witnesses as to the potential effects of those drugs. Furthermore, defense counsel testified, contrary to the testimony of the

7

defendant, that he was never instructed to secure the services of a psychiatrist.  We found the testimony of trial counsel to be credible.  Furthermore, the defendant failed to demonstrate exactly what such testimony might suggest.  We perceive little value in demonstrating to the jury by professional testimony, or otherwise, that the victim suffered certain physical reactions that were not noted contra indications to the drugs she was taking.  The defendant's claim lacks merit.

## CONCLUSIONS OF LAW

(1)  The defendant was not deprived of his right to representation by competent and effective prior counsel.

(2)  The defendant's prior counsel at all times relevant competently and effectively represented this defendant.  The claims made by the defendant and referenced in our January 9, 1998, Order lack merit, and thus are incorporated herein.

Accordingly, we enter the following.

**COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY**
**CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA     :   No. 84 - 1992
                                      :
                   vs.                       :
                                        :
EDWARD ACKERMAN,                     :
                        Defendant       :

Karen Byrnes Noon, Assistant District Attorney - for the Commonwealth
Joseph P. Semasek, Public Defender - for the Defendant

## ORDER OF COURT

STINE, J.

     AND NOW, this _31st_ day of ___August___, 1998, at _4:00_ _P_.M.,

the Defendant's Petition for Relief under the Post-Conviction Relief Act is DENIED.

                          BY THE COURT,

                             _____, J.

**COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY**
**CRIMINAL DIVISION**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : No. 84-1992 |
| | : |
| vs. | : |
| | : |
| EDWARD ACKERMAN, | : |
| Defendant | : |

**F I L E D**

JAN 0 9 1998

Stephen M Lukach
Clerk of Courts
Per _____

Karen Byrnes-Noon, Assistant District Attorney - for the Commonwealth
Joseph P. Semasek, Public Defender - for the Defendant

## ORDER OF COURT

STINE, J.

AND NOW, this _____9th_____ day of January, 1998, at ___10:00___ A.M., in accord with our Order of September 19, 1997, and upon consideration of the Defendant's Post-Conviction Petition, as supplemented by post-conviction counsel on December 10, 1997, and the Commonwealth's response thereto, it is hereby ORDERED that the following claims designated in the supplemented motion filed December 10, 1997, are dismissed for the following reasons:

1.      Ineffectiveness for defense counsel's failure to obtain DNA testing. The Defendant has failed to specify what exculpatory evidence was or may have been withheld, or to designate what may have been available for DNA testing. As presented at trial there was no testimony to suggest physical evidence for purposes of testing, nor was there a suggestion of the existence of evidence that could have been tested. The Defendant has failed to allege sufficient facts to support the claim. **Commonwealth v. Cottman**, 327 Pa. Super. 453, 476 A.2d 40 (1984).

2.      Commonwealth's failure to comply with discovery. The Defendant has failed to specify what exculpatory evidence was not made available. Testimony from

both trials indicate full disclosure.  The Defendant has failed to allege sufficient facts to support this claim.

      3.      Failure to produce notes.  The Defendant has failed to specify what notes the Commonwealth failed to produce.  References in the pro se petition to handwritten notes made by Trooper McAndrew were fully explained and not available for production.  All notes maintained by counsel appear to have been provided via discovery.  The Defendant has failed to allege sufficient facts to support the claim.

      4.      Failure to examine all statements of victim/defendant.  The Defendant has failed to specify what exculpatory evidence or what statements made by the victim or defendant that were not provided for examination.  The Defendant has failed to allege sufficient facts to support the claim.

      9.      Violation of Rule of Criminal Procedure 1405.  The provisions of the rule referenced by defense counsel were not in effect at the time of sentencing.  The effective date of the rule was July 1, 1996.  Furthermore, Defendant has failed to allege any prejudice as a result of the purported harm, and sentencing was completed within 60 days of the final verdict.  Furthermore, this issue has been fully litigated and addressed on appeal by the Superior Court of Pennsylvania, docketed at No. 4080PHL1993, dated October 7, 1996.

It is further ORDERED that a hearing on the issues raised in the Defendant's Petition in paragraphs 5 through 8 is scheduled for the **24th day of March, 1998, at 1:30 P.M.** in Courtroom No. 5, Schuylkill County Courthouse, Pottsville, Pennsylvania.

                           BY THE COURT,

                           _____, J.

**EXHIBIT K**

**ORDER OF THE
HONORABLE D. MICHAEL STINE
DATED 10/20/98**

**COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY**
**CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA       : No. 84 - 1992

vs.                                :

EDWARD ACKERMAN,                   :
                    Defendant      :

**FILED**

OCT 2 0 1998

Stephen M Lukach Jr.
Clerk of Courts

Per _____

Karen Byrnes Noon, Assistant District Attorney - for the Commonwealth
Joseph P. Semasek, Public Defender - for the Defendant

## ORDER AND OPINION PURSUANT TO PA.R.A.P. 1925

STINE, J.

AND NOW, this _20th_ day of October, 1998, at _10:30_ _A_.M., it is

hereby ORDERED that the Clerk of Courts of Schuylkill County shall transmit the

record, together with the Opinion of this Court, to the Pennsylvania Superior Court.

The Court's Opinion filed on September 1, 1998, is attached as the Trial Court Opinion

pursuant to Pa.R.A.P. 1925.

BY THE COURT,

_____, J.

CLERK OF COURTS OFFICE

1998 OCT 20  P 3: 25

SCHUYLKILL COUNTY, PA

**COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY
CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA     :   No. 84 - 1992

             vs.                   :

EDWARD ACKERMAN,             :

            Defendant       :

FILED

SEP 0 1 1998

Stephen M Lukach Jr
Clerk of cts.

F

Karen Byrnes Noon, Assistant District Attorney - for the Commonwealth
Joseph P. Semasek, Public Defender - for the Defendant

## OPINION OF COURT

STINE, J.

The matter before the court for consideration is the defendant's petition for relief under the Post-Conviction Relief Act, 42 Pa.C.S.A. §9541, *et seq.* An evidentiary hearing was conducted by the court, at which time the defendant was represented by counsel other than trial counsel. After careful consideration of the entire record and the applicable law, we are convinced that the defendant's petition must be denied.

We make the following **FINDINGS OF FACT:**

(1) The defendant was arrested on November 11, 1991, and charged with rape and related offenses.

(2) Following a preliminary hearing the defendant was held for court on these charges.

(3) The case was tried before this court and a jury from October 29 through November 2, 1992 resulting in a conviction on two of the counts in the criminal information, indecent assault and simple assault. The jury was unable to reach a verdict as to the remaining counts in the criminal information.

(4)  Thereafter the defendant filed post-trial motions, raising double jeopardy issues, which were denied by the trial court.

(5)  An appeal was filed by the defendant on March 17, 1994 and the judgment of the Court of Common Pleas was affirmed by the Superior Court on November 7, 1994.

(6)  On April 11, 1995 the Pennsylvania Supreme Court denied the defendant's petition for allowance of appeal and remanded the record to the trial court for trial on the remaining charges.

(7)  The retrial began on September 11, 1995, and on September 13, 1995, a jury found the defendant guilty of the offenses of rape, involuntary deviate sexual intercourse, aggravated indecent assault, and terroristic threats.[1]

(8)  On October 31, 1995, the defendant was sentenced to a prison term of 4-12 years for rape, concurrent terms for involuntary deviate sexual intercourse, and 1-24 months for simple assault, and a consecutive term of 6-12 months for terroristic threats.

(9)  An appeal from the judgment of sentence was filed to the Superior Court of Pennsylvania with the judgment of sentence being affirmed by the Superior Court on October 7, 1996.

(10)  Further findings of fact are separately discussed hereinafter emanating from the post-conviction proceeding and hearing thereon.

## DISCUSSION

The defendant initially filed his petition for post-conviction relief *pro se* raising various factors that he alleged emanate from ineffective assistance of trial counsel.  In the petition for post-conviction relief the defendant further requested the appointment of counsel, and thereafter the court appointed Attorney Joseph Semasek of the Public

---

[1] Prior to the defendant's second trial, the Commonwealth moved to nol pros the charges of kidnapping and unlawful restraint.

2

Defender's Office, directed that any amendments to the petition be made within a given time, and directed a response from the Commonwealth.  Following an amended petition by PCRA counsel, and response of the Commonwealth, this court entered an order dismissing various allegations in the initial PCRA petition setting forth the reasons for those dismissals.  That order entered January 9, 1998, is incorporated herein.  Defense counsel then filed a subsequent amended petition on April 22, 1998, with the hearing before the court being limited to those issues not previously ruled upon by the court in our January 9, 1998 order.

The defendant alleges ineffectiveness of trial counsel in the following respects: in failing to file a suppression motion to exclude the defendant's admissions made to Trooper McAndrew both during a telephone interview and a personal interview the following day; that counsel failed to properly impeach the testimony of Trooper McAndrew regarding conflicting testimony involving notes taken during the interviews; by failing to secure exculpatory evidence in the nature of a coat worn by the victim at the time of the offense; by failing to secure expert testimony regarding the effects of drugs which the victim was using at the time of the incident; by failing to secure the handwritten notes of the investigating officer prior to trial; by failing to impeach the testimony of the prosecuting officers with regard to the identity of the defendant; and by failing to investigate the scene of the incident prior to trial.  While there are other allegations set forth in the amended petition for post-conviction relief, no testimony was presented with regard to those additional issues.

To be eligible for post-conviction relief, an appellant must establish by a preponderance of the evidence that his conviction or sentence resulted from one or more

of the errors or defects listed at 42 Pa.C.S.A. §9543, and that the issues he raises have not been previously litigated or waived. 42 Pa.C.S.A. §9543(3). To establish an ineffective assistance of counsel claim, the defendant must demonstrate that the underlying claim is of arguable merit, that counsel's action or inaction was not grounded on any reasonable basis designed to effectuate the defendant's interest, and finally that the outcome of the proceedings would have been different but for the act or omission in question. **Commonwealth v. Travaglia**, 541 Pa. 108, 661 A.2d 352 (1995). The defendant bears the burden of proof of all three prongs of this standard. **Commonwealth v. Baker**, 531 Pa. 541, 562, 614 A.2d 663, 673 (1992). Counsel is presumed to have acted in his client's best interest and suggestions to the contrary are the defendant's burden to prove. **Commonwealth v. Miller**, 541 Pa. 531, 557, 664 A.2d 1310, 1323 (1995), (citations omitted). With these standards in mind, we turn to the allegation raised in defendant's petition.

Much of the argument presented by the defendant relates to the statements given to Trooper McAndrew and trial counsel's use of those statements. The defendant argues that trial counsel was ineffective for failing to have those purported statements suppressed, failing to properly impeach Trooper McAndrew for what defendant perceives as inconsistency in those statements, and for denying the defendant his right of confrontation because defense counsel did not secure the handwritten notes referenced by Trooper McAndrew. The record clearly demonstrates that the arguments with regard to those statements lack merit. Initially we note that in both trials defense counsel vigorously cross examined Trooper McAndrew with regard to making notes, especially notes from the initial telephone conversation with the defendant. By comparing the testimony of Trooper McAndrew in the first trial (N.T. pp. 189-192) and the second trial (N.T. pp. 319-330) it appears that there is little, if any, inconsistency at all. The defendant makes reference to

4

inconsistencies as to whether or not McAndrew made notes of the telephone conversation on the evening of November 10, and asserts that the testimony at the two proceedings is inconsistent. The testimony at the initial trial does not in any way state that the trooper did not take notes; rather Trooper McAndrew testified that he recalled specifically that the defendant said that the acts were consensual. During the second trial the trooper did say he may have taken notes, but that he did not maintain those specific notes after his police report was completed. Simply stated the disparity of that testimony here is minimal, if existent at all, and any further impeachment would not affect the outcome of the trial. This is especially so in light of the testimony of the victim. Counsel's examination for purposes of testing McAndrew's credibility as to the statement given over the phone was more than adequate by defense counsel.

The defendant's argument that the statement given to Trooper McAndrew should have been suppressed is likewise without merit. As noted in reviewing the standards for challenging the effectiveness of counsel, the defendant must demonstrate that the underlying claim is of arguable merit. It is clear from the record that the only inculpatory statement made by the defendant was made on the evening of November 10, 1992, where the defendant spontaneously stated to Trooper McAndrew that his encounter with the victim was consensual. The defendant failed to advance any legal basis for suppression of that statement. Initially we note that the phone conversation in which the statement was given was not under circumstances where the defendant was subject to custodial interrogation. **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The defendant did not present any evidence to suggest that trial counsel was ineffective for not having the statement suppressed, but argues that the trooper should not have been believed. That is not a suppression issue, but rather a credibility issue. Thus,

counsel could not have been ineffective for not filing a suppression motion, where, as here, no grounds for the suppression of the statement exist.[2]

The defendant also argues that counsel was somehow ineffective for not securing exculpatory evidence, in particular the coat worn by the victim. Defendant equates the fact that they did not have the coat with being denied exculpatory evidence. The record simply refutes this contention. The testimony of the prosecutors during trial clearly indicated that there were no markings or mud on the victim's coat, and thus the jury was well aware that some conflict existed between the testimony of the victim and the physical evidence of the coat. To try to argue that the defendant was denied that exculpatory evidence somehow suggests that preserving a coat which had no prosecutorial value is equivalent with preserving evidence which is exculpatory in its very nature. The testimony presented at trial as to the condition of the coat clearly favored the defendant, and maintaining the coat had no further value.

The defendant next argues that his trial counsel was somehow ineffective in failing to further impeach the victim and prosecutors as a result of his misidentification related to his first name. The crux of the argument is that because he was initially identified as Charles Ackerman, his attorney should have somehow challenged the affidavit of probable cause or further impeached witnesses because of the use of that name. That argument likewise lacks merit. What is clear from the transcript of both trials is that the victim clearly identified this defendant. The fact that the victim may have misidentified the first name of the individual involved is negated by actual sight identifications by the victim at the preliminary hearing and at both trials, as well as information provided that she

---

[2] In the defendant's supplemental brief, filed July 21, 1998, the defendant makes a rambling argument addressed to prior inconsistent statements of witness and their use at trial for impeachment purposes, but fails to address the issues at hand. In addition the defendant argues violations of mandatory discovery provisions which relate to notes that may have been made by Trooper McAndrew, but that simply did not exist following preparation of the police report. Counsel cannot be ineffective for failing to secure that which does not exist. The defendant was well aware of the content of the admission as it was contained in the affidavit of the probable cause attached to the criminal complaint.

scratched the face of the defendant, in an area which proved to be identical to the wounds found on Edward Paul Ackerman. To attempt to argue misidentification where there has been no misidentification, other than use of an improper first name, would not affect the outcome of the proceedings.

The defendant next asserts that trial counsel was somehow ineffective for failing to visit the immediate site of the incident prior to the first trial. Although some spurious comments were made by the defendant that in doing so his attorney could not effectively examine witnesses as to lighting and conditions on the field adjacent to the defendant's home, nothing was presented that demonstrated that trial counsel was not aware of those conditions. To the contrary, extensive testimony was elicited by trial counsel at both trials as to the surrounding conditions as well as the lighting available. Furthermore, nothing presented suggests that the defendant was incapable of making counsel fully aware of surrounding conditions. Clearly the defendant was fully acclimated with the surrounding area, he lived there. Nothing presented at this proceeding suggests that the trial counsel was ineffective by failing to go to the scene prior to the first trial, nor can the court envision that the area could not be adequately described to defense counsel by his client, in that nothing extraordinary existed with regard to those conditions.

Finally the defendant argues that his counsel was ineffective for not securing the services of a psychiatrist to testify as to the effects of the drugs that were being taken by the defendant at the time of the incident. The offer by the defendant was that such testimony would demonstrate that she could not have had the reactions to the drugs which she indicated, thus her credibility would be further questioned. Defense counsel had secured information with regard to the reactionary characteristics of the drugs which the victim was taking, and extensively examined medical witnesses as to the potential effects of those drugs. Furthermore, defense counsel testified, contrary to the testimony of the

7

defendant, that he was never instructed to secure the services of a psychiatrist. We found the testimony of trial counsel to be credible. Furthermore, the defendant failed to demonstrate exactly what such testimony might suggest. We perceive little value in demonstrating to the jury by professional testimony, or otherwise, that the victim suffered certain physical reactions that were not noted contra indications to the drugs she was taking. The defendant's claim lacks merit.

## CONCLUSIONS OF LAW

(1) The defendant was not deprived of his right to representation by competent and effective prior counsel.

(2) The defendant's prior counsel at all times relevant competently and effectively represented this defendant. The claims made by the defendant and referenced in our January 9, 1998, Order lack merit, and thus are incorporated herein.

Accordingly, we enter the following.

8

**COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY
CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA    :   No. 84 - 1992
                                  :
          vs.                     :
                                    :
EDWARD ACKERMAN,                  :
                       Defendant         :

Karen Byrnes Noon, Assistant District Attorney - for the Commonwealth
Joseph P. Semasek, Public Defender - for the Defendant

**ORDER OF COURT**

STINE, J.

     AND NOW, this __31ˢᵗ__ day of __August__, 1998, at __4:00__ __P__.M.,

the Defendant's Petition for Relief under the Post-Conviction Relief Act is DENIED.

BY THE COURT,

_____, J.

**COURT OF COMMON PLEAS OF SCHUYLKILL COUNTY**
**CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA   : No. 84-1992

                           vs.             :

EDWARD ACKERMAN,            :

                   Defendant    :

**FILED**

JAN 0 9 1998

Stephen M Lukach
Clerk of Courts
Per _____

Karen Byrnes-Noon, Assistant District Attorney - for the Commonwealth
Joseph P. Semasek, Public Defender - for the Defendant

### ORDER OF COURT

STINE, J.

    AND NOW, this _____9th_____ day of January, 1998, at ___10:00___ A.M., in accord with our Order of September 19, 1997, and upon consideration of the Defendant's Post-Conviction Petition, as supplemented by post-conviction counsel on December 10, 1997, and the Commonwealth's response thereto, it is hereby ORDERED that the following claims designated in the supplemented motion filed December 10, 1997, are dismissed for the following reasons:

    1.    Ineffectiveness for defense counsel's failure to obtain DNA testing. The Defendant has failed to specify what exculpatory evidence was or may have been withheld, or to designate what may have been available for DNA testing. As presented at trial there was no testimony to suggest physical evidence for purposes of testing, nor was there a suggestion of the existence of evidence that could have been tested. The Defendant has failed to allege sufficient facts to support the claim. **Commonwealth v. Cottman**, 327 Pa. Super. 453, 476 A.2d 40 (1984).

    2.    Commonwealth's failure to comply with discovery. The Defendant has failed to specify what exculpatory evidence was not made available. Testimony from

both trials indicate full disclosure.  The Defendant has failed to allege sufficient facts to support this claim.

      3.     Failure to produce notes.  The Defendant has failed to specify what notes the Commonwealth failed to produce.  References in the pro se petition to handwritten notes made by Trooper McAndrew were fully explained and not available for production.  All notes maintained by counsel appear to have been provided via discovery.  The Defendant has failed to allege sufficient facts to support the claim.

      4.     Failure to examine all statements of victim/defendant.  The Defendant has failed to specify what exculpatory evidence or what statements made by the victim or defendant that were not provided for examination.  The Defendant has failed to allege sufficient facts to support the claim.

      9.     Violation of Rule of Criminal Procedure 1405.  The provisions of the rule referenced by defense counsel were not in effect at the time of sentencing.  The effective date of the rule was July 1, 1996.  Furthermore, Defendant has failed to allege any prejudice as a result of the purported harm, and sentencing was completed within 60 days of the final verdict.  Furthermore, this issue has been fully litigated and addressed on appeal by the Superior Court of Pennsylvania, docketed at No. 4080PHL1993, dated October 7, 1996.

      It is further ORDERED that a hearing on the issues raised in the Defendant's Petition in paragraphs 5 through 8 is scheduled for the **24th day of March, 1998, at 1:30 P.M.** in Courtroom No. 5, Schuylkill County Courthouse, Pottsville, Pennsylvania.

                             BY THE COURT,

                          _____, J.

2

# EXHIBIT L

# JUDGMENT AND ORDER
# OF THE SUPERIOR COURT
# DATED 10/15/99

` J. S63028/99

COMMONWEALTH OF PENNSYLVANIA,  :  IN THE SUPERIOR COURT OF
  :  PENNSYLVANIA
          Appellee  :
  :
          v.  :
  :
EDWARD ACKERMAN,  :
  :
          Appellant  :  No. 1424 Harrisburg 1998

Appeal from the Order Dated August 31, 1998,
Docketed September 1, 1998, In the Court of
Common Pleas of Schuylkill County, Criminal
No. 84 of 1992

*J U D G M E N T*

*ON CONSIDERATION WHEREOF, it is now here ordered and
adjudged by this Court that the judgment of the Court of
Common Pleas of*   Schuylkill       *County be, and the same
is hereby* Affirmed.

*BY THE COURT:*

*PROTHONOTARY*

*Dated:*  October 15, 1999

J. S63028/99

COMMONWEALTH OF PENNSYLVANIA,  :  IN THE SUPERIOR COURT OF
                              :        PENNSYLVANIA
                    Appellee  :
                              :
              v.              :
                              :
EDWARD ACKERMAN,              :
                              :
                   Appellant  :    No. 1424 Harrisburg 1998

Appeal from the Order Dated August 31, 1998,
Docketed September 1, 1998, In the Court of
Common Pleas of Schuylkill County, Criminal
No. 84 of 1992

BEFORE:   DEL SOLE, EAKIN and BECK, JJ.

MEMORANDUM:                          **F I L E D** OCT 1 5 1999

Appellant Edward Ackerman brings this *pro se* appeal from the dismissal of his petition brought pursuant to the Post Conviction Relief Act, 42 Pa.C.S.A. §§ 9541-9546 (PCRA).   Appellant is currently serving a sentence of four to twelve years for rape, with concurrent terms for involuntary deviate sexual intercourse and simple assault, and a consecutive term of six to twelve months for terroristic threats.[1]  Judgment of sentence

---

[1] The rape occurred on November 10, 1991 in Nuremburg, Schuylkill County. A jury convicted appellant of simple assault and indecent assault in his first trial, in 1991, and was unable to reach a verdict on the other charges. The trial court then entered a mistrial on the other charges.  In a new trial in 1995, a jury found appellant guilty of the remaining offenses of rape, involuntary deviate sexual intercourse, aggravated assault and terroristic threats.

J. S63028/99

was affirmed by this Court in a memorandum filed on October 7, 1996. Appellant filed a timely petition for collateral relief on August 4, 1997, requesting appointment of counsel. After counsel filed an amended petition, the PCRA court dismissed certain of the petition's claims in an order dated January 9, 1998, and scheduled a hearing on the remaining issues. Counsel then, without leave of court, filed another amended petition that reiterated some of the matters previously addressed and adding other issues. Following an evidentiary hearing on May 22, 1998 (in which the court took evidence only on those matters not ruled upon in the January 9, 1998 order), the court dismissed the amended petition and this timely appeal followed.

Appellant raises seven issues in his appeal to this court. The sixth and seventh issues[2], not presented in appellant's petition and not addressed by the PCRA court, are waived. We therefore address only the remaining issues. The first three claims of error all allege ineffectiveness of trial counsel in relation to the testimony of trooper Francis V. McAndrew at trial. McAndrew, at the time of the criminal incidents in issue, was an investigator assigned to the Frackville barracks of the Pennsylvania state police.

To prevail in a claim of ineffectiveness, an appellant must demonstrate that the underlying claim is of arguable merit, that counsel's action or

---

[2] Alleging ineffectiveness of trial counsel for using appellant's work notes as a brief, and accusing PCRA counsel of conflict of interest.

J. S63028/99

inaction had no reasonable basis designed to effectuate the defendant's interests, and that he was prejudiced thereby.  **Commonwealth v. Travaglia**, 541 Pa. 108, 661 A.2d 352 (1995).  Counsel is presumed to be effective, and the burden is on appellant to prove otherwise. **Commonwealth v. Miller**, 541 Pa. 531, 664 A.2d 1310 (1995).  Appellant's argument is that trial counsel was ineffective for failing to have McAndrew's statement (about what appellant said to McAndrew on the telephone during the investigation), suppressed as inadmissible hearsay; failing to have McAndrew's statement in the affidavit of probable cause suppressed; and failing to obtain the handwritten notes of the statement.  As trial counsel explained at the PCRA hearing, he did try to have the statement suppressed on the basis of police failure to warn appellant of his rights, but he lost on that issue because the conversation was not a custodial investigation. Whether McAndrew gave inconsistent statements was a credibility issue, and the handwritten notes which appellant refers to simply did not exist.  N.T., 5/22/1998, at 32-33.

Appellant also accuses the PCRA court of error for not finding ineffectiveness of counsel because counsel did not find and turn over to him the notes about the alleged statement.  He also formulates the same issue as prosecutorial misconduct. Trial counsel testified that he turned over to appellant all the notes that he took during trial preparation. N.T., at 32-33. Appellant claims that the Commonwealth failed to give him the notes, but

-3-

J. S63028/99

there is no specific evidence that the notes existed. At trial, when McAndrew was questioned about the notes, he stated that he may have taken some notes on the conversation with appellant. He was then asked, "Do you have any of those notes?" and he answered "I don't believe so." N.T., 9/12/95, at 328. We find this insufficient to establish ineffectiveness of trial counsel.

Finally, appellant assigns error to the PCRA court for failing to have a hearing on DNA evidence. As the court explained in its January 9, 1998 order, the defendant "failed to specify what exculpatory evidence was or may have been withheld, or to designate what may have been available for DNA testing. The defendant has failed to allege sufficient facts to support the claim. *Commonwealth v. Cottman*, 476 A.2d 40 (Pa. Super. 1984)." Appellant's additional concise statements of matters complained of on appeal states that "Counsel failed to raise police destruction of exculpatory evidence. Said evidence was in the possession of police (see property receipt) and was destroyed." Without more, this claim must fail. Although appellant now refers in his brief to hairs recovered from a rape test performed on the victim, this specific issue was not properly preserved below. Finding no merit in any of appellant's claims of error, we affirm the order of the PCRA court.

Order affirmed.